Jake AYERS, Jr.; Bennie G. Thompson; Virginia Hill; B. Leon Johnson; Pamela Gipson, Individually and on behalf of All Others Similarly Situated; et al., Plaintiffs,

United States of America,
Plaintiff/Intervenor,

v.

Kirk FORDICE, Governor, State of Mississippi, W. Ray Cleere, Commissioner of Higher Education; Board of Trustees of State Institutions of Higher Learning, Diane Martin Miller, President, Nan McGahey Baker, Vice President, William S. Crawford, Frank Crosthwait, Ricki R. Garrett, Will A. Hickman, J. Marlin Ivey, James W. Luvene, J.P. "Jake" Mills, Carl Nicholson, Jr., Cass Pennington, Sidney L. Rushing, Members; Delta State University, Kent Wyatt, President; Mississippi State University, Donald W. Zacharias, President; Mississippi University For Women, Clyda S. Rent, President; University of Mississippi, R. Gerald Turner, Chancellor; University of Southern Mississippi, Aubrey K. Lucas, President; et al., Defendants.

No. 4:75CV009–B–O.

United States District Court,
N.D. Mississippi,
Greenville Division.

March 7, 1995.

Alvin O. Chambliss, Jr., North Miss. Rural Legal Services, Oxford, MS, Otis Berry, North Miss. Rural Legal Services, Lexington, MS, Callestyne Hall–Crawford, North Miss. Rural Legal Services, Greenwood, MS, Robert Pressman, Center for Law and Educ., Cambridge, MA, Armand Derfner, Charleston, SC, Solomon Osborne, Willie J. Perkins, Greenwood, MS, J. Clay Smith, Washington, DC, for private plaintiffs.

Laverne Younger, Judith Keith, John Moore, Craig Crenshaw, Jr., Franz Marshall, U.S. Dept. of Justice, Washington, DC, John R. Hailman, Felicia Adams, Asst. U.S. Attys., Oxford, MS, for government/intervening plaintiffs.

William F. Goodman, Jr., Paul Stephenson, III, William F. Ray, Watkins & Eager, Mike Moore, R. Lloyd Arnold; Allen Purdie, Office of Atty. Gen. State of Miss., Greg Hinkelbein, Atty. for Governor, Jackson, MS, for defendants IHL Bd. & State of Miss.

## TABLE OF CONTENTS

STATEMENT OF THE CASE .............................................. 1427
CONTENTIONS OF THE PARTIES ........................................ 1428
 A. DEFENDANTS ................................................... 1428

 B. UNITED STATES/PRIVATE PLAINTIFFS ........................... 1428

FINDINGS OF FACT

ADMISSIONS ....................................................... 1430
 A. CONTENTIONS.................................................. 1430
 B. OVERVIEW..................................................... 1430
 C. POLICIES AND/OR PRACTICES GOVERNING UNDERGRADUATE
 ADMISSIONS STANDARDS ...................................... 1431
 1. ACT CUTOFFS ............................................ 1431
 2. ACT CUTOFFS AND ALUMNI CONNECTION AS A BASIS FOR
 THE AWARD OF SCHOLARSHIPS ........................... 1433
 3. EXCEPTIONS ............................................ 1434
CONCLUSION: UNDERGRADUATE ADMISSIONS ......................... 1434
GRADUATE ADMISSIONS STANDARDS.................................. 1435
 A. OVERVIEW..................................................... 1435
 B. DISPARATE IMPACT ........................................... 1436
CONCLUSION: GRADUATE SCHOOL ADMISSIONS ........................ 1436
MISSIONS/ACADEMIC PROGRAMS ..................................... 1436
 A. CONTENTIONS................................................. 1436
 B. OVERVIEW..................................................... 1437
 C. UNDERDEVELOPED NON–UNIQUE INSTITUTIONS.................. 1437
 1. BACKGROUND ........................................... 1437
 (a) MISSION DESIGNATIONS ........................... 1438
 (b) ALLOCATION OF PROGRAMS ........................ 1439
 (c) ALCORN STATE UNIVERSITY (ASU) ..................... 1439
 (d) JACKSON STATE UNIVERSITY (JSU) ..................... 1440
 (e) MISSISSIPPI VALLEY STATE UNIVERSITY (MVSU) ....... 1440
 2. ACCREDITATION ......................................... 1441
PROGRAM DUPLICATION ............................................ 1441
 A. CONTENTIONS................................................. 1441
 B. OVERVIEW..................................................... 1441
 C. UNNECESSARY DUPLICATION ................................... 1441
 1. BACKGROUND ........................................... 1441
 2. HWIs VERSUS HBIs (Percentage of Duplication) ................. 1442
 3. UNIQUENESS............................................. 1442
 (a) JSU versus HWIs (Unnecessary Duplication) .................. 1442
 (b) ASU versus HWIs (Unnecessary Duplication).................. 1442
 (c) MVSU versus HWIs (Unnecessary Duplication) ................ 1443
 (d) HWIs versus HBIs (Percentage Of Unnecessary Duplication).... 1443
 D. PROGRAM INITIATION AND ELIMINATION ........................ 1443
 E. OFF–CAMPUS OFFERINGS/DESTRUCTIVE COMPETITION ........... 1444
CONCLUSION: PROGRAM DUPLICATION; ACCREDITATION; MISSIONS.... 1444
 A. DUPLICATION ................................................ 1444
 B. ACCREDITATION ............................................. 1445
 C. MISSIONS .................................................... 1445
NUMBER OF UNIVERSITIES ......................................... 1445
 A. CONTENTIONS................................................. 1445
 B. OVERVIEW..................................................... 1446
FUNDING POLICIES AND PRACTICES ................................. 1446
 A. CONTENTIONS................................................. 1446
 B. PREVIOUS FINDINGS: FUNDING................................. 1446
 C. FUNDING FORMULA ........................................... 1447
 1. INSTRUCTION ........................................... 1447
 2. RESEARCH ............................................. 1448
 3. PUBLIC SERVICE ........................................ 1448
 4. ACADEMIC SUPPORT..................................... 1448
 5. REMAINING FORMULA COMPONENTS....................... 1448
 D. FORMULA IMPACT ........................................... 1449
 E. OUTSIDE THE FORMULA FUNDING ............................. 1451
 1. LINE ITEM FUNDING....................................... 1451

 2. ENDOWMENTS ............................................ 1451
 F. EQUITY ................................................ 1451
CONCLUSION: FUNDING ............................................ 1452
FACILITIES .................................................... 1453
 A. CONTENTIONS ..................................... 1453
 B. OVERVIEW ........................................ 1453
 C. BACKGROUND ...................................... 1453
 1. FACILITIES/PROJECT FUNDING ....................... 1453
 2. PREVIOUS FINDINGS—CAPITAL IMPROVEMENTS FUNDING ................................................... 1454
 3. PREVIOUS FINDINGS—REPAIR AND RENOVATION FUNDING ................................................... 1454
 4. ALLOCATION OF FACILITIES RESOURCES TODAY ........... 1454
 D. QUALITY ......................................... 1456
 1. PREVIOUS FINDINGS ON "INSTITUTIONAL CHARACTER".... 1456
 2. ADDITIONAL FINDINGS ON "INSTITUTIONAL CHARACTER" .................................................. 1456
 E. LIBRARIES ....................................... 1456
 F. EQUIPMENT ....................................... 1457
 G. LAND ............................................ 1457
 H. FOOTBALL STADIUM ............................... 1457
 I. FACILITIES AND STUDENT CHOICE ................... 1457
CONCLUSION: FACILITIES ......................................... 1457
EMPLOYMENT .................................................... 1459
 A. CONTENTIONS ..................................... 1459
 B. OVERVIEW ........................................ 1459
 C. RACIAL IDENTIFIABILITY .......................... 1459
 D. FACULTY SALARIES ................................ 1459
 E. RANK AND TENURE ................................ 1460
 F. RECRUITMENT ..................................... 1460
 1. PREVIOUS FINDINGS—RECRUITMENT AND HIRING ......... 1460
 2. ADDITIONAL FINDINGS—RECRUITMENT AND HIRING ....... 1460
 3. QUALIFIED POOL ................................... 1461
 4. DEFENDANTS' EFFORTS IN MINORITY EMPLOYMENT ....... 1462
CONCLUSION: EMPLOYMENT ........................................ 1462
LAND GRANT ................................................... 1463
 A. CONTENTIONS ..................................... 1463
 B. OVERVIEW ........................................ 1463
 C. BACKGROUND ...................................... 1463
 1. RESIDENT INSTRUCTION ............................. 1464
 2. RESEARCH ......................................... 1465
 3. EXTENSION ........................................ 1465
CONCLUSION: LAND GRANT ........................................ 1466
CLIMATE ...................................................... 1466
 A. CONTENTIONS ..................................... 1466
 B. OVERVIEW ........................................ 1466
 C. RACIAL CLIMATE IN GENERAL ...................... 1466
 1. THE UNIVERSITY OF MISSISSIPPI .................... 1467
 2. MISSISSIPPI STATE UNIVERSITY .................... 1468
 3. THE UNIVERSITY OF SOUTHERN MISSISSIPPI.............. 1468
 4. DELTA STATE UNIVERSITY.......................... 1469
 5. MISSISSIPPI UNIVERSITY FOR WOMEN ................ 1469
 D. CONTINUING RACIAL IDENTIFIABILITY .............. 1469
 E. RETENTION ....................................... 1470
 F. STUDENT CHOICE AND THE HWIs ................... 1470
 G. STUDENT CHOICE AND THE HBIs ................... 1470
CONCLUSION: CLIMATE .......................................... 1471
GOVERNANCE/BOARD OF TRUSTEES................................... 1472
 A. CONTENTIONS ..................................... 1472
 B. BACKGROUND ...................................... 1472
 C. TODAY ........................................... 1473

CONCLUSION: GOVERNANCE ........................................... 1473
FAILURE TO PLAN/ASSESS ............................................. 1473
 A. CONTENTIONS .................................................. 1473
 B. OVERVIEW..................................................... 1473
CONCLUSION: FAILURE TO PLAN/ASSESS............................. 1474
ACCESS: COMMUNITY COLLEGES ..................................... 1474
 A. OVERVIEW..................................................... 1474
 B. BACKGROUND ................................................. 1474
CONCLUSION: COMMUNITY COLLEGES....:........................... 1475
ATHLETIC CONFERENCES ............................................. 1476
GRADUATE COUNCILS................................................. 1476
CONCLUSION: INTERACTION OF POLICIES AND PRACTICES FOSTER-
 ING SEPARATION OF THE RACES; THE SCOPE OF THE VIOLATION.... 1477
DEFENDANTS' PROPOSED REMEDIES ................................. 1477
ADMISSIONS ......................................................... 1477
 A. OVERVIEW..................................................... 1477
 B. PROPOSAL .................................................... 1477
 1. OVERVIEW ............................................... 1477
 2. SPRING PLACEMENT PROCESS ............................. 1478
 3. SUMMER PROGRAM ...................................... 1478
 C. IMPACT PROJECTED FOR NEW ADMISSIONS STANDARDS ......... 1479
 D. PROPOSED REMEDIES/ADMISSIONS............................. 1479
 1. PRIVATE PLAINTIFFS..................................... 1479
 2. UNITED STATES ......................................... 1480
 E. CRITIQUE: ADMISSIONS ....................................... 1480
CONCLUSION: UNDERGRADUATE ADMISSIONS ......................... 1481
MISSIONS ........................................................... 1483
 A. OVERVIEW..................................................... 1483
 B. PROPOSAL .................................................... 1483
 1. JACKSON STATE UNIVERSITY .............................. 1483
 2. ALCORN STATE UNIVERSITY ............................... 1483
 C. PROPOSED REMEDIES: MISSIONS .............................. 1483
 1. JSU: Private Plaintiffs.................................... 1483
 2. JSU: United States ...................................... 1484
 D. CRITIQUE: MISSIONS ........................................ 1484
 1. JSU.................................................... 1484
 2. ASU.................................................... 1484
CONCLUSION: MISSIONS ............................................. 1484
 A. JSU ......................................................... 1484
 B. ASU ......................................................... 1486
PROGRAM DUPLICATION ............................................. 1486
NUMBER OF INSTITUTIONS........................................... 1487
 A. OVERVIEW..................................................... 1487
 B. PROPOSAL: MERGER OF DSU AND MVSU ......................... 1487
 1. THE DECISION TO MERGE ................................. 1487
 2. CRITIQUE ............................................... 1487
 (a) Historical Precedent....................................... 1487
 (b) Fiscal Responsibility....................................... 1487
 (c) Size and Character of the Merged Institutions ................ 1488
 C. PROPOSAL: MERGER OF MUW AND MSU ......................... 1488
 1. THE DECISION TO MERGE ................................. 1488
 2. CRITIQUE ............................................... 1489
 (a) Background........................................... 1489
 (b) Impact on Desegregation ................................. 1489
CONCLUSION: NUMBER OF UNIVERSITIES ............................. 1489
CONCLUSIONS OF LAW .............................................. 1493
REMEDIAL DECREE................................................... 1494
ADMISSIONS ......................................................... 1494
MISSIONS ........................................................... 1494
APPENDIX ................................................. APPENDIX – 1496
 PRIVATE PLAINTIFFS ..................................... APPENDIX – 1496
 UNITED STATES......................................... APPENDIX – 1498

### MEMORANDUM OPINION AND REMEDIAL DECREE

BIGGERS, District Judge.

*Jarndyce and Jarndyce* drones on. The ... suit has, in course of time, become so complicated, that no man alive knows what it means. The parties to it understand it least; but it has been observed that no two lawyers can talk about it for five minutes without coming to a total disagreement as to all the premises. Innumerable children have been born into it; innumerable old people have died out of it. Scores of persons have found themselves made parties in Jarndyce without knowing how or why. The little plaintiff or defendant who was promised a new rocking-horse when Jarndyce should be settled, has grown up, possessed himself of a real horse, and trotted away into another world. Fair wards of court have faded into mothers and grandmothers; a long procession of judges has come in and gone out; thirty to forty counsel have been known to appear at one time; costs have been incurred to the amount of many thousands of pounds; there are not three Jarndyces left upon the face of the earth perhaps, but *Jarndyce and Jarndyce* still drags its dreary length before the court....[1]

More than a few parallels can be drawn between the cases of *Jarndyce* and *Fordice.* Although one is fictional and the other very real, and one involves the settlement of a family estate while the other requires a vast inquiry into the constitutional rights of a class of people as they relate to a system of colleges and universities, similarities do exist. Those parallels, while interesting to compare, are not relevant here, however, and better left for the reader who might so choose to draw for himself from the novel describing *Jarndyce*, cited above, and the opinions chronicling *Fordice*, cited below.

### STATEMENT OF THE CASE

This class action suit was instituted on January 28, 1975 against the Governor of Mississippi, the Board of Trustees of State Institutions of Higher Learning of the State of Mississippi, the Commissioner of Higher Education and other officials and the five historically white universities in the State of Mississippi. The class was certified by the court as:

> all black citizens residing in Mississippi whether students, former students, parents or taxpayers who have been, are or will be discriminated against on account of race in ... the universities operated by the said Board of Trustees.[2]

After years of settlement negotiations and discovery, a six-week trial took place from April 17 through June 1, 1987. On December 10, 1987, this court found that the State's policies in the field of higher education were race-neutral and ruled in favor of the defendants on all issues. *Ayers v. Allain,* 674 F.Supp. 1523 (N.D.Miss.1987). The plaintiffs appealed the court's ruling to the Fifth Circuit Court of Appeals where a divided panel reversed and remanded the cause for remedial proceedings. *Ayers v. Allain,* 893 F.2d 732 (5th Cir.1990). On rehearing *en banc,* the Fifth Circuit vacated the panel opinion and reinstated this court's findings of fact and conclusions of law. *Ayers v. Allain,* 914 F.2d 676 (5th Cir.1990). On April 15, 1991, the United States Supreme Court granted certiorari. *Ayers v. Mabus,* 499 U.S. 958, 111 S.Ct. 1579, 113 L.Ed.2d 644 (1991).

On June 26, 1992, the Supreme Court ruled that the State's adoption of race-neutral policies to govern its public higher education system, the *ratio decidendi* for this court's previous decision, did not go far enough in fulfilling the State's affirmative obligation to disestablish its prior *de jure* segregated system. Holding that dismantlement of the State's prior "segregative admission policy" is insufficient to find in favor of the State where "policies traceable to the *de jure* system are still in force and have discriminatory effects," *United States v. Ford-*

---

1. Charles Dickens, *Bleak House* (Norman Page ed., Penguin Books 1971) (1853).

2. *Ayers v. Allain,* 674 F.Supp. 1523, 1526 (N.D.Miss.1987).

*ice,* —— U.S. ——, ——, 112 S.Ct. 2727, 2736, 120 L.Ed.2d 575 (1992), the Supreme Court remanded this cause to this court to "consider the State's duties in their proper light" in determining whether or not the State has "met its affirmative obligation to dismantle its prior dual system." *Fordice,* —— U.S. at ——, 112 S.Ct. at 2743. "If policies traceable to the *de jure* system are still in force and have discriminatory effects, those policies ... must be reformed to the extent practicable and consistent with sound educational practices." *Fordice,* —— U.S. at ——, 112 S.Ct. at 2736.

In 1987, this court made extensive findings of fact concerning the higher education system of Mississippi. Without attempting to delineate "an exclusive list of unconstitutional remnants of Mississippi's prior *de jure* system," the Supreme Court identified "admission standards, program duplication, institutional mission assignments and continued operation of all eight public universities" as "constitutionally suspect policies ... of the present system." *Fordice,* —— U.S. at ——, 112 S.Ct. at 2738. Accordingly, this court's task on remand is to "examine, in light of the proper standard, each of the other policies now governing the State's university system that have been challenged or that are challenged ... in light of the standard" articulated in *Fordice. Id.*

On September 25, 1992 this court issued an order setting a status and scheduling conference for October 22, 1992.[3] In response to that order, the defendants unveiled their proposal for modification of the higher education system. After extensive settlement negotiations proved unfruitful, the trial of the case began on May 9, 1994.

One hundred and three witnesses whose testimony covered more than 11,000 pages of transcript were heard over the span of ten weeks, and approximately 60,000 pages of exhibits were admitted. On remand, the court has made additional findings of fact and conclusions of law pursuant to Fed. R.Civ.P. 52.

## CONTENTIONS OF THE PARTIES

As a point of departure, the court will initially set out the positions of the parties with regard to this court's previous undisturbed findings of fact, additional challenged policies on remand and, in general, the scope of these proceedings.

### A. DEFENDANTS

Essentially, it is the defendants' position that their liability has yet to be established and cannot now be established because its proposed system-wide reorganization has completely dismantled the prior *de jure* system to the extent educationally sound and practicable. Allegedly, that reorganization, the details of which will be thoroughly explored herein, has eliminated whatever segregative effects past policies and practices observed by the Supreme Court as "constitutionally suspect" might have had.

With regard to the additional challenged policies and practices on remand, as well as those that were challenged in 1987, the defendants' position is essentially that the issues raised by the plaintiff parties are either specifically precluded by this court's previous undisturbed findings of fact, or alternatively, now foreclosed by the decision in *Fordice.*

### B. UNITED STATES/PRIVATE PLAINTIFFS

The United States and the private plaintiffs do not share the same analytical approach to the policies and practices of Mississippi's higher education system that they contend is constitutionally deficient in most if not all aspects. However, their delineation of allegedly unlawful systematic policies and practices is in most material respects alike. With a few notable exceptions, addressed *infra,*[4] primarily their differences are con-

---

**3.** Included in this order was a request by the court that each party submit proposed remedies "to resolve the areas of the State's liability pursuant to the Supreme Court mandate." After submissions by all parties were received, it was apparent that substantial disagreement existed as to whether the State's proposed remedies cured

the "constitutionally suspect" areas identified by the Supreme Court.

**4.** According to the private plaintiffs, this cause is not confined to desegregating the university system of Mississippi. Rather, the private plaintiffs' seek to expand the judicial inquiry to a system-wide examination of policies and practices that

fined to the proper emphasis placed on the evidence adduced over the long history of this action.

In the area of agreement, the plaintiff parties' position may be summed up as follows: that the State of Mississippi is not now in compliance with the United States Constitution; that the State's proposed reorganization scheme will not eliminate the continuing segregative effects of past discriminatory practices traceable to the *de jure* era; and that the areas challenged in 1987 and not examined under the correct legal analysis, as well as additional areas challenged on remand, are further examples of policies and practices traceable to the *de jure* past that have continuing segregative effects and must be now eliminated or reformed to the extent educationally sound and practicable.

As identified in the pleadings, both the private plaintiffs and the United States allege that certain "aspects, features, policies and practices of the defendants are remnants of the *de jure* system, and are examples of racial discrimination carried out by the defendants." [5] Each plaintiff party separately identifies policies and practices that allegedly violate the law and while many of those identified are similar and in some cases, exactly alike, each of the policies or practices is treated below. The United States' submission both in the text and in the appendix attached hereto is identified by the characters "US" followed by the number of the alleged remnant/unlawful practice. The private plaintiffs' submission is identified by the letter/number combination employed in the pretrial order (example "A5."). Except where specifically noted, when referenced as a group, the historically white universities or institutions will be designated as "HWIs." The HWIs consist of the University of Mississippi ("UM"); The University of Southern Mississippi ("USM"); The Mississippi University for Woman ("MUW"); The University of Mississippi Medical Center ("UMMC"); Mississippi State University ("MSU"); and Delta State University ("DSU"). Except where specifically noted, when referenced as a group, the historically black universities or institutions will be designated as "HBIs". The HBIs consist of Jackson State University ("JSU"); Alcorn State University ("ASU"); and Mississippi Valley State University (MVSU"). Record citations will be abbreviated as follows: Trial on Remand Transcript—[witness] [page]; 1987 Trial Transcript—(1987) [witness] [page]; Trial on Remand Exhibits—[Party]X [no.]; 1987 Trial Exhibits—(1987) [party]X [no.].[6] The court will initially treat the alleged remnants and challenged policies and practices that coincide with the areas outlined by the Supreme Court in *Fordice.*

### FINDINGS OF FACT

In viewing the facts of this case, the court has attempted to be vigilant in viewing them as they affect the constitutional rights of persons, and avoid the easier but erroneous exercise of viewing colleges and universities as the entities whose rights are being litigated here. Since most of the testimony and the vast majority of the documentary evi-

discriminate against black students in any manner whether or not such policies also foster separation of the races. It is the theoretical approach to the issues raised in this action that distinguish the private plaintiff's case from that of the United States:

Plaintiffs' case has been characterized as a desegregation case, and it is that. But that is not all it is. The basic wrong at all times has been the State's operation of a public higher education system based on white supremacy. White supremacy produced racial discrimination against black people long before the specific method of segregation was devised and used. For example, white supremacy meant affording white people opportunities denied to black people. Nowadays, the policy and practice of racial discriminating still survives and is

more deeply entrenched than simply the method of segregation.
Pretrial Order 4(i).

5. Pretrial Order at 4(ii). "If any of the aspects, policies, or practices which we name are not traceable, then we nonetheless allege that they are discriminatory in purpose (and thus violate the Fourteenth Amendment) or discriminatory in effect (and thus violate the Title VI regulations)." Pretrial Order at 4(i). The United States simply designates many of the same allegations as "Contested Issues of Fact." Pretrial Order at 9(b).

6. Private plaintiffs' exhibits are designated as PX; United States' exhibits are designated as USX; Board of Trustees exhibits as BDX; MUW's exhibits as WX.

dence have pertained to the eight universities in the higher education system, it has often been perceived by some that this case is about rights of colleges and universities to equal funding, numbers of programs and quality of facilities; but the Fourteenth Amendment provides that "no state shall deny to any *person* the equal protection of the laws" (emphasis added). The Constitution does not provide educational institutions with constitutional protections. The remnants of *de jure* segregation have been mandated by the Supreme Court in *Fordice* to be identified by this court and analyzed as to educational soundness and practicality. The historically racially predominant colleges—both black and white—are remnants so identified herein; however, those institutions are relevant to this inquiry because they affect the constitutional rights of persons, not because institutions themselves possess constitutional protections. In applying the analysis mandated by *Fordice* to the facts of this case, the court has consistently viewed those facts in the light of how they affect persons and avoided any analysis based on the allocation of constitutional rights to the colleges and universities which, although understandably loved and revered by their respective alumni, are merely institutions created by state statutes.

## ADMISSIONS

### A. CONTENTIONS

The plaintiffs allege that the State is in violation of the law for failing to eliminate the effects of segregation as they pertain to the following areas: (1) the use of the ACT assessment instrument in determining undergraduate admissions; (2) use of ACT scores in determining entry to programs; (3) using ACT scores for awarding scholarships; and (4) institutional use of exceptions to the regular admissions requirements. The plaintiffs allege that the admissions standards also operate in connection with other factors to direct black students to the HBIs in this state.

### B. OVERVIEW

The court has previously addressed university entrance requirements in the opinion

issued after the 1987 trial. At that time, admissions standards for first-time entering freshman required completion of a specific high school core curriculum and achievement of a specified score on the American College Test (hereinafter "ACT"). Exceptions from this requirement were available for students failing to satisfy these standards; however, the numbers of students enrolling under such exceptions were limited by the institution affording the exception. *Ayers*, 674 F.Supp. at 1530–36, 1554–57.

In 1987, admissions standards differed among universities according to the historic racial identifiability of the institutions. In general, the HWIs required an ACT score of 15 for regular admission;[7] exceptions were limited to the greater of 5% of the preceding year's freshman class or 50 students for students attaining an ACT score of at least 9. The HBIs required an ACT score of only 13 for regular admission. ASU and MVSU allowed exceptions up to 10% of the university's total Fall enrollment for the previous year, while JSU allowed exceptions up to 8% of the previous year's freshman class for students attaining an ACT score of at least 9. No university in the system allowed admission, conditional or otherwise, for students attaining below a 9 on the ACT. *Ayers*, 674 F.Supp. at 1534–35, 1556. In 1987 this court observed that the ACT was a "highly relevant status report on student school achievement"; that "the ACT, as a standardized instrument, enables educators to assess uniformly the level of academic preparation of students graduating from high schools across the state"; that the ACT "provides information necessary for student placement and serves as a valid predictor of academic performance during the first year of college" and that both nationally as well as in Mississippi, African–American students "scored somewhat lower" on the ACT. *Ayers*, 674 F.Supp. at 1534, 1556.

The old ACT was administered for the last time in 1989. In the Fall of 1989, the ACT organization substituted the Enhanced ACT Assessment (hereinafter "EACT") for the ACT Assessment used in 1987. The ACT

---

**7.** As of 1987, MUW required a composite score of 18 on the ACT. BDX 234.

used in 1987 consisted of a battery of tests in the following four subject areas: English, mathematics, "social studies reading," and "natural sciences reading." The battery of tests under the EACT consists of English, mathematics, reading and science reasoning tests. Concordance tables were published by ACT for use by institutions in converting scores earned on the old ACT to the appropriate EACT score. As explained by the publishers, "[e]ach concordant value for the Enhanced ACT Assessment has—as nearly as possible—the same relative standing (percentile rank) in the national sample as does the corresponding score on the current ACT Assessment." ACT also provides an "estimated score interval" which reflects "the probable interval within which a student's score would have fallen if he or she had taken the Enhanced ACT Assessment instead of the current ACT Assessment." [8]

In October 1989 the Board of Trustees of State Institutions of Higher Learning (the Board) solicited recommendations from the eight universities with regard to new admissions standards based on the Enhanced ACT. Each HWI recommended use of an EACT score of 18 for regular admission, the concordant value of which under the old ACT score was approximately 15. Thus, the new admissions requirements at the HWIs remained substantially the same as those under the previous ACT. The HBIs, rather than recommend use of an EACT score of 17, with a concordant value of 13 on the old ACT, the score previously required by the HBIs for regular admission, recommended adoption of an EACT score of 15 for regular admission, the concordant value of 11 on the old ACT. Thus, in 1989 the HBIs, in effect, lowered their admissions requirements by this recommendation.[9]

For students classified as "high risk," UM, DSU and MSU recommended an EACT score range from 14 to 17, the concordant values of which ranged from 9 to 14 on the old ACT. USM requested a composite EACT minimum score of 16 for this classification of students, and MUW requested a minimum EACT score of 15. For high risk admissions, the HBIs recommended EACT scores ranging from 12 to 14, the concordant values of which ranged from 7 to 10 under the old ACT. Additionally, JSU increased its percentage of allowable high risk admittees from 8% to 10%. The Board approved all institutional recommendations. From 1990 to 1994, differential admissions standards persisted in the system, which as detailed above, basically utilized a version of the 1987 standards with various exceptions.[10]

## C. POLICIES AND/OR PRACTICES GOVERNING UNDERGRADUATE ADMISSIONS STANDARDS

### 1. ACT CUTOFFS [11]

The ACT test is designed to measure and evaluate the general educational development of a student at the particular time the test is taken. The prevailing view in education is that, while as a diagnostic instrument the ACT is a source of useful information, it is inappropriate to use ACT scores as the *sole* criterion for admission to an institution.[12] Other measurements of a student's potential, including high school grade point average (hereinafter "GPA"), rank in high school class and teacher evaluations, when used in conjunction with ACT scores are in general more highly correlated with college academic performance than a performance predicted by use of the ACT test score alone.[13] Analysis of enrollment data spanning the years 1988 through 1992 indicates that over 60% of the students enrolled at the HBIs scored below 15 on the ACT compared with approximately 85% of the enrolled students at the HWIs scoring above 15 on the ACT.[14] Of course, the 85% of students referred to in-

8. Anzalone 5725–26; 5733; BDX 227; 228; 233.

9. BDX 233–235; PX 16.

10. Anzalone 5736–43; BDX 233–235; PX 16.

11. Appendix B1; B2; B3; B8; B9; US24; US27.

12. Loewen 5156; Anzalone 5809; Hillard 9882.

13. Allen 4433–4434; Loewen 5167–5170.

14. USX 015; Allen 4456.

cludes both black and white students at HWIs.

White students continue to score consistently higher on standardized tests in general than black students. This phenomenon is present not only in Mississippi and other *de jure* states but also in non *de jure* states throughout the United States.[15] It is also generally recognized that Asians score higher on these tests than Caucasians. It is estimated that approximately 19% of black Mississippians who take the test score 12 or below. Regarding this phenomenon, the court has heard opinion that (1) for black students, it is not clear that ACT test scores accurately predict academic performance; (2) in general, test scores are not accurate predictors of performance for students from disadvantaged backgrounds; and, consequently, (3) the use of ACT cutoff scores has a negative effect upon access and educational opportunity to students from poor socioeconomic backgrounds. Regardless of whether the ACT is a flawed predictor of black student performance, the preponderance of opinion affirms that there is a clear correlation among success with standardized tests, the past degree of educational opportunity experienced by the test taker and preparedness for college work.[16] Finally, the average or mean ACT scores are increasing for both black and white Mississippians.

The court has heard extensive testimony regarding the various disparities in public school districts[17] throughout the state and the demographic makeup of those districts. The private plaintiffs contend that the State's discriminatory treatment of its black citizens pervasive during its prior *de jure* history has to some degree shaped the socioeconomic plight of those citizens and helped to contribute to the lesser degree of educational attainment of its black citizens. Previous state authorities had recognized this variance and during the *de jure* period in this state's history, instituted discriminatory policies accordingly.[18] As of 1994, however, the defendants had undertaken to correct the variance in ACT scores by race through such measures as participation in a mandatory College Preparatory Curriculum or "core."

At least since the 1980's, establishment of a prescribed "core" curriculum in high schools has become common throughout the country. Uniformly, the core consists of a battery of college preparatory courses designed to better prepare high school students for the college experience,[19] and has been described as providing "the informational basis for doing well in college generally, and for significant academic growth and development."[20] Not surprisingly, participation in the core is related and correlates to increased ACT scores.[21]

In Mississippi, the results of participation in the core are likewise consistent. In 1986, the first-year students completed the core as it now exists, and mean ACT scores increased and significantly so for minority stu-

15. Allen 4456.

16. Loewen 5196; Anzalone 5831–33; Allen 4453–57; Blake 4043–45; Hendericks 3762.

17. While no public school district was "on probation" at the time of trial, a number of school districts were in jeopardy of being placed on probation because of the acute shortage of science and math teachers. These shortages required many teachers to teach outside of the particular subject areas for which they were trained. Thompson 1192–93. At present, all public schools in Mississippi offer a College Preparatory Curriculum ("CPC"). BDX 222. To the extent that the quality of the core offered in Mississippi's primary/secondary schools differs by socioeconomic circumstance, the same affects both black and white students to the degree that they are poor. Allen 4560. To the degree that access to the university system is limited by the "quality" of the core offered at the primary/secondary school levels, blacks as a class are dispro-portionately affected, if at all by this condition, solely on account of the higher percentage of blacks versus whites below the poverty line.

18. The court will not again recite the history of the defendants' discriminatory application of the ACT cutoff scores as a means to exclude blacks from attendance at the HWIs. The same may be found at *Ayers*, 674 F.Supp. at 1530–31. *See also* Anderson 4866–70.

19. Anzalone 5747.

20. Allen 4464.

21. Correlation between the core and improved ACT scores may be seen by comparing the 1989 ACT scores of students taking the core with scores of students without the benefit of the core. Students participating in the core attained a composite mean ACT score of 19.8. Nonparticipating students registered a 17.2 composite mean ACT score. Anzalone 5770; BDX 255.

dents. While participation in the core has increased over time for both black and white high school students, over 40% of the ACT test takers today still indicate a lack of complete participation in the core.[22]

Addressing among other things the recognized disparity in college-going rates as between black and white Mississippians, in 1989 the Board developed a program known as "Project 95." As described by board members, Project 95 is a formal collaborative effort among the Institutions of Higher Learning (IHL) system, the community college system and the primary/secondary public school system. Dr. Charles Pickett, Associate Commissioner of Academic Affairs for the Board, a graduate of a historically black high school and a HBI, described Project 95 as a vehicle designed to bridge the gap between high school and college and to make more accessible to minorities higher education without weakening admissions requirements.[23]

### 2. ACT CUTOFFS AND ALUMNI CONNECTION AS A BASIS FOR THE AWARD OF SCHOLARSHIPS [24]

Board policy allows each institution to waive state non-resident fees for out-of-state students who wish to attend college in Mississippi by providing alumni scholarships, provided the applicant has a minimum ACT score of 21 and is the child of a nonresident alumnus. Evidence has been presented which shows a marked disparity in percentage awarded by race in any given year.[25] It is contended that because of the historical exclusion of blacks from the HWIs, and the statistical difference between ACT scores of blacks and whites, these restrictions on financial aid to students from other states discriminate against black student applicants.[26]

Additionally, the plaintiffs have pointed to numerous instances of institutional policies of the HWIs regarding use of an ACT cutoff score as the sole criterion for the award of academic scholarship monies.[27] It is contended that basing scholarship dollars on ACT cutoffs, set beyond the range of what most black students achieve on the test, eliminates this source of aid to black students and is educationally unsound because a student's overall academic performance is a more reasonable basis for making a decision about scholarship aid.[28]

---

**22.** Pickett 5950. In 1989, 51.3% of all ACT tested students in the state had completed the core curriculum. 48.6% of those tested indicated that they had not. Of the black ACT tested students in 1989, 51.8% indicated that they had completed the core as compared with 48.2% who had not. Anzalone 5770–71; BDX 255. Of the white ACT tested students in 1989, 51.2% indicated that they had completed the core as compared with 48.8% who had not. BDX 255. Participation in the core has gradually increased since 1989 overall. By 1993, the percentage of students taking the core increased to 58.3%. This percentage compares favorably with the rates of participation in the core nationally. Anzalone 5772. Black participation in the core increased to 55.1% by 1993. White participation also increased to 59.5% in that year. BDX 255.

**23.** Pickett 5943–44; 5957–64; BDX 203. Components of Project 95 include the following: retraining teachers in the primary/secondary school system as well as restructuring the training teachers now receive at the university level; the creation of a position on the board staff for a minority teacher recruiter; programs designed to increase minority enrollment in higher education such as "College Discovery" and "Career Beginnings," both of which bring high school students to participating college campuses for exposure to college life; financial aid workshops designed to communicate the sources of financial aid to communities throughout the state and to assist families in the financial aid application process.

**24.** Appendix B4; US25.

**25.** PX 299; PX 320–21; PX 323.

**26.** Allen 4569–72.

**27.** PX 299 (recipients of DSU's "Presidential scholarship" requires ACT minimum score of 26); PX 298 (MSU, MUW, UM, and USM scholarships based on minimum ACT scores as sole criterion for award).

**28.** Allen 4467–68. The poverty rate for black Mississippians exceeds that of white Mississippians. As of the 1990 census, 46.4% of black persons residing in the state were below the

### 3. EXCEPTIONS [29]

The number of "at risk" exception slots (available for students making below the required minimum ACT score) at the HWIs for the time period 1986–1992 was consistently lower than those available at the HBIs for the same time period.[30] While there is considerable evidence to indicate that the HWIs were disinterested in using the admissions exceptions available to them and, likewise, failed to publish those exceptions to the same extent as the HBIs [31] for the time period 1986–1992, the HWIs consistently used a substantial portion of the available exceptions to their minimum test score requirements.[32]

### CONCLUSION: UNDERGRADUATE ADMISSIONS

The court finds that the admissions standards that existed at the time of trial in 1987, although racially neutral on their face, were discriminatory when viewed under the legal standard established in *Fordice* and should be altered.[33] Moreover, Dr. Anderson, historian for the United States, amply supplied the factual predicate regarding the traceability of the ACT component of the 1987 standards [34] implicit in this court's initial ruling [35] and, thus, additional findings of fact regarding the traceability of those admissions standards are neither necessary nor useful. Likewise, the segregative effect of such differential admissions policies cannot be denied in view of their operation in a system of higher education where racially identifiable institutions provide essentially many of the same academic course offerings in identical or overlapping service areas. The defendants' current proposal seeks to eliminate this vestige of the *de jure* era, and it is clear that under the *Fordice* analysis the admissions standards have served to channel black students to the HBIs. It should be noted that the lower ACT requirements at the HBIs were put into effect by the Board only after recommendations by the HBI presidents, but it is the Board's responsibility to manage the higher education system in accordance with constitutional principles. The effect of the recommendations to the Board to key the entrance requirements at the HBIs lower than at the HWIs resulted in the "channeling effect" described in *Fordice*, —— U.S. at ——, 112 S.Ct. at 2739, and must now be remedied.

■ As noted earlier, the performance of Mississippi's black citizens on the standardized entrance tests is statistically lower than that of whites. While the court agrees with the defendants that it is not their obligation to remedy every societal ill which the plaintiffs can establish has a nexus to the *de jure* past, it is now clear that their duty does encompass eradication of the ACT cutoff score as a sole criterion for admission to the system when the ACT is used in conjunction with differing admissions standards between the HBIs and HWIs. That is not to say that the use of an ACT cutoff in all circumstances is unlawful however. Rather, its particular use in any circumstance must be examined to consider whether as a component of the policy challenged, the same is traceable to prior *de jure* segregation.

■ The Board's policy of allowing alumni scholarships to be based on ACT cutoffs and the use of ACT cutoff scores as the sole criterion for the receipt of academic scholarship monies has not been proven to have linkage with the *de jure* system, and there is

poverty line. As of 1992, 77.1% of black undergraduates in the system received federal Pell grants as compared with 28.9% of the white undergraduates. Accordingly, in general, black applicants to Mississippi universities are more likely to need financial aid than white applicants. PX 388; Allen 4568–69.

**29.** Appendix B5; B6; B7; US26.

**30.** PX 62; PX 63.

**31.** Allen 4577; (1987) Meredith 4565–66; (1987) Lucas 3467.

**32.** PX 64.

**33.** In reviewing the undisturbed findings of fact made by this court, the Supreme Court in connection with this issue found that: "[t]he present admission standards are not only traceable to the de jure system and were originally adopted for a discriminatory purpose, but they also have present discriminatory effects." *Fordice*, —— U.S. at ——–——, 112 S.Ct. at 2738–39.

**34.** Anderson 4866–69.

**35.** *Ayers*, 674 F.Supp. at 1530–31.

no evidence that these practices currently foster separation of the races such as influencing student choice.[36] Therefore, reformation of these policies cannot be ordered consistent with the law of the case, absent evidence of discriminatory purpose of which the court finds none. The use of ACT scores in awarding scholarships is widespread throughout the United States and generally viewed as educationally sound.

■ The court finds that the plaintiffs have failed to prove the allegation that the HWIs do not use their admissions exceptions "to a substantial degree." While true that the HWIs have not to the time of trial encouraged exceptions to their admissions requirements, neither use of nor the failure to use exceptions to the regular admissions requirements is traceable to the prior *de jure* system.

The State and other defendants have greatly improved access to the higher education system for minorities. In the age group 18 to 24, black enrollment in public higher education in Mississippi per thousand blacks in the population is higher than the national mean and black enrollment per thousand blacks in many non *de jure* states.[37] While the experts disagree as to the exact degree of black participation in the higher education system [38] and, thus, the effectiveness of those measures designed to increase black participation, there is no per se policy or practice of minimizing the participation of African–Americans in the system. As Dr. James Wharton pointed out, some states, California being one, have set the entrance requirements for their universities at a level which makes it very difficult for black high school graduates to gain admittance to any university. Conversely, institutions in Louisiana, a state having open admissions, suffer from a very high attrition rate resulting in students owing one, two or three years of college expenses and having little or nothing to show for it. Such students were admitted without having the preparation to do the college work.[39]

The question has been posed to the court whether blacks as a group should have the same statistical opportunity to be admitted to college as whites, as determined by the admissions policies.[40] To gain statistical parity there would have to be different admissions standards based on race. The court rejects that approach. As Dr. Wharton testified, in California Asians do significantly better than Caucasians on the entrance tests. Are the California policies discriminatory against the Caucasians since the Asians are admitted in higher percentages of applicants than the Caucasians? Should admissions policies to universities be set so that racial groups can be admitted in equal percentages of applicants?[41] The court must reject any such proposal as well as open admissions to universities.

Remnants outside of the admissions arena that may have a negative effect on black access to the system will be addressed elsewhere.

## GRADUATE ADMISSIONS STANDARDS [42]

■ Challenged for the first time on remand, it is the contention of the plaintiff parties that the use of standardized cutoff scores for entry into graduate programs at the HWIs is both traceable to the prior *de jure* system as well as currently producing segregative effects.

### A. OVERVIEW

Mississippi institutions began using the Graduate Record Exam or "GRE" in the

**36.** Nor may such an effect on student choice be presumed in light of institutional practices that set aside scholarship monies for blacks that likewise have high ACT cutoff requirements. *See* Rent 10541 (MUW Heritage Scholarships to black enrollees scoring ACTs of 18, 19 and 20); *see also* BDX 674 (ASU scholarship for minimum composite ACT score of 22).

**37.** BDX 298.

**38.** *Cf.* Wharton 8941–42; BDX 298 with Loewen 10236–241; PX 525.

**39.** Wharton 8949–51; 9188; 10791.

**40.** Wharton 9129–31.

**41.** Wharton 10797.

**42.** Appendix B10; US28.

1960s.[43] The GRE is a common diagnostic tool designed to measure a student's qualifications for graduate study, and in particular a student's verbal, quantitative and analytical abilities. There have been literally thousands of validity studies [44] on the ability of the GRE to predict performance in graduate school. The results of those tests indicate that GRE general test scores "are slightly to moderately predictive of graduate first-year grade point average." [45] In other words, GRE subscores have limited power to predict how well individuals will actually do in their first year of graduate school. As a result of these and similar studies, it has been determined that a student's undergraduate grade point average is consistently a better predictor of academic success in graduate school than GRE scores.[46]

## B. DISPARATE IMPACT

Studies indicate that black examinees score, on average, 129 scale points below white examinees on the verbal section of the GRE. The disparities on the quantitative and analytical segments are 152 and 151 scale points, respectively. Because of the limited predictive power of the GRE, use of an absolute cutoff score for admission to programs is strongly cautioned against by the makers of the test, the use of which will invariably lead to many classification errors in the admissions process. Many persons who are admitted will fail whereas many others excluded would have succeeded. The Educational Testing Service or "ETS" on behalf of the Graduate Record Examinations Board has published guidelines for the proper and appropriate uses of the GRE. Guidelines promulgated by ETS include strictures against using GRE scores as the sole criterion for admission into a program. The guidelines also recommend institutions to conduct validity studies in conjunction with the use of the GRE scores and advise against combin-

ing the three measures (verbal, quantitative and analytical) to determine the appropriate entrance requirements and, finally, caution against basing decisions on small score differences.[47]

## CONCLUSION: GRADUATE SCHOOL ADMISSIONS

Graduate School catalogs promulgated by UM, MSU and USM indicate various violations of the GRE guidelines ranging from aggregation of the three GRE subscores to the apparent use of GRE cutoff scores in the admissions process. The defendants have conceded through their witnesses that the catalogs may infer violations of ETS criteria and are misleading but maintain that, in actual practice, certain universities do not practice GRE subscore aggregation or use the GRE test results as cutoff scores for entrance to any particular program.

Institutional aggregation of test scores for admission criteria appears to have disparate impact upon blacks. Moreover, like the ACT, the announcement of a minimum cutoff score more likely than not affects student choice to some degree. While the defendants have denied institutional misuse of the GRE and other graduate admissions tests, they have undertaken to reform these policies and to modify their catalogs to reflect the proper employment of the GRE consistent with sound educational practice as reflected by the publisher's guidelines. Inasmuch as they have undertaken that duty, the court will order that completed within a specified period and the modifications presented to the Monitoring Committee, the creation and function of which will be described hereinafter, for review.

## MISSIONS/ACADEMIC PROGRAMS

### A. CONTENTIONS

The United States has raised as a remnant "[w]hether the defendants have perpetuated

---

**43.** Anderson 4900; Dingerson 7882.

**44.** Test validity refers to the extent to which a given assessment is actually measuring what it is designed to measure and the accuracy thereof. Haney 2903. The most common method of determining an assessment's validity is by studying how well the test or assessment actually predicted performance in the first year of the educa-

al program for which the assessment is designed. Haney 2903–04.

**45.** PX 86.

**46.** Haney 2899; 2904–05; PX 86.

**47.** Haney 2909–18; PX 86; PX 88.

segregation ... by deterring other-race enrollment in the traditionally black public universities through the assignment of institutional missions and scopes." The United States addresses the defendants' assignments of institutional missions together with funding, program duplication, land grant programming, facilities, employment, the number of universities and athletic competition as components of what they identify as "Policies and Practices Bearing Upon the Ability of the Historically Black Institutions to Attract Diverse Student Populations."

## B. OVERVIEW

In 1987 this court found that the differential mission designations were "rationally based on sound educational policies and are not violative of the Equal Protection Clause." *Ayers*, 674 F.Supp. at 1561. The standard articulated by the Supreme Court now requires the court to revisit that conclusion in light of the *Fordice* analysis and apply it to the various components that make up the system of higher education in Mississippi to which mission is closely tied. Previous findings of fact made by the court in 1987 remain relevant to this analysis and to that degree will be specifically reiterated.

## C. UNDERDEVELOPED NON-UNIQUE INSTITUTIONS [48]

The 1987 opinion set forth the historical development of each of the eight Mississippi universities. *Ayers*, 674 F.Supp. at 1526–28. Since this institutional history was incorporated into the court's 1987 opinion, it is easily available and will not be included herein; however, some historical information is necessary to put into perspective the rationale underlying the court's findings and remedies. A brief historical sketch of the development of each HBI to the degree relevant to the allegations of the plaintiff parties regarding the traceability of its underdevelopment is deemed necessary. Prior to that analysis,

however, the court will attempt to briefly describe the historical circumstances out of which these institutions developed in an effort to put into context the higher education institutional landscape as it exists today. The historical context is helpful in illuminating facets of the system in an effort to determine whether the same are vestiges of the prior *de jure* system.

### 1. BACKGROUND

The Mississippi Constitution of 1890 included a clause, known as the interpretation clause, which was designed to disenfranchise black Mississippians. The clause required potential registrants for voting to interpret a provision of the constitution chosen by the local registrars. The testimony of Dr. James Loewen was that the decline in educational opportunity for black Mississippians was directly tied to the interpretation clause. The less education members of the black population of the state possessed, the less their ability to properly interpret the state constitution and accordingly exercise the franchise.[49] A central premise of education of blacks after the establishment of ASU in 1871, was that blacks could only benefit from agricultural or mechanical training, rather than a liberal education that was provided for its white citizenry. Accordingly, after 1890, state appropriations for black education dropped dramatically. The State reduced appropriations for ASU during this period but the institution was nonetheless allowed to exist because of its emphasis on the teaching of agricultural skills rather than on providing a liberal education.[50]

In keeping with the design of restricting the educational opportunities of its black citizens, educational facilities for African–Americans—even primary and secondary schools—were scarce in Mississippi up until the 1940s–50s.[51] By 1952–53, although the black secondary school population in the state was larger than the white secondary school popu-

---

**48.** Appendix C12; US33; US45.

**49.** Loewen 5073–74.

**50.** Loewen 5075–76; 5082–89.

**51.** For instance, in 1928–29 less than 1% of the eligible black population was enrolled in high

school. By 1940, although approximately one-third of the white population had attended high school, less than 7% of the black population had achieved even this modest goal. Loewen 5086; Blake 4045–47.

lation, there were only approximately one-third as many black secondary school teachers as there were white teachers. Also during this time, most black high schools offered only one or two years of high school and approximately 69% of the black teachers were without a college degree.[52] The lack of qualified black school teachers is explained in part by the absence of black normal schools designed to educate and train teachers.

The State Normal School at Holly Springs, founded in 1873, was the first and only such institution designated for the training of black teachers in Mississippi but that institution was closed by Governor Vardaman in 1904. From 1904 until 1940, the State of Mississippi had no facilities designated for the training of black teachers. The lack of primary and secondary schools for black Mississippians also had a significant impact on black college-going rates during this time period. In 1940, while 5.5% of the white adults in Mississippi had attained a college degree, only approximately .3% of the adult black population had done so.[53] By 1925, white Mississippians could choose among five public institutions of higher learning. Black Mississippians had only ASU. Undoubtedly, the lack of institutions of higher learning for blacks was also significant in its impact on the black attendance rate in Mississippi during this period.[54] At the time of the Supreme Court's decision in *Brown*[55] in 1954, 10% of all college degrees awarded by state universities were earned by blacks,[56] although they comprised an estimated 45% of the population.[57]

## (a) MISSION DESIGNATIONS [58]

In 1965–66, the Board authorized role and scope studies whereby each university was requested to study its respective strengths and weaknesses and to make recommendations as to its development for approximately the next ten years. Additionally, the institutions were requested to submit recommendations for programmatic expansion during the ensuing period consistent with their identified strengths. In 1974, the board staff itself began a study of the role and scope of the eight institutions, the result of which was a document produced in 1977 which assigned the leadership positions in the system of higher education to only USM, UM and MSU.[59]

In 1981, the Board assigned missions to the various institutions of higher learning in Mississippi. A university's "mission" is that which defines the institution relative to all other institutions within the system. The Board designated MSU, UM and USM as "comprehensive" universities, a designation which implied that these institutions did and could offer the greater number and higher level of degree programs than the remaining institutions. *Ayers*, 674 F.Supp. at 1539. JSU was designated as an "urban" university whose emphasis was "oriented toward service of the urban community" of Jackson, Mississippi. *Id.* ASU, DSU, MUW and MVSU "received the designation of 'regional' Universities. The 'regional' designation signifies a more limited programmatic focus for these institutions, that is, each is expected to restrict course offerings to quality undergraduate instruction." *Ayers*, 674 at 1539–40.

The 1977 system study became the working document from which the 1981 Mission Statement was developed with only minor alterations. One difference between the role

52. Loewen 5095–96.

53. Anderson 4765; Blake 4045.

54. This fact may be illuminated by examination of ASU's enrollment in 1907 compared with the enrollment figure for 1940. In 1907, ASU's student's body consisted of only 460 students. By 1940, ASU's enrollment was only 455 students, a net loss of five students at the end of the thirty-three year period despite the fact that only one university was available to the African–American race during this time period. PX 164(n); PX 164(r).

55. *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

56. Blake 4025; 4027; Loewen 5096.

57. (1987) PX 200. (Percentage based on 1950 Census data.)

58. Appendix C1; US32.

59. Anderson 4771–72; 4791–92.

and scope document of 1977 and the Mission Statement of 1981 is the fact that JSU was designated as an "urban" university. The classification of ASU and MVSU as regional universities limited their offerings at the masters level. The 1981 Mission Statement had the effect of maintaining the status quo [60] with respect to programmatic offerings at JSU, MVSU, ASU, MUW and DSU and is consistent with the development of the institutions during the *de jure* period.[61]

In considering the programmatic scope of the universities and comparing the programs of the HWIs with those of the HBIs, it is perhaps easy to fall into the perspective that views fewer comparable offerings at a HBI as indicia of discrimination against black students who are enrolled or might later choose to enroll in the HBIs but, when viewed from the perspective of the Constitution, citizens are not deprived of equal protection of the law where an equal opportunity exists to attend either the more comprehensive HWIs *or* the less comprehensive HBIs and that opportunity is truly unfettered by vestiges of the past such as, *inter alia,* differential admissions requirements.

#### (b) ALLOCATION OF PROGRAMS [62]

The years 1945 through 1970 were marked by considerable expansion of the system and the period is sometimes referred to as the "college boom years." During this time period, college enrollment increased substantially at both the HBIs and the HWIs, although the lion's share of the state's higher education resources was received by the comprehensive institutions, particularly in the area of programmatic allocations. From 1949–59, approximately 40 doctoral programs were authorized, all of which were developed at USM, MSU, and UM. MSU and USM in particular experienced substantial growth during this time period.[63]

There were no master's degree programs offered at the HBIs in the state until 1951–52 when a master's degree program in education was established at JSU. There were no doctoral degree programs offered in the HBIs in the state until a doctorate in early childhood education was established at JSU. And although JSU gained an "urban" mission in 1981, further expansion into the doctoral arena was not encouraged because MSU, UM and USM were already performing those missions. As was true in 1987, there continues to be no professional programs at the HBIs in the state.[64]

Analysis of the time period 1966 to 1974 indicates the extent of programmatic expansion at the HWIs during this time proximate to the Board's role and scope studies in 1966 and again in 1974–77. From 1966–1974, no HBI offered a doctoral program whereas during this same time period, MSU increased its doctoral offerings from 26 to 35; UM from 18 to 28; and USM from 14 to 37. While ASU offered a master's degree program in 1966, none was available at that school in 1974. JSU experienced substantial growth at the masters level during this time period and increased its number of masters programs from 2 in 1966 to 23 by 1974. With the exception of UM, all HWIs also experienced substantial growth during this time period at the masters level.[65] Next follows a more detailed review of the institutional histories of Mississippi's HBIs.

#### (c) ALCORN STATE UNIVERSITY (ASU)

ASU is the oldest land grant college established for blacks in the United States. *Ayers,* 674 F.Supp. at 1527. Prior to its founding in 1871, there were no state institutions of higher learning that blacks could attend. Because of the political climate during the early years of reconstruction, ASU did rela-

---

**60.** *See* (1987) Meredith 4523–24 (The 1981 Mission Statement in effect "put boundaries around all institutions").

**61.** Anderson 4793, 4838; (1987) Meredith 4525.

**62.** Appendix C8–C11; D4; US41–US44.

**63.** Anderson 4751–54; 4757; 4913.

**64.** Anderson 4858–4860; (1987) Meredith 4516–17; *Ayers,* 674 F.Supp. at 1539.

**65.** DSU increased the number of its masters level programs from 1 to 13; MUW from 5 to 14; MSU from 43 to 68; and USM from 30 to 73. (1987) USX 490; USX 1.

tively well in its early years. Its first governing boards were composed exclusively of black persons and its annual appropriations from the state equaled the state appropriation for the University of Mississippi, the only other state institution for higher learning at that time. ASU received three-fifths (⅗) of the 1862 Morrill funds upon its founding and, although founded as the land grant counterpart to UM, ASU's function was primarily undergraduate teacher education. In 1875, the Democrat Party returned to power in Mississippi and ASU's fortunes began to wane. ASU's state appropriation for 1875 was reduced substantially and, by 1896, the governing board for the university was all white.[66]

ASU received substantial programmatic enhancement in the years following *de jure* segregation. Although offering only six undergraduate programs in education and several in the agricultural and mechanical arts during *de jure* segregation, ASU's academic structure now consists of seven divisions.[67]

Today, ASU offers thirty-four undergraduate programs, four masters programs, and one specialist degree.[68] ASU has currently 1700 acres, approximately 400 of which house academic facilities. The institution, classified as a regional university, enjoyed salary levels for associate and assistant professors higher on average than either DSU or MUW, its HWI regional peers, both in 1991–92 and again in 1992–93.[69]

### (d) JACKSON STATE UNIVERSITY (JSU)

JSU was acquired by the State of Mississippi in 1940 for the express purpose of providing a training school for black teachers for the black public schools in the state.

*Ayers,* 674 F.Supp. at 1528. Prior to its acquisition, JSU was "Jackson College," a private four-year institution founded in the 1880's. Jackson College was forced to move to its present location on Lynch Street in downtown Jackson in 1902 because of racial hostility at the site of the institution's former location in an area of Jackson near present day Millsaps College.[70]

Upon its acquisition by the State of Mississippi, Jackson College was downgraded to a two-year institution and its name was changed to Mississippi Negro Training School. By 1944, JSU had regained four-year status and its mission was broadened after 1954 to a liberal arts and sciences institution with graduate education in teaching.[71] From 1967 through 1984, JSU experienced "a tremendous period of growth." 674 F.Supp. at 1538.[72] Today, JSU offers thirty-four undergraduate programs, twenty-eight master's degree programs, five specialist degrees, and four doctoral programs.[73]

### (e) MISSISSIPPI VALLEY STATE UNIVERSITY (MVSU)

Located in the Mississippi Delta region near Itta Bena, MVSU was established in 1946 for the purpose of training black teachers for service in the rural and elementary black schools. MVSU also provided vocational training. *Ayers,* 674 F.Supp. at 1528. The institution, then known as Mississippi Vocational College, opened its doors in 1950. After its founding, its role initially was that of vocational training at the precollege level, a focus which gradually shifted to the status of an undergraduate institution with heavy emphasis on education and the production of teachers.[74]

---

66. Anderson 4762–64; 4956–57.

67. Those divisions are: the Division of General College of Excellence; the Division of Arts and Sciences; the Division of Business, the Division of Education and Psychology; the Division of Agriculture and Applied Sciences; the Division of Nursing and the Division of Graduate Studies. USX 383; Robinson 788–92.

68. USX 119; USX 127.

69. A. Johnson 1043; USX 33AA; Robinson 777–80.

70. Loewen 5085.

71. Anderson 4775–76; 4957; Loewen 5091.

72. Recitation of the programmatic expansion experienced by JSU in this time frame may be found at *Ayers,* 674 F.Supp. at 1538–39.

73. USX 119.

74. Anderson 4957.

In 1964, Mississippi Vocational College changed its name to Mississippi Valley State College and achieved accreditation for the first time in 1968. In 1974, the college was bestowed the name "University" by the legislature and became Mississippi Valley State University.

MVSU began offering graduate courses in 1976. As of 1974, MVSU offered the same number of bachelor's degree programs as DSU, the regional HWI 35 miles away, one more than MUW, and four to twelve more than JSU and ASU. MVSU presently only offers one post-baccalaureate level degree. While MVSU has been substantially reduced programmatically since 1974, the present number of programs it offers is comparable with that of one of its HWI regional counterparts, MUW. Today, MVSU offers nineteen undergraduate degree programs and one master's degree program.[75]

## 2. ACCREDITATION [76]

As of 1961, ASU, JSU and MVSU were not accredited institutions; however, today they all have attained accreditation. In 1992, ASU was given notice of several deficiencies in its teacher education programs relating to the areas of its library holdings, faculty and financial resources, but has retained its accreditation. Since 1980, with the possible exception of JSU, the overall percentage of programs accredited at all universities has increased substantially.[77] Today, all public universities are accredited by the Southern Association of Colleges and Schools (SAC) and none are currently on probation.[78]

## PROGRAM DUPLICATION

## A. CONTENTIONS

Phrased as the question "whether the defendants have since 1954 engaged in any actions which have the effect of increasing or

perpetuating racial separation among Mississippi public institutions of higher education, including, *inter alia,* the maintenance and operation of traditionally white institutions, or branches thereof, in close proximity to traditionally black institutions," as well as the "placement of academic programs," the inquiry into program duplication is closely related to the off-campus offerings issue.

## B. OVERVIEW

In 1987, the court rejected the plaintiffs' challenge to the duplicative offerings between proximate institutions. On remand, the plaintiffs again retained their expert in program duplication, Clifton Conrad, who presented essentially the same analysis as that which he presented in 1987. In 1995, the court again revisits this issue in light of the legal standard articulated in *Fordice.*

## C. UNNECESSARY DUPLICATION [79]

### 1. BACKGROUND

"Program duplication refers to those instances in which broadly similar programs are offered at more than one institution. A program is defined as *necessarily* duplicated if the presence of that program is essential for the provision of general education or specialized education in the basic liberal arts and sciences at the baccalaureate level. Program duplication and necessary duplication refer to the core programs, that is, programs that are considered to be essential.[80] Unnecessary duplication refers to those instances where two or more institutions offer the same nonessential or noncore program. Under this definition, all duplication at the bachelors level of nonbasic liberal arts and sciences course work and all duplication at the masters level and above are considered to be unnecessary." *Ayers,* 674 F.Supp. at 1540

**75.** (1987) USX 492; USX 127; USX 119.

**76.** Appendix B13; C7; US30.

**77.** (1987) USX 501; USX 130. *See also* Conrad 5487.

**78.** Anderson 4862; Robinson 743; 791; Whisenton 3352–53.

**79.** Appendix C14; US47.

**80.** Under Conrad's topology, "core" programs are those "essential to the provision of basic and specialized studies in the liberal arts and sciences. These [programs] have been at the hearts of the university not only since antiquity, but the founding of the Harvard College in 1636 in this country." Conrad 5277.

(emphasis added). The CIP (Classification of Instructional Programs) classification scheme in higher education superseded the HEGIS (Higher Education General Information Survey) classification scheme in the late 1980s. (Conrad's duplication analysis in 1987 was based on the HEGIS classification scheme.) In simplest terms, the CIP classification is the six-digit numerical designation that identifies programs offered in higher education.[81]

### 2. HWIs VERSUS HBIs (Percentage of Duplication)

By comparison of the programs identified by CIP designation throughout Mississippi's system of higher education, 77% of the programs offered at one or more of the three HBIs at the bachelors level are also offered or duplicated at one or more of the five HWIs; 83% of the programs offered at one or more of the HBIs at the masters level are duplicated at one or more of the five HWIs; and 60% of the programs offered at one or more of the HBIs at the specialists level are duplicated at one or more of the five HWIs. Finally, 25% of the doctoral programs offered at one or more of the HBIs are duplicated at one or more of the five HWIs. There is no duplication between the HBIs and the HWIs at the professional level because the HBIs offer no professional programs, i.e., programs in law, pharmacy, medicine, etc.[82]

### 3. UNIQUENESS

"Unique" programs are those not duplicated by another public institution in the system. Programs classified as unique under this definition need not be popular—only scarce.[83] Using this definition, JSU has four unique programs at the bachelors level; three unique programs at the masters level; two such programs at the specialists level and three unique programs at the doctoral

level. ASU has seven programs at the bachelors level and one unique program at the masters level which are not offered by any of the five HWIs. MVSU has three unique programs at the bachelors level when compared with the five HWIs and one at the masters level. "Meaningful uniqueness" has been defined as the presence of a reasonable number of high demand [84] noncore programs at one university that are unduplicated anywhere else in the system.[85] Using this approach to scrutinize program offerings, as a group, the HWIs have a large degree of programmatic uniqueness as compared with the HBIs as a group.[86]

### (a) JSU versus HWIs (Unnecessary Duplication)

At the bachelors level, sixteen out of seventeen CIP programs classified by Dr. Conrad as noncore that were offered at JSU are duplicated by one or more of the five HWIs. At the masters level, twenty-five out of twenty-eight noncore CIP programs offered at JSU are duplicated by one or more of the five HWIs. At the specialists level, three out of five noncore CIP programs offered at JSU are duplicated by one or more of the five HWIs. At the doctoral level, one out of the four CIP programs identified as noncore offered at JSU are duplicated by one or more of the five HWIs.[87]

### (b) ASU versus HWIs (Unnecessary Duplication)

At the bachelors level, eleven out of fifteen noncore programs offered at ASU are duplicated by one or more of the five HWIs. At the masters level, three out of four noncore programs offered at ASU are duplicated by one or more of the five HWIs. At the specialist level, the only noncore program of-

**81.** USX 145; Conrad 5244–45.

**82.** Conrad 5253–5260; USX 111; 112.

**83.** Conrad 5272; Pickett 6094.

**84.** Programs identified as "high demand" are those programs at any degree level in which at

least .2% of the nation's graduates receive their degrees.

**85.** Conrad 5273; 5297–99; USX 150.

**86.** USX 122–126.

**87.** Conrad 5290–92; USX 113; USX 119.

fered at ASU is duplicated by one or more of the five HWIs.[88]

### (c) MVSU versus HWIs (Unnecessary Duplication)

At the bachelors level, eight out of ten noncore programs offered at MVSU are duplicated by one or more of the five HWIs.[89] At the masters level, there is no duplication between the masters program offered by MVSU and the masters programs at the HWIs.[90]

### (d) HWIs versus HBIs (Percentage of Unnecessary Duplication)

By comparison of the programs identified by CIP designation throughout Mississippi's system of higher education, 40% of the bachelors programs identified as noncore offered at one or more of the three HBIs are unnecessarily (according to Conrad's classification) duplicated at one or more of the five HWIs; 83% of the masters programs offered at one or more of the HBIs are unnecessarily duplicated [91] at one or more of the five HWIs; 60% of the specialist programs offered at one or more of the HBIs are unnecessarily duplicated at one or more of the five HWIs; finally, 25% of the doctoral programs offered at one or more of the HBIs are unnecessarily duplicated at one or more of the five HWIs.[92]

## D. PROGRAM INITIATION AND ELIMINATION

The process for approval of new programs is as follows. First, a notification of intent is sent to the Commissioner of Higher Education by the institution, notifying him that it intends to develop a new program. Second, a formal proposal is developed and sent to the Board that includes justification for the program, faculty credentials of those expected to participate, the expected cost of the program and its possible duplication with other programs in the system. A conference between university officials and the board staff occurs, after which time the proposal goes before the Board along with the staff's recommendations of approval or disapproval. Finally, after consideration of the staff's recommendations, the Board votes to approve or disapprove the proposed program.[93]

"Unnecessary Duplication" as defined by the Board is the existence of two or more identical or very similar programs at two or more institutions at the same time where the programs are either not critical components of the mission of the institution or are without documented demand and/or documented need. Thus, teacher education programs offered at both JSU and USM are not unnecessarily duplicative since both are critical to the missions of each university (both having begun as teacher colleges) and also supported by a documented need in the state for teachers.[94]

By 1986, the Board had completed a comprehensive review of all programs offered at the institutions of higher learning in Mississippi. Approximately four hundred programs were eliminated throughout the system as unnecessarily duplicative according to the Board's definition. Thereafter, the Board initiated a program review process which, as currently practiced, operates essentially as follows: programs are flagged after enrollment or graduation rates drop below a certain figure predetermined by the Board; once enrollment drops below that preestablished level, the board staff consults with university officials at which time the university is given an opportunity to justify the program's continued existence in light of the noted deficiencies.[95] As a result of the program review process, there has been a net decrease system-wide of seventy-seven programs since 1987, but none have been elimi-

---

88. Conrad 5292; USX 113; USX 119.

89. USX 119.

90. USX 113; USX 119.

91. Any duplication at the graduate level is not essential or is "unnecessary" under Conrad's topology. Conrad 5282.

92. Conrad 5282–87; 5304; USX 118.

93. Pickett 5999–6000; BDX 390.

94. Pickett 6002–05. *See* USX 114 for identification of various teacher education programs classified as unnecessarily duplicative by Conrad.

95. Pickett 5953; 5988–89; BDX 391.

nated at a HBI because of low enrollment in the program.[96]

### E. OFF–CAMPUS OFFERINGS/DESTRUCTIVE COMPETITION[97]

Since 1987, JSU has had control of an attractive complex in Jackson formerly known as the Universities Center and now known as the JSU Graduate Center. Programs of other public universities offered there or in Jackson include (1) a fifth year of MSU's architecture program; (2) in-service public service training programs offered by USM as well as a small library science program; (3) a small graduate program in engineering; a doctorate in higher education and a paralegal program offered by UM; and finally (4) a "smattering" of unidentified courses offered by MUW.[98]

### CONCLUSION: PROGRAM DUPLICATION; ACCREDITATION; MISSIONS

### A. DUPLICATION

The Supreme Court noted that "[i]t can hardly be denied that such duplication was part and parcel of the prior dual system of higher education—the whole notion of 'separate but equal' required duplicative programs in two sets of schools—and that the present unnecessary duplication is a continuation of that practice." *Fordice,* —— U.S. at ——, 112 S.Ct. at 2727. As the higher education system exists today, duplication of programs among institutions continues to be pervasive; however, that is true of all systems throughout the country which have more than one university. Whether or not continuation of that duplication is educationally justifiable in light of the proposed revisions to the system, and after a *Fordice* analysis is conducted, is the question before the court.

■ Throughout the United States, duplicative course offerings between proximate institutions is a matter of concern in regard to fiscal irresponsibility and usually nothing more. Where duplication is by design as in

the former *de jure* states of the South, the fact that a degree of duplication among once racially exclusive institutions presently exists is not objectionable until and unless that duplication (1) is found to have segregative effects and (2) can be reformed "consistent with sound educational practices." *Fordice,* —— U.S. at ——, 112 S.Ct. at 2736.

■ A point to be noted initially is the similarity in the parties' definition of "unnecessary duplication." Both the plaintiffs' expert's definition of unnecessary duplication and the Board's approach to unnecessary duplication hinge in a sense upon core and noncore programs. The difference essentially is that the Board equates core with institutional mission, documented demand, and possible need. Such a notion of core programs immensely expands the scope of necessary duplication. Conversely, the plaintiffs' analysis is constructed upon a university framework remote in time from today's educational environment, and expands the field considerably so that nonessential or noncore programs include such highly desirable or high demand programs as elementary/secondary teacher education and business. Both analyses have their usefulness as well as their drawbacks in relation to approaching the issues involved in this cause.

The Board's approach to programmatic control and duplication is typical of that found throughout the United States[99] and, thus, could be characterized as an educationally sound "business as usual" approach to duplication. Under this approach, assuming the *de jure* dual curriculum has been dismantled, nothing more need be said or, more importantly, done. Conversely, the United States' approach, while having no meaning or use outside of a university system without both historically white and historically black universities,[100] more directly focuses upon issues relevant in this lawsuit, namely, what is and is not being offered at the HBIs and whether that which is has some chance of

---

**96.** Pickett 6002; 6078.

**97.** Appendix C20; US53–US54.

**98.** Cleere 8084–88. Commissioner Cleere has characterized all of these programs as "nonduplicative activities." Cleere 8084.

**99.** Conrad 5461–63.

**100.** Conrad 5459–60.

desegregating those institutions. As the United States' expert is first to acknowledge, analysis of duplication by CIP codes tells little of the internal makeup of programs such as program emphasis, quality, and/or the relative academic rigor of the program. Similarly, duplicative CIP programs at two universities may lead to an altogether different degree at each university.[101] As such, it is difficult to accept the proposition that Conrad's analysis actually yields an answer to the threshold question he himself poses: "[h]as this formally *de jure* curriculum system been dismantled?"[102] It is reasonable to conclude that (1) program emphasis (2) perceived quality and (3) degree sought play some role in student choice. Thus, standing alone, the extent to which these factors conspicuously distinguish programs at each university has some bearing on whether program duplication as it now exists promotes a racial choice of institutions. The duplication issue, however, does not stand alone and the element of differential admissions standards operating in conjunction with similar institutional offerings between the HBIs and HWIs, as the Supreme Court pointed out, raises a serious inference that this duplication continues to promote segregation.

## B. ACCREDITATION

There has been little evidence presented on the accreditation issue as it stands today. Dr. Anderson's opinion that the lack of program and institutional accreditation during the *de jure* period negatively impacted upon the prestige of the institution is clearly warranted from the historical record as well as consistent with other witnesses' opinions regarding this question. While it is obvious that the State of Mississippi was less than attentive to the HBIs during *de jure* segregation, there is no evidence that the State's previous failings in this regard persist into the present day. As noted earlier, since 1980 the percentage of programs accredited at all universities has increased substantially.

101. Conrad 5455.

102. Conrad 5460.

## C. MISSIONS

Regarding the mission designations, it is clear to the court that the present limited missions of ASU, MVSU and JSU are remnants of the past and that their position vis-a-vis the HWIs today was caused by the State's past educational policies and practices in a variety of ways.

The Supreme Court in *Fordice* observed that "[t]he mission designations have as their antecedents the policies enacted to perpetuate racial separation during the de jure segregated regime." *Fordice,* —— U.S. at ——, 112 S.Ct. at 2742. Moreover, "when combined with the differential admission practices and unnecessary program duplication, it is likely that the mission designations interfere with student choice and tend to perpetuate the segregated system." *Id.* As with the prior admissions standards, the Supreme Court indicated both the traceability of this practice[103] as well as the potential segregative effects that the differential mission designations continue to foster in Mississippi. To eliminate any doubt that the limited mission designations of the HBIs are the result of policies and practices traceable to the *de jure* past, the plaintiffs again presented testimony of numerous witnesses which, in detail, provides the factual predicate upon which traceability of this facet of the current higher education system is clearly established. The fact that two of the three HBIs are underdeveloped institutions by state design does not in and of itself lead to the conclusion that they currently foster separation of the races at the undergraduate level. Whether or not the Board's proposals eliminate the "likely" interference caused by the limited missions of the HBIs working in conjunction with pervasive program duplication and differential admissions standards will be addressed *infra.*

## NUMBER OF UNIVERSITIES

### A. CONTENTIONS

As noted earlier, the defendants contend that this alone is the only remnant of the

103. The traceable antecedents of the mission assignments of the various universities were pointed out by the Fifth Circuit in *Ayers,* 914 F.2d at 692.

past presently having segregative effects, without sound educational justification and in need of reforming. On this point there is at least common ground as to the traceability of the policy of maintaining eight universities.[104]

## B. OVERVIEW

The most emotionally charged issue in this case, the number of institutions the state has chosen to maintain, "in itself makes for different choices, particularly when examined in the light of other factors present in the operation of the system, such as admissions, program duplication, and institutional mission designations." *Fordice,* —— U.S. at ——, 112 S.Ct. at 2742. On this issue there are no additional findings of fact necessary to determine the traceability of the practice and, in the case of the geographical proximity of the institutions in the Delta, the segregative effects, when viewed in the context of the admissions standards, and the duplicative program offerings at those proximate institutions are also evident. Although the State now proposes to eliminate this vestige of the *de jure* past by moving to a six-university system, whether or not that proposal is mandated by the *Fordice* analysis will be reviewed within the context of the court's critique of the defendants' merger and consolidation proposal.

The plaintiffs' position on this subject throughout this litigation has been at times contradictory. On one hand, the Plaintiffs vigorously defend MVSU's bid for continued existence, a position which has some basis for argument[105] as a school for nurturing and supporting disadvantaged students, but one which on its face appears contradictory to the ends of student desegregation in the Delta. On the other hand, the plaintiffs also vigorously defend MUW's fight to remain a freestanding institution on the ground that the proposed merger of MUW and MSU will have no impact upon desegregation.[106] If MUW's continued existence as a part of the higher education system has no effect on desegregation, then the plaintiffs have no standing to urge that the Board's proposed merger of MUW and MSU be rejected by the court.

## FUNDING POLICIES AND PRACTICES [107]

### A. CONTENTIONS

On this issue, the plaintiffs have posed the question as follows: "[w]hether the State of Mississippi has allocated resources to the traditionally black institutions of a kind and degree sufficient to give them a realistic opportunity to attract white students." [108] The plaintiff parties allege that funding of the HBIs poses a barrier to their successful desegregation inasmuch as allocation of greater funding for the comprehensive universities equates with greater funding per full-time equivalent (FTE) student so enrolled, thereby effectively eliminating the HBIs as viable choices for attendance by white students and stigmatizing the HBIs as inferior institutions. The defendants continue to contend that the only sound educational basis for higher education funding is funding of universities based on what they do or are expected to do. Although the issue encompasses all sources of funding, the primary focus of the plaintiff parties is the funding formula employed by the defendant Board to distribute the funds allocated by the State for the purpose of financing the higher education of its citizens.

### B. PREVIOUS FINDINGS: FUNDING

It is the Board's responsibility to allocate the legislative general support appropriation

---

**104.** "Plaintiffs recognize that the issue of the number of institutions of higher education (senior and community colleges) to be operated is before the Court." Pretrial Order at p. 34.

**105.** Leslie 358 (merger inefficient from financial standpoint); Anderson 4971–72 (merger/closure of a HBI by the State of Mississippi analogous to their dependant status/uncertain future during *de jure* period); Allen 4554 (merger of HBI will have negative impact on access as well as stigmatic consequences); Loewen 10250 (negative impact on black student access); Conrad 10337 (negative impact on desegregation and equal opportunity).

**106.** Garrett 9560; Conrad 10338.

**107.** Appendix B3; C2; US34–US35.

**108.** United States Contested Issues of Fact at p. 24.

among the respective institutions. The general support appropriation does not include funds for capital improvements, the Mississippi Agricultural and Forestry Experiment Station, or the Mississippi Cooperative Extension Service. *Ayers,* 674 F.Supp. at 1546.

In previously concluding that "the funding formula does not treat the predominantly black institutions inequitably," the court based its finding on (1) the institutional groupings of the universities as reflective of their approximate funding needs; (2) the fact that during the time period 1981–82 through 1986–1987 departures from the formula allocation had benefited the HBIs; and (3) comparison of the funding for the HBIs with funding of institutions of like character within the region. *Ayers,* 674 F.Supp. at 1546–48.

## C. FUNDING FORMULA [109]

Developed in 1974, the funding formula in place at the time of the first trial is described in the court's previous decision at 674 F.Supp. 1546–47. In November of 1987, subsequent to the first trial, the Board adopted a new formula for funding institutions of higher learning. The formula consists of the following components: (1) instruction; (2) research; (3) public service; (4) academic support; (5) student services; (6) institutional support; (7) operation and maintenance of plant; and (8) scholarships and fellowships. The board staff requests funding for higher education twelve months in advance. Essentially, each formula component represents the following percentages of the total budget in FY 1994–95: (1) instruction 58.21%; (2) research 2.02%; (3) public service .60%; (4) academic support 9.43%; (5) student services 5.28%; (6) institutional support 10.34%; (7)

operation and maintenance of plant 11.05%; (8) scholarships and fellowships 3.07%.[110]

## 1. INSTRUCTION

The instruction component of the formula is derived in the following manner. First, the previous year's student credit hours produced by each university are totaled and divided by a predetermined standard to determine the FTE students that each university had during the preceding fiscal year. All undergraduate hours are divided by 30; graduate hours by 24. Once the division is made, the number of FTE students per university is derived. Next, to determine the number of FTE instructors a university has generated, a staffing ratio table is consulted.[111] The number of FTE students per discipline is calculated and the staffing ratio table determines the number of FTE instructors. Stated another way, FTE instructors per university are determined by the number of FTE students previously enrolled by discipline and level of instruction.[112]

After the number of FTE instructors are calculated, a faculty salary survey[113] is consulted to determine the average faculty salary in the region per discipline per institutional type. The total instructional salary budget is thus determined by applying the average faculty salaries derived from the survey to the total number of FTE instructors by discipline in each division, upper, lower and graduate. All universities are thus calculated and totaled for a figure that represents the total need for faculty salaries systemwide. To the total amount of faculty salaries is added an amount for fringe benefits. Calculated as a percentage of salary, the fringe benefits percentage changes yearly and is keyed to the current rate allowed other state

**109.** Appendix C3–C4; C6; US36–US37; US39.

**110.** Lott 7023; 7030; BDX 274; BDX 275.

**111.** Staffing ratios reflect the number of students per faculty member under the formula by discipline and level of study. Leslie 313. The staffing ratios that are currently in use today were approved by the Board in 1987 when the formula was developed. The staffing ratios were compiled from formulas then existing in five states, namely, Virginia, South Carolina, Georgia, Tennessee and Kentucky. Lott 7027; BDX 661.

**112.** Lott 7032–34.

**113.** Faculty salary levels for use in the formula are derived by consulting a salary survey published by the National Association of State Universities and Land Grant Colleges. The data contained in the survey reflects the current average faculty salaries prevailing in the region per discipline per type of institution, e.g., Doctoral I or Doctoral II institutions. Lott 7028; BDX 276.

employees. Finally, the instructional component includes an amount for departmental expense also calculated as a percentage of the total faculty salary amount. The amount budgeted for departmental expense is designed to cover departmental secretaries, faculty travel and instructional supplies and equipment.[114]

## 2. RESEARCH

The research component is separately budgeted and calculated as a dollar amount per doctorate degree awarded. Funding varies by discipline similar to the faculty salary discipline differences. That is, it is assumed that doctoral instructional costs vary by discipline. Research formula funding is provided only to the universities that award doctoral degrees.[115]

## 3. PUBLIC SERVICE

Funding for public service is provided as a base amount per university. Funding in this category is based upon the mission of the university as it existed at the time the formula was created. The base amount for the three comprehensive universities and JSU are the same. All other universities within the system receive a lesser amount.[116]

## 4. ACADEMIC SUPPORT

Academic support funding provided to each university under the formula consists of three components: staffing support, allocation for library holdings and an allocation for academic administration. The staffing support allocation is a base amount that varies among three institutional groupings: MSU, UM and USM receive the most as "comprehensive" universities; DSU and JSU as "Doctoral III" institutions are next in line followed by ASU, MUW and MVSU, as the three "regional" universities. The amount allocated to each institution for library hold-

ings is based on a 1986 system study which determined that the system should have approximately 5,400,000 volumes. A percentage of that projected amount is allocated to each university based upon the programs and enrollment of the universities as they then existed. The sum calculated for academic administration is a percentage of the three preceding formula components: instruction, research and public service. For fiscal year 1994-95, it is 9.1% of these categories.[117]

## 5. REMAINING FORMULA COMPONENTS

Funding for student services is calculated as a base amount per university and is set according to the mission of each school with the three comprehensive universities receiving equal amounts and the remaining five universities receiving more than the three comprehensive universities also in equal amounts. The adjustment the Board makes according to the size of the university is a recognition that the smaller institutions have less ability to support their intercollegiate athletics program. An additional amount is added for each university based on head count and FTE enrollment. Institutional support is calculated as a percentage of instruction, research and public service. For 1994-95 it is 17% of these categories.[118]

The operation and maintenance category consists of utilities and plant maintenance funding. Utilities are funded at the previous year's actual expenditures on gas, water and electricity. The plant maintenance component is allocated to the universities based upon their square footage in use. Square footage is funded differently at the universities depending upon the intensity of use.[119] Scholarships and fellowships are funded as a percentage of the general tuition income recognized in the self-generated component.

114. Lott 7034–35; BDX 276.

115. Lott 7036–37.

116. Lott 7037–38.

117. Lott 7038–39; BDX 275; 277.

118. Lott 7039–41; BDX 275.

119. Intensity of use is adjusted by adding equivalent square footage to campuses with lesser square feet per student such as JSU and USM. Campuses with above average square feet per student, like MUW and MVSU, are compensated at a lesser rate per square foot. An allowance is made for storage square feet and for the presence of historical buildings. Lott 7042.

For FY 1994–95, this category constitutes 10.72% of the general tuition income.[120]

After the total need (system-wide) is established by adding the amounts calculated under each of the eight components, from that amount is subtracted an amount representing the students' contribution through tuition or the self-generated category. The self-generated component of the formula in any given year is determined by calculating the general tuition for each of the eight universities and multiplying that total by the universities' FTE productivity and calculating that dollar value. Once that calculation is made (total estimated expected need minus student fees), the figure remaining will be the Board's net request to the legislature.[121]

## D. FORMULA IMPACT

The new formula differs materially from the previous one in several ways. First, whereas the old formula was cost based, that is, based on the actual expenditure per credit hour at each of the universities, the new formula, while not funding institutions according to their mission designations, funds the institutions by their size.[122] Second, under the old formula, the staffing ratios for doctoral courses were sharply differentiated from other post-baccalaureate hours. Pursuant to the new formula, the doctoral staffing ratio has been eliminated and all graduate work is now funded at the same level with no distinction made between masters, specialist or doctoral level courses. Third, whereas previously the amount of doctoral hours generated by the universities determined the amount of funding under the research category, currently research is funded by the number of doctorates produced by the university. Finally, under the new formula tuition has been standardized by institutional groupings, the three comprehensive universities having the largest tuition, JSU and DSU

having the next largest, and the remaining universities having the lowest.[123]

The most significant similarity between the present formula and the previous formula is that they are both instruction based. Because the level of student enrollments and the number of students enrolled are the major determinants of how much a university stands to receive under the formula, at what level and in what discipline students are enrolled markedly affect a university's funding. Formula funding in Mississippi makes the standard assumption made elsewhere in the United States that lower division (freshman/sophomore) course work is the least expensive to teach. Likewise, the staffing ratios assume graduate level instruction is the most expensive to teach and, accordingly, "appropriately reward[ ] the universities for teaching at the graduate level."[124] Thus, because the size of the university's enrollment determines the level of funding, the larger institutions with the highest percentage of upper level programs obtain the greatest amount of funding. This causes practically the same result as under the previous formula that funded by institutional mission designation.

The court finds the testimony pertaining to funding interesting and problematic in that it concentrates on the levels of funding at the various universities as if it is the institutions themselves which have the right not to be discriminated against by funding rather than the students who attend those institutions whose rights are in issue. An argument for equal funding of the institutions, regardless of the level of programs at the various institutions, does not adequately take into consideration that the number of black students attending the HWIs of the state is 44% of the number of black students attending the HBIs of the state, and the number is rising annually.

**120.** Lott 7041–42; BDX 275.

**121.** Lott 7043–45.

**122.** Lott 7021; Cruthers 7375–76. For instance, under the old formula, each institution received a predetermined amount for physical plant based upon its mission grouping. Now, however, funding for physical plant is geared to the amount of

a university's square footage. Likewise, student service monies are allocated according to the university's size of enrollment and faculty. Cruthers 7375–76.

**123.** Lott 7048–49.

**124.** Lott 7059–64.

The court also finds it noteworthy that when calculating the expenditures of state tax dollars on behalf of all students enrolled in higher education in the state—both at community colleges and universities—more dollars per student are expended for black students than white students. This factor is created by a higher percentage of white students than black students choosing to attend the lower cost community colleges for their first two years of college work.[125] Thus, in overall funding in college work, more state appropriations go per student to black students than white students because of the choices made as to where they enroll.

Since the formula was put into place in 1987, the three comprehensive institutions have consistently received approximately 70% of the State's appropriations for higher education. The actual effect of the implementation of the funding formula has been to "lock in" the institutions' positions vis-a-vis other institutions in the system to the point in time of their development that immediately preceded the implementation of the formula. Stated another way, when the formula was put into place in 1987, the institutions were funded according to how they existed at that time in terms of their existing missions, existing programs and so forth. The historical funding of each or any institution was not considered.[126]

The term "redundancy" refers to repetitiveness or duplication within the formula. The amount of redundancy within a formula is the measure to which certain components of the formula are rewarded more than once.[127] The degree of redundancy in the Mississippi formula together with its basic structural components works to the advantage of the Level I Comprehensive Universities in several ways. Because of the staffing ratios, the Level I institutions that have more graduate FTEs receive more resources under the formula. Likewise, because the Level I universities have the more expensive programs or "the programs that have the highest yields ... in terms of dollars," again, they receive more resources under the formula. Accordingly, the instructional salary budget is larger at the Level I institutions. Because the regional universities, including the HBIs, have the highest percentage of their students enrolled at the lower division, these institutions consistently receive less under the formula.[128]

An institution with a high ration of lower level students to upper level students, according to Dr. Lott, could increase its level of funding if the university retained those lower level students. For example, if JSU would increase its percentage of students remaining at JSU after their sophomore year from its present 38% to 45%, the formula would provide JSU with additional funding in excess of approximately $2 million per year.[129]

Another example of redundancy in the formula is the research component funding. Because research dollars are based upon the number of doctorates produced, again the Level I institutions with the largest number of doctorates produced receive more resources under the formula, another reward for being a level I university.[130]

Because funding for academic support as well as institutional support is calculated as a percentage of the previous three categories, again the Level I universities receive more resources simply by virtue of having larger amounts in the previous categories. The ef-

---

125. It is estimated that approximately 37% of the new enrollment in the state by black students are in the IHL system as compared to approximately 26% of first time white enrollment in the four-year system. Wharton 8949.

126. Sullivan 1232; Cruthers 7448.

127. Leslie 314–316.

128. Leslie 318–22. For instance, in FY 1993, USM has the lowest percentage of their actual course work taught at the freshman/sophomore level at approximately 38%. Ranked below USM is MSU and UM with approximately 39% and 47% of their enrollment taught at these levels, respectively. DSU's enrollment more closely approximates that of the white comprehensives at about 46% of its enrollment at these levels. At JSU, 62% of its productivity is at the freshman/sophomore levels. At ASU, MUW and MVSU, approximately 66% of their enrollment is at the lower divisions. Lott 7063; BDX 283.

129. Lott 7066–67; BDX 277; BDX 284; BDX 286.

130. Leslie 323; USX 49.

fects under the formula of being a Level I institution are thus compounded.[131] In the category of scholarships/fellowships, the Mississippi practice of gearing the allocation under the formula to a percentage of the amount of tuition charged is not unusual or peculiar to Mississippi. Such a calculation rests upon the standard assumption that the more tuition a university charges, the more it should receive in terms of student aid money. However, although the Level I institutions charge the highest tuition, in general, they have the largest proportion of their student body able to pay or having the least financial need than some of the other universities in the state, particularly the HBIs.[132] The current funding formula disregards all revenue sources flowing to the university that stem from private sources such as gifts and contracts.[133]

A nonresident fee provision has been recently added to the self-generated component of the formula. In simplest terms, this provision returns any nonresident tuition the university is able to generate to the self-generated expectation after the nonresident enrollment at the university exceeds 15% of its student body. UM and JSU traditionally have a larger percentage of nonresidents in their student bodies than any of the universities and, accordingly, have previously gained by their nonresident tuition charges. Under the new 15% rule, these universities stand to lose the most in terms of funding;[134] however, contrary to the plaintiffs' claims, the court finds no racial nexus to this rule.

## E. OUTSIDE THE FORMULA FUNDING [135]

### 1. LINE ITEM FUNDING

Mississippi provides additional funds for education through line item funding. Line item funding is provided by the legislature for specific activities and programs offered at one or more of the eight public universities. This form of funding is a substantial share of the total state appropriation for IHLs and contributes significantly to the quality of an IHL. Line item or "outside the formula" funding disproportionately flows to the HWIs. Evidence indicates that no HBI received state funding through this source until 1993.[136]

### 2. ENDOWMENTS

The primary contributors to an IHL's endowment are its graduates. Endowment funds are important financial resources for universities and the availability of such funds affects the overall quality of an institution and the educational experiences of its students. The endowments of the HWIs in Mississippi total approximately $115 million. By comparison, the endowments of the HBIs total approximately $5 million. One significant feature of endowment dollars is the flexibility by which the institution may use the funds.[137]

## F. EQUITY

As it concerns the pattern of funding from all sources for the HBIs during the *de jure* period, the following testimony by Dr. Anderson, the United States' historian provides the relevant background facts:

The first building program directed at a HBI was for ASU in 1925. In 1929, that building program was implemented when the State of Mississippi matched the General Education Board ("GEB")[138] appropriations for the university. The next significant building

---

131. Leslie 324; 326.

132. Leslie 325; *see* also BDX 289–93.

133. Cruthers 7454–55.

134. Lott 7031; 7053–56.

135. Appendix C5; US38.

136. Leslie 328–34; Lott 7167.

137. Lott 7168; Leslie 301–03; 398.

138. The General Education Board was established in 1902 for the purpose of furthering the development of education in the South. Southern states contractually obligated to the GEB by virtue of their receipt of funding from the foundation were required to maintain and submit periodic reports to the Board detailing, among other things, their educational budgets, enrollment, population and institutional development in order to justify funding requests and, in general, to keep the Board apprised of their educational efforts. Anderson 4737–38.

program for the HBIs took place in the early 1950s and was directed at all three HBIs.[139]

Growth in funding for the HBIs in the early 1950's was motivated at least in part by the Board's anticipation of the *Brown* decision. According to the plaintiffs' expert historian, the Board increased funding of the HBIs for the purpose of absorbing projected sharp increases in the number of college-bound black seniors in the state in an effort to preserve segregation. The major growth period in higher education in Mississippi occurred from 1945 until approximately 1970. As referred to previously, the "college boom years" delineates the era where the public institutions of higher learning in Mississippi developed into the structure that persists today in terms of the relative positions of the universities.[140]

Most of the monies spent by the State in higher education during this time period was invested in the HWIs. That investment included land, buildings or physical plant, permanent improvements and the allocation of FTE faculty positions and academic degree programs, particularly at the graduate and professional levels. At the start of Mississippi's college boom era, the University of Mississippi was the leading institution in the state. During this period, MSU and USM were transformed into major comprehensive research universities. By the end of the college boom era, USM and MSU had achieved approximate parity with UM.[141]

In terms of their shares of enrollment, FTE faculty positions and investments in land, buildings and equipment made by the State, the position of the HBIs is currently similar to that existing at the end of the *de jure* period. From 1960 until the present, greater funding has been provided to the HWIs as compared with the HBIs. During the same period of time, the HBIs have spent less per student than have the HWIs.[142]

By head count enrollment, in 1992, approximately 11,300 blacks attended a HBI in Mis-sissippi as compared with approximately 5000 blacks who attended a HWI. On a per student basis, state appropriations for black students at four-year institutions continued to lag behind state appropriations for white students at four-year institutions, primarily because of the reasons previously described. By 1992, however, because more black students were enrolling in HWIs and more white students were similarly enrolling in HBIs, the percentage difference in state appropriations between the races declined;[143] however, as previously noted, when comparing state appropriations for both community colleges and universities, black students receive more on a per student basis than white students. The analysis of state expenditures on a per student basis according to race is a more valid measure of whether discrimination exists in state funding than is a comparison of funding between institutions, each of which has both black and white attendees, as long as there is an unfettered choice by the students of which university or community college to attend.

## CONCLUSION: FUNDING

■ The plaintiffs do not contend that the funding formula currently used in Mississippi, either in its entirety or by individual component, is educationally unsound. They do contend, however, that funding under the formula continues the perpetuation of the historic missions of the HWIs. In fact, the financial impact of formula funding on the universities and the universities' missions are practically inseparable. And while the comprehensive universities no longer have a racial component to their mission assignments, the current size and scope of their missions are likewise closely tied to Mississippi's *de jure* past. Were all other things equal, no issue would exist on this subject inasmuch as it is educationally sound to fund institutions according to the missions they fulfill in the State's system of higher education. The funding formula does not operate on a "clean slate," however, and the historical disparity

139. Anderson 4901.

140. Anderson 4908; 4751–52.

141. Anderson 4752–4754; 4976.

142. Anderson 4975; Leslie 281–85.

143. Leslie 426; 287–290; USX 33dd.

in funding between the HWIs and HBIs once practiced by law persists through perpetuation of the status quo as it existed then.

Current policies and practices governing funding of institutions are lawful. There is no per se funding policy or practice traceable to the *de jure* era. Attainment of funding "equity" between the HBIs and HWIs is impractical and educationally unsound. It can neither be attained within our lifetime nor, as Dr. Siskin and others pointed out, does it realistically promise to guarantee further desegregation given the present institutional landscape.[144] The testimony showed that the formula is largely geared to funding the students without consideration of race at whichever institution the students choose to attend and at the program level the students choose. Accordingly, the court finds that the funding formula should not be altered.

### FACILITIES

#### A. CONTENTIONS

"Whether vestiges of the State operated racially dual system of public higher education remain in the State of Mississippi, particularly with respect to ... construction and maintenance of physical facilities."[145]

#### B. OVERVIEW

In its previous opinion, 674 F.Supp. at 1561, this court found no "racially discriminatory pattern existing with respect to the allocation and condition of facilities when measuring facility resources by the amount of net square feet per full-time equivalent student." That finding was based upon a comparison of the institution's share of enrollment with that of the institution's proportionate share of state appropriations for capital improvements. Acknowledging that "there is a need for repair of facilities at the historically black institutions," based on the evidence before it, this court found no difference in the degree of that need among all institutions. *Id.* at

1562. What follows are additional findings of fact with regard to the facilities issue.

#### C. BACKGROUND

##### 1. FACILITIES/PROJECT FUNDING

One aspect of the State's decision-making authority regarding facilities is exercised through the allocation of money. Two sources of funding for facilities are legislative appropriations and self-generated funds. Self-generated funds provide resources for capital improvements as well as for repair and renovation and include federal grants and loans provided through the Educational Building Corporation[146], as well as private donations and gifts. Self-generated funds are a significant source of revenue of the institution for the improvement of facilities.[147]

The three general categories of facilities expenditures in Mississippi are capital improvement expenditures, repair and renovation expenditures, and operations and maintenance funding. Capital improvement expenditures add usable space to a campus; repair and renovation projects improve existing space; and operation and maintenance expenditures are routine expenditures necessary to keeping existing facilities operating and maintained properly. Operation and maintenance allocations are made as part of the regular formula funding process. An institution's operation and maintenance budget is based upon the amount of square feet each institution is responsible for maintaining. Each institution has control over its operation and maintenance monies and is expected to maintain its campus with those monies. Campus landscaping and grounds maintenance monies are derived from the university's operation and maintenance budget. In the field of facilities maintenance, capital improvement and repair and renova-

**144.** Sullivan 2300–01.

**145.** United States Contested Issues of Fact No. 2(g).

**146.** The Educational Building Corporation is a corporate financing mechanism that provides fa-

cilities monies not available otherwise. The corporate entity may borrow money directly or issue its own bonds. Bowman 6595.

**147.** Bowman 6594; Kaiser 965.

tion, Mississippi has a decentralized system with a high degree of institutional autonomy.[148]

Typically, a capital improvement or repair and renovation project undergoes three phases: (1) the funding phase; (2) the design phase; and (3) the construction phase. The funding phase involves the search for money. Funding for such projects is generally provided by either the institutions' self-generated funds or through legislative appropriation. At the lowest level in the process, the institution identifies a need by way of an annual assessment whether the need is in the nature of new construction or the renovation of existing construction. The institution outlines a brief description of the project, together with a preliminary estimate of its cost, and submits the proposal to the board office. The Board processes many such proposals in a year.[149] Institutions prioritize their requests and the Board in turn considers and further prioritizes the items requested for presentation to the legislature as a system-wide proposal. When the legislature approves a construction or repair/renovation project, the item is funded by line item appropriation with a specific amount restricted to each project.[150]

After the funding phase is complete, the design phase of the construction project follows. The institution selects the design team of architects and engineers responsible for the project's completion. If the project is funded from self-generated funds, the final decision for awarding the design contract is made by the university. The institution's administration, after consulting with the design professional selected, chooses the location of the proposed building. The design phase is at an end when a complete set of plans and specifications have been developed, submitted by the institution to the Board,

approved by the Board and advertised for bids. The final phase is the actual construction of the facility after awarding the contract. At this time the contractor moves to the site and construction begins. After the project is completed to the satisfaction of the institution it is formally accepted and turned over to the institution for use.[151]

## 2. PREVIOUS FINDINGS—CAPITAL IMPROVEMENTS FUNDING

From 1964–65 through 1984–85, FTE enrollment in the system "nearly doubled." This growth in enrollment "was accompanied by a substantial increase in campus space and plant improvement." *Ayers*, 674 F.Supp. at 1548. When viewed in the context of enrollment figures at the IHLs, the state disproportionately provided funding to the HWIs "in the early years" of this period. *Id.* When viewed by percentage of enrollment, however, the HBIs "having only approximately 25% of the total system-wide enrollment ... received 39% of the state appropriations from 1970 through 1980 for new construction, and from 1981 through 1986 received 51% of such funds." *Id.* at 1549.[152]

## 3. PREVIOUS FINDINGS—REPAIR AND RENOVATION FUNDING

"During the period 1981 through 1986, the state building commission allocated over 30% of all major repair and renovation appropriations to the predominantly black institutions." *Ayers*, 674 F.Supp. at 1549.[153]

## 4. ALLOCATION OF FACILITIES RESOURCES TODAY

From 1981 until 1994, HBIs averaged 22% of the enrollment in higher education system-wide but obtained 32% of the total funding available for capital improvements. Since

---

**148.** Bowman 6605–07; 6624; Lee 1517; Curry 6666.

**149.** By way of illustration, in 1993 the Board received requests totaling approximately $300 Million. Bowman 6592.

**150.** Bowman 6591–93; 6597–98.

**151.** Bowman 6599–6004.

**152.** (1987) USX 835–36; 1987 BDX 326–330; 344.

**153.** (1987) BDX 331–338.

1981, the State has allocated to the HBIs approximately one-and-a-half times the system average of the capital improvements monies on either a per student or a per square foot basis.[154]

For the period 1981 through 1993, the HBIs as a group in Mississippi have received a proportionately higher share of state appropriations for capital improvements and for repairs and renovation than the HWIs when the proportion of state appropriations is measured in terms of the institutions' enrollment and Education and General (E & G) square footage.[155] According to one of the plaintiffs' witnesses, at least up until 1987, physical facilities resources have been "allocated equitably from the viewpoint of racial characteristics of the institutions."[156]

Estimated at $100 per GSF (gross square feet), MSU, UM and USM, each have a higher replacement value (1992) than any of the regional universities. JSU has a greater replacement value currently than either MUW or DSU. While MUW has a higher replacement cost than either MVSU or ASU, both of the latter HBIs have a higher replacement cost than DSU.[157]

The IHLs in Mississippi vary in their dependence on state appropriations for facilities construction. The HBIs since 1985 have relied to a large degree on state appropriations to fund construction projects undertaken at these campuses as opposed to self-generated funds. Viewed in the context of institutional size, the three comprehensive universities have less dependence on state appropriations for construction projects followed next by

JSU. In order of degree of dependence, MVSU depends exclusively on the state for such funding followed by MUW (91%); ASU and DSU follow next, respectively.[158]

Considering the age of the institutions, there is no difference in the overall construction quality of the facilities at the HBIs as compared with the HWIs.[159] There is a difference of opinion as to whether the quality of the workmanship employed in the construction of the facilities at the HBIs is inferior to that employed at the HWIs. According to the defendants' witnesses, there is no difference in workmanship.[160] According to the plaintiffs' witnesses, poor workmanship at certain HBIs has been evident since their founding.[161]

While the facilities at all universities suffer from problems associated with deferred maintenance, the levels of maintenance evident at the HBIs are below those exhibited at the HWIs. In general, there is a higher degree of deferred maintenance at the HBIs. Over time, continued deferred maintenance affects the university's core facilities. The institutions are not required to spend the funds in the categories for which they are earmarked; they may, in fact, set aside dollars earmarked for operation and maintenance for other uses according to the priorities set by the institution.[162] There is evidence to suggest that this is done by the HBIs to a larger extent than the HWIs. One way to remedy the misuse of repair and renovation monies would be placing control of the monies with the Board, which is opposed by the universities, both the HBIs and HWIs.

**154.** From 1981 through 1993, ASU received approximately $18.00 per square foot in total capital improvements and renovations dollars—more than any other university in the system. The system average was approximately $11.00 per square foot for this time period. Curry 6673–74; 6681; BDX 174; USX 101.

**155.** Bowman 6614; Curry 6676; BDX 162, 175, 175–A. "E & G" space is that involved in the basic academic program of the institution. It does not include space utilized for housing and student unions. Bowman 6613.

**156.** (1987) Kaiser 597–98.

**157.** USX 90 (Table 3); Kaiser 973–75.

**158.** Kaiser 975–76; USX 90 (Table 4).

**159.** Bowman 6619; Curry 6688–89.

**160.** Bowman 6619 (no difference in the quality, type and nature of construction); Curry 6688 (same).

**161.** Henderson 1409–10; Johnson 1282.

**162.** Curry 6690; Kaiser 928; 987; Johnson 1357–59; Bowman 6619; USX 43(a).

## D. QUALITY [163]

### 1. PREVIOUS FINDINGS ON "INSTITUTIONAL CHARACTER"

"The physical plant of the higher educational institution is a basic tool to facilitate its educational programs. There is a close relationship between facilities and the development or expansion of academic programs." *Ayers,* 674 F.Supp. at 1549. "The particular mix of facilities found at a given institution defines its 'character.' Objectively, one might include such factors as the age and construction type and design of campus buildings, their condition, ease of access, extent of land holdings, ability to expand, and visual images in defining institutional character. The subjective factors include the opinions of the academic community and the media and the opinions of parents, alumni and students." *Id.* "The character of the historically black institutions in 1954 was acknowledged to be inferior or unequal to that of the historically white institutions at that time. The facilities at the historically black institutions in 1954 were deemed to be adequate for undergraduate education." *Ayers,* 674 F.Supp. at 1549–50.

### 2. ADDITIONAL FINDINGS ON "INSTITUTIONAL CHARACTER"

"Quality" of facilities in higher education relates to the physical condition of an institution, the appropriateness for the programs for which the facility was designed, and certain intangibles related to the appearance of the facilities overall such as the ambiance of a campus and its distinctive "sense of place." In a broader sense, the quality or physical character of the facilities found at an institution is closely tied to both the physical condition as well as the functional appropriateness of the facility. The functional appropriateness of space or of a facility is linked to its design, its equipment, its appearance and the materials used to construct its component parts.[164]

The 1981 Dober Study (cited by this court in its 1987 opinion) addressed the utilization of space within the public four-year system, but did not draw any conclusions about the overall quality (as described above) of the institutions studied.[165] The Dober Study however did address the condition of buildings throughout the system and analyzed the relative degree of repair and renovation requirements for each institution in the system. When viewed in the context of the conditions of buildings system-wide, the study concluded that ASU needed the most attention followed by MUW and UM. DSU needed the least attention in terms of conditions of its facilities. MSU, JSU, USM, and MVSU were in approximate parity in relation to the overall condition of the buildings then present on their campuses.[166]

## E. LIBRARIES [167]

During the *de jure* period, the failure of the HBIs to gain accreditation of their programs was in part attributable to the inadequacy of their library holdings. The library of a university "is symbolic of the scholarly purpose of the institution, of its embodiment of academic enterprise."[168] Despite changes in technology, the library remains part of an institution's image and one of its strongest characteristics and, thus, plays a part in the recruitment of students and faculty. Measured in terms of the number of holdings, the library collections at the HWIs have been consistently superior to the library collections at the HBIs for the past 40 years. Although the libraries at all of the eight public institutions are in need of renovation and addition, the libraries at ASU, MVSU and JSU are of a lesser quality overall in

163. Appendix C15; US48.

164. Kaiser 834–838.

165. Kaiser 837.

166. Dober ranked the universities in the system by condition of physical plant using an analysis that identified buildings ranging in conditions from numerous functional problems requiring major repair/renovation to "practically unusable" buildings. (1987) Dober 3890–92; (1987) BDX 304.

167. Appendix C16; US49.

168. Kaiser 841.

terms of the condition of their space.[169]

The state legislature has recently approved a $12 million library expansion now underway at JSU. An addition to the library at ASU is currently underway with $3 million having already been spent in connection with the addition.[170]

## F. EQUIPMENT [171]

During the *de jure* era, investment in equipment at the HWIs exceeded that provided the HBIs. The quality and type of equipment available on a campus is important from the student's standpoint in terms of adequately preparing the student to enter the job market. Likewise, it is important from an institutional perspective as an aid in recruitment. In terms of fixed equipment (e.g., science lab furnishings) the quality of the equipment at the HBIs is inferior to that at the HWIs. The technical and scientific equipment present at the HWIs is more advanced and generally in better condition than that of the HBIs. JSU is a large user of the super computer. According to Dean Michael Dingerson at UM, JSU is the third largest user in the system of the computer each month.[172]

## G. LAND [173]

JSU now possesses approximately 120 acres of land. The sum of $5 million has been made available to JSU for additional land acquisition, and properties surrounding the campus of JSU continue to be purchased. The projected land acquisitions proposed by the Board for JSU have the potential of enhancing the appearance of the campus enormously and will help solve the existing problems connected to the lack of adequate land for its existing mission.[174]

## H. FOOTBALL STADIUM [175]

JSU currently does not have a football stadium. Dr. Kaiser testified that the possession of a football stadium under the control of a university affects the reputation of the university in the community.[176]

## I. FACILITIES AND STUDENT CHOICE

The general appearance of the grounds of a campus is part of its appeal and, thus, maintenance of the grounds is the institution's most visible attribute. Institutions build new facilities for various reasons including (1) response to enrollment pressures, (2) to provide specialized facilities for new or expected programs, and (3) to replace buildings in danger of collapse or for other safety considerations.[177] The nature and condition of facilities of a campus are factors that influence student choice in deciding where to attend college.[178] While either may bear on the perceived reputation of an institution, neither the replacement value of its buildings nor the number of books in the library is a significant feature of a university that influences student choice of where to attend.[179]

## CONCLUSION: FACILITIES

■ There is no pattern of inequity in funding in recent years for the HBIs as a group. The court finds that the nature and kind of problems faced by the HBIs in terms of maintenance and repair do not differ significantly from those faced by the HWIs. Drainage problems are pervasive throughout the system and present at both the HWIs and HBIs, especially those in the Delta.

**169.** Anderson 4951–52; Kaiser 840–46; Conrad 5383; USX 131; PX 266.

**170.** Bowman 6599; 6624; Kaiser 1031.

**171.** Appendix C17; US50.

**172.** Anderson 5010–11; Kaiser 849–60; Dingerson 7859.

**173.** Appendix C18; US51.

**174.** Kaiser 872–73; 944; Bowman 6627–28; Lee 1515–16; Curry 6701; 6721–22.

**175.** Appendix C19; US52.

**176.** Kaiser 871–72.

**177.** Johnson 1271; Curry 6663–64; 6690–91.

**178.** Curry 6699 (relatively modest); Kaiser 925 (a significant role).

**179.** Loewen 10207–09.

Likewise, both groups of institutions currently experience the same type of structural problems, typically the result of settling foundations.[180] There are, however, observable differences in the upkeep of some of the institutions within the system as well as the quantity and quality of the landscaping present throughout the campuses, thereby creating a "sense of place" at some HBIs which is arguably inferior to that found at some of the better manicured and maintained HWIs.

Undeniably, the appearance of the university campus plays some role in student choice. In this context, the issue presented is whether the neglect of the HBIs' facilities, particularly their respective physical plants, continues in some form today and, if so, the nature and direction that corrective action should take. While no current facility policy or practice has been identified as having a *de jure* connection, it is clear that the State's lack of control of each university's operation and maintenance expenditures, in combination with traceable aspects of the university system, such as the historical neglect of the physical facilities at the HBIs, serves to decrease the attractiveness of these institutions and, thus, to some extent their ability to desegregate. The defendants have raised a substantial doubt in the court's mind as to the practicality or desegregation productivity of institutional enhancement to the degree requested by the plaintiff parties,[181] and the court will not speculate as to whether or to what degree such measures, referred to at least once as the "Field of Dreams" theory, reasonably promise to attract other-race students to the IHLs. One measure that appears likely to have an immediate impact on the appearance of these institutions, however, is vesting control of the IHLs' autonomy over their operation and maintenance funding to the Board.[182] Having been presented with no evidence as to the educational soundness of such a measure, the court has no opinion as to this possible change of policy.

[9] The court finds little usefulness in comparing, on the basis of race, library facilities and holdings of universities with broadly disparate missions. The differences in the universities' volume holdings are attributable to their historical mission assignments. In the absence of proof that the HBIs' library holdings impact student choice to the extent of precluding those institutions as viable choices for white students, the court finds that increasing the size of the HBIs' libraries beyond that consistent with their missions is not educationally sound. As noted earlier, ASU's and JSU's libraries are undergoing expansion.[183]

■ Self-generated funds (SGF) are a significant source of money to a university and account for more than half of project financing system-wide.[184] The fact that UM, USM and MSU can draw more research dollars today because of their size and accordingly have the enhanced ability to fund more self-generated projects than the regional universities is a product of past funding practices. To a degree, such funding practices explain the relative disparity in size and degree of research activity at the comprehensive HWIs as compared with JSU.

The defendants argue that institutional enhancement of the HBIs, to the degree urged, will escalate the level of segregation in the system. The court need not embrace the defendants' argument in order to reject the notion that enhancement toward attaining parity of scope at the HBIs relative to the HWIs is necessary to end segregation in Mississippi. Rather, the issue to decide in this area is whether present remnants affecting the HBIs, in light of other systemic infirmities noted throughout this opinion, are educationally unsound and there exists a practical alternative. Viewed within this context, the enhanced ability of the HWIs to self-generate funds vis-a-vis the abilities of the HBIs to do so in and of itself is of little significance.

180. Bowman 6618–19.

181. *See* USX 90; Wharton 8984–91; Siskin 8730–32.

182. *See* Kaiser 1017–18.

183. Bowman 6624; 6627; Kaiser 1031.

184. BDX 509.

## EMPLOYMENT

### A. CONTENTIONS

On the issue of "[w]hether defendants' employment and employment-related policies and practices perpetuate segregation by resulting in racially identifiable faculty and administrators at Mississippi public institutions, and in race-based differences in faculty rank, tenure, and salary," [185] the court has heard extensive testimony both in 1987 and in 1994.

### B. OVERVIEW

In 1987 this court found that the State of Mississippi's race-neutral hiring practices satisfied its obligations under the law to dismantle its former *de jure* segregated system; however, today's inquiry focuses upon the identification of remnants within the hiring process that continue to foster segregation or the racial identifiability of the institutions of higher learning in Mississippi.

### C. RACIAL IDENTIFIABILITY [186]

During the *de jure* period, no blacks served as faculty, administrators or managers at the HWIs. In 1992–93, 3.27% of the total faculty present at all ranks in the HWIs was black.[187] That figure compares favorably with national averages of black fulltime regular faculty at public comprehensive and doctoral institutions.[188]

### D. FACULTY SALARIES [189]

During the *de jure* period, the faculty salary levels at the HBIs were consistently lower than that which prevailed at the HWIs for faculty at the same ranks. Since approximately 1979, salary levels at all Mississippi universities are consistently lower relative to those found in the surrounding states of the southeastern region. MSU, UM and USM have on average the highest faculty salaries of all universities in the system. Tuition is also the highest at these universities.[190]

When grouped solely on the basis of their predominant racial characteristics, rather than by institutional size and scope, the differences between the salary levels prevailing at the HBIs and the HWIs continue to be significant.[191] Likewise, the percentage of faculty holding positions of instructor and assistant professor, the two lowest compensated ranks in academia, is greater at the HBIs in general.[192]

The court deems it noteworthy that although funding for faculty salaries is provided by the State under the formula, the institutions themselves determine the number of faculty positions needed and their corresponding rank within the university, as well as the compensation for that rank. Thus, because of the institutional autonomy present in the system, an institution may have a higher state appropriation per FTE student compared with its regional peers, yet maintain lower faculty salary levels. With respect to the formula funding of faculty salaries per institution type, Doctoral I through Masters II, the formula keys off average faculty salaries by discipline and rank found at peer institutions in the region (Southeast Region IV). The overall average faculty salaries assigned by discipline to each type of institution assume a rank distribution as that currently prevailing in the region.[193] As a

185. United States Contested Issues of Fact No. 7.

186. Appendix D1; US55–US57.

187. By institution, the percentage of the total black fulltime faculty was as follows: (1) DSU 3.70%; (2) MSU 3.59%; (3) MUW 1.79%; (4) UM 3.13%; and (5) USM 3.23%. Anderson 4953; Siskin 8680; BDX 134–139.

188. Siskin 8680–81.

189. Appendix D3; US59.

190. Anderson 4954; Feisal 8550; Lott 7050.

191. For instance, in 1991–92 there was approximately an $8,000.00 difference in the faculty salaries between the HWIs and HBIs or approximately 27%.

192. For example, by institution, the percent of faculty holding these ranks in 1991–92 are as follows: ASU 62%; DSU 46%; JSU 51%; MSU 33%; MUW 57%; MVSU 62%; UM 42%; USM 39%. The average salary by rank prevailing in the system for this year was as follows: $45,445—Professor; $36,128—Associate Professor; $31,834—Assistant Professor; and $23,089—Instructor. Leslie 342; USX 33(aa).

193. It is assumed that each institution within the category has 41% of their faculty at the full professor range; 31% at the associate professor

result of this assumption, those institutions that choose to vary from the rank distribution assumed in the average faculty salary rates, are in a sense, either over-compensated in their salary formula funding, or under-compensated.[194]

## E. RANK AND TENURE [195]

The racial makeup of a university faculty and of the various levels of the faculty affects student choice. For the period 1986–1992, the percentage of white full and associate professors at the five HWIs remained high, whereas the percentage of blacks holding these ranks continued to be stable and low.[196] For the system as a whole, 94% of the full professors at the HWIs were white as opposed to 2% black. For fiscal year 1992, 98% of the administrators at the HWIs were white; 2% were black. In 1991–92, 22% of the faculty at the HBIs were full professors as compared with 36% of the faculty at the HWI's holding this rank. Twenty-three percent of the faculty at the HBIs was at the instructor rank as opposed to 11% at the HWIs.[197]

Board policy currently prevents offers of tenure at the time of hiring even to recruits from other universities holding tenure there. Desegregation of a university is advanced when blacks hold visible and influential positions within the university. Symbolically, it sends a signal to other blacks in the community that the university is committed to sharing power. Practically, it provides the university a better chance to recruit other black faculty by virtue of the contacts existing black faculty may have in the qualified pool.[198]

## F. RECRUITMENT

### 1. PREVIOUS FINDINGS—RECRUITMENT AND HIRING

In 1987, this court found that "[t]he statistical presence of other-race faculty at the historically black institutions is substantial and unchallenged." *Ayers*, 674 F.Supp. at 1537. It remains so today. "The defendant universities recruit and hire faculty on a nationwide basis. [Exhibit citations omitted.] The historically white institutions expend substantial affirmative efforts in an attempt to attract and employ other-race faculty...." *Id.* "Recruitment of minority faculty is severely hampered by the acute shortage of supply of minority individuals having the requisite qualifications." *Id.* "[T]he push to employ more minority faculty is a nationwide issue. Institutions throughout the country are competing for the same limited supply and finding it extremely difficult to increase the percentage of other-race faculty. Mississippi universities are at a distinct competitive disadvantage in attempting to attract, employ, and retain qualified black faculty members." *Id.* at 1538. Finally, "[s]ince 1974, the percentage of blacks hired by Mississippi universities exceeded the black representation in the qualified labor pool." *Id.*

### 2. ADDITIONAL FINDINGS—RECRUITMENT AND HIRING

Some Mississippi institutions, whether because of perceptions, availability of Ph.Ds or other reasons, continue to have a more difficult time in recruiting minorities than many other institutions in the United States. Lack of competitive salaries also continues to be a

---

rank; 23.2% at the assistant professor rank; and 4.4% at the instructor range.

**194.** For instance, ASU, having a lower percentage of its faculty at the full professor rank than that prevailing in the region but a greater percentage of its faculty at the instructor level than that prevailing in the region, is actually funded at a higher average salary rate than it is presently paying. Lott 7119–26; BDX 664.

**195.** Appendix D2; US58.

**196.** By university for fiscal year 1992, the percentage of faculty holding full professor status was as follows: (a) USM 97% white and 1% black; (b) UM 96% white and .5% black; (c) MUW 100% white and 0% black; (d) DSU 97% white and 1% black. Finally, MSU has 94% of its full professors white as opposed to only 2% black. Clauge 4172–74; USX 76–80.

**197.** Clauge 4170–76; USX 73; USX 75–80; Leslie 299; USX 33.

**198.** Clauge 4181; 4184.

factor making it more difficult to recruit qualified black faculty.[199]

In 1987 the percentage of black faculty in the HWIs in Mississippi was approximately 2.9%. That figure is now up to 4.1%, a significant increase that compares favorably with the percentage of black faculty nationwide. In 1986, black faculty made up approximately 12% of the total faculty in the system. By 1992, black faculty had increased to 17% of the total faculty. In both 1986 as well as 1992, over 80% of the black faculty in the public system was employed at the HBIs. For the period 1987–1993 there has been little improvement in the representation of black faculty at the HWIs at the ranks of associate and full (tenured) professor. For the same time period, white faculty at the HBIs continued to be well represented at the associate and full professorial ranks.[200]

Analysis of black faculty now present at Mississippi's HWIs by discipline and degree attainment indicates that since 1974, Mississippi HWIs have hired more black faculty than would be statistically predicted. Statistical analysis of all faculty now present at Mississippi's HWIs indicates that, when viewed as a group, existing faculty hired prior to 1974 are excessively white; those hired after 1974 are excessively black. The racial composition of the faculties present at all HWIs is within statistical expectations.[201]

### 3. QUALIFIED POOL

For the time period 1979 through 1989, the HWIs have awarded 97% of all the doctorates awarded to African–Americans in Mississippi; the historically black universities have awarded 3% of the African–American doctorates. For the same time period, of the total doctorates earned by African–Americans in Mississippi, 68% were in education; 12% in social sciences; 4% in physical sciences; 10% in life sciences; .6% in engineering; 3% in the humanities; and 2% in professional fields. The percentage of African–Americans earning doctorates in education in Mississippi is extremely high in relation to the doctorates earned in other disciplines. Because doctorates in education primarily lead to careers in elementary and secondary education, the pool of black doctorates available for faculty positions at Mississippi institutions is limited.[202]

The shortage of African–Americans earning doctorates is a problem that persists throughout the United States. For instance, in 1991 blacks earning doctorates nationwide accounted for only 3.8% of all doctorates awarded to U.S. citizens. Similarly, less than 5% of all master's degrees awarded nationwide were awarded to blacks in 1990. In 1992, the number of Ph.Ds awarded in the United States to black United States citizens in the core subject of mathematics, including all sub-categories, was four. There were eleven awarded in 1991 and four in 1990.[203] Moreover, predominantly black institutions are an important source of competition with HWIs for African–American Ph.Ds.[204] Likewise, business, industry and government compete with universities for African–American Ph.Ds. Only approximately 40% of all black doctorates earned in a year move into academia.[205]

**199.** Clauge 4208; Feisal 8550; *see also Ayers,* 674 F.Supp. at 1538.

**200.** Feisal 8568–69; Allen 4490–91; 4498–99; PX 282; USX 24–30A.

**201.** Siskin 8668–77; BDX 134–139; BDX 146–151. Proceeding under the assumption that the HWIs in Mississippi recruit nationally, Siskin's conclusion that the HWIs' minority hiring exceeded what would be expected based on the qualified labor pool, was arrived by comparison of all hirings by HWIs since 1986 by discipline and degree attainment with percentage of black degrees conferred in 1988–89 nationally. BDX 151.

**202.** Clauge 4225–33; USX 82–85; USX 87–88.

**203.** BDX 200 at p. 50.

**204.** Clauge 4291–92. Factors that influence black faculty in their choice of universities include: (1) the working conditions or the perceived quality of the work place; (2) a preference that the career match the mission of the institution; (3) a commitment to work with black students; (4) the perceived sincerity in recruitment efforts at HBIs; (5) the length of the probationary period; (6) tenure prospects; and (7) salary. Feisal 8537–38; BDX 199.

**205.** Clauge 4273–75; 4291–92; Siskin 8780–82; Feisal 8540–41.

The degree of black faculty representation in academia also varies by type of institution. In public doctorate-granting institutions, African–Americans average approximately 1.8% of the total faculty, whereas in public universities of lesser scope, black faculty make up approximately 3.5% of the total faculty present. For approximately the last twenty years, the percentage of black faculty has remained relatively constant (at 4.2% to 4.5%) vis-a-vis the total number of faculty throughout the country.[206]

## 4. DEFENDANTS' EFFORTS IN MINORITY EMPLOYMENT

The basic techniques of Mississippi IHLs for hiring faculty are typical to those employed at universities across the nation. The process begins at the departmental level with the identification of need. The institution's administration reviews departmental requests and either approves or disapproves the request for an additional position.[207] In an effort to attract and retain qualified black faculty, the HWIs in Mississippi continue to develop various means to accomplish this purpose.[208] Some of the more notable programs designed toward increasing faculty diversity are detailed below.

DSU has a "grow your own" program, whereby the university sends its minority graduates to other institutions for completion of their terminal degree. The institution requires two years of teaching at the university for every one year of graduate financial support. DSU also provides financial support to junior black faculty working on advanced degrees.[209] MSU's efforts include the allocation of additional funding for minority faculty and participation in the Minority Alliance Program. MSU also provides for financial incentives to departments to encourage minority recruitment[210] and requires its departments annually to report their efforts to hire minority faculty. MSU participates in cooperative faculty exchange agreements with ASU and JSU.[211] MUW pays higher salaries for black faculty on average than its white faculty of comparable rank.[212] UM uses minority recruitment funds to encourage diversity at the departmental level by enhancement of salaries paid to black faculty. Black faculty employed at UM on average receive $3,000 per year more in pay than white faculty. Like DSU, UM also has a "grow your own" policy and provides financial and other support to minority instructors working toward their doctorates. UM also participates in faculty exchange programs. The university attempts to recruit at HBIs and gives minority faculty priority in campus housing. Like DSU and UM, USM also provides financial support to minority graduates seeking terminal degrees at other institutions with the requirement that they teach at least one full year at the university.[213]

## CONCLUSION: EMPLOYMENT

■ The HWIs remain racially identifiable at the administrative and tenured faculty ranks. The point of inquiry however must focus upon whether this continuing state of affairs (a) is the result of policies and practices having as their historical antecedents, practices of the *de jure* era and (b) whether racial identifiability at the faculty/administrative rank continues to foster segregation of the races.

It is an undeniable fact that Mississippi, together with all prior *de jure* segregated states, has to some degree affected the qualified pool of black applicants for faculty positions. It is likewise true that *de jure* segregation has materially contributed to the shortage of minority faculty and administra-

206. Feisal 8540–45.

207. Feisal 8546–48.

208. Institutional measures prevailing in 1987 are detailed at *Ayers,* 674 F.Supp. at 1537.

209. Wyatt 10711–712; BDX 14.

210. Currently, MSU now makes available $1,000,000 for promoting the employment of black faculty. Zacharias 8438–39.

211. Feisal 8560–61; Zacharias 8438–39; BDX 30.

212. Rent 10555.

213. Turner 6383–85; Hoops 6742–43; BDX 55; BDX 68.

tors at the HWIs. Both plaintiffs' and defendants' experts agree that diversity in the faculty ranks of an institution increases diversity in all other facets of the university.

As the Supreme Court in *Fordice* observed, "[u]nquestionably, a larger rather than a smaller number of institutions from which to choose in itself makes for different choices...." [214] There is no current policy or practice in a relevant sense that produces the shortage of available black faculty, nor can liability be based on prior exclusionary admissions policies and practices that reduced the qualified pool, in light of the State's continuous substantial affirmative efforts to correct this imbalance. Absent a finding of discriminatory purpose in current means and methods of institutional hiring, the court cannot, consistent with *Fordice*, address this imbalance through intervention in the hiring/promotion processes employed by the universities.

Although the racial predominance of faculty and administrators at the HWIs and the shortage of qualified black faculty are to some extent attributable to *de jure* segregation, the HWIs are making sincere and serious efforts to increase the percentages of African–American faculty and administrators at these institutions. Universities throughout the nation have the same problem in this regard. As Dr. Bernard Siskin pointed out, the policies and practices of the defendants have resulted in the hiring of more African–American faculty than one would expect from a statistical analysis of the pool available and the national hiring drive.

## LAND GRANT [215]

### A. CONTENTIONS

"Whether Alcorn State University has been limited in its role in the State of Mississippi's land grant program, due to its racial heritage and the racial identity of its enrollment and administration ... in a manner that decreases its attractiveness to other-race students." [216]

## B. OVERVIEW

The court has previously traced the historical land grant funding disparity between ASU and MSU and has likewise noted the programmatic differences between the land grant universities in the areas of instruction, research and cooperative extension. *See Ayers,* 674 F.Supp. at 1543–1546. In 1987, the court found that the plaintiffs had failed to "make a showing that educational opportunity in the land grant area is in any way restricted." *Ayers,* 674 F.Supp. at 1563. Moreover, the court found that "the differentiations made by the defendants with respect to the nature of the land grant programs offered at the two land grant schools are educationally sound and are not motivated by discriminatory motive." *Id.* The *Fordice* analysis requires close reexamination of the land grant issue to determine the educational soundness of the continued practice of conducting the majority of land grant activities at MSU. Although the traceability of the practice to the prior *de jure* era cannot reasonably be disputed, the court must determine whether its continuation has segregative effects and, secondly, whether its elimination would be impractical in terms of educational soundness.

## C. BACKGROUND

The original legislation creating land grant institutions was passed on July 2, 1862. These institutions, later to be known as land grant colleges, were set up to teach agriculture and mechanical arts. On May 13, 1871, the state legislature authorized the governor to receive the land scrip granted to the State by virtue of the 1862 Morrill Act. On that occasion, three-fifths of the land scrip was given to ASU; two-fifths to UM. Thus, Alcorn was designated a land grant college in 1871; Mississippi State University (then Mis-

---

**214.** —— U.S. at ——, 112 S.Ct. at 2742. In this context, the presence of three public HBIs, one of which is a doctorate-granting institution, appears likely to contribute to the continued racial identifiability of Mississippi HWIs at the administrative/tenured faculty ranks.

**215.** Appendix C13; US46(a-i).

**216.** United States Contested Issues of Fact No. 8.

sissippi A & M) was not so designated until its establishment in 1878.[217]

In 1887, Congress passed an act designed to fund agricultural research in the several states. The 1887 act or "Hatch Act" provided for equal distribution of federal funds between the land grant colleges then extant "unless the legislature of such State shall otherwise direct." The Mississippi legislature did in fact direct otherwise. MSU, rather than Alcorn was designated to administer the Hatch Act funds.[218]

In 1890, Congress passed an act authorizing the states to establish land grant colleges for its black citizens. The beneficiaries of these funds were distinguished from the white land grant colleges by the designation "1890 institutions." Although established approximately nineteen years earlier, ASU was considered thenceforth as the State's 1890 institution.[219]

In 1913, an act was passed designed to aid agricultural extension work for farmers. The 1913 legislation or Smith–Lever Cooperative Extension Act authorized the states to designate the college or colleges to administer the money stemming from this source of federal funding. The State of Mississippi so directed that MSU would administer the Smith–Lever funds to the exclusion of all other institutions. Together these four Acts defined the "Land Grant" college. The pattern of channeling the federal dollars made available through the Hatch and Smith–Lever Acts away from the 1890 institutions or black land grant colleges and to the land grant institutions designated for whites was consistent throughout the South. The failure to invest in ASU during the *de jure* period made it impossible for it to develop into a full-fledged land grant institution. Thus, while holding the land grant designation, ASU was not developed as such an institution.[220] In 1954, the Brewton Report recommended considering "the abandonment of the present land-grant program operated at Alcorn, in view of the limited number of students enrolled." [221]

Elements traditionally considered as part of the land grant function include: a directed research program; an experiment station; an extension service and resident instruction programs. "Core" agricultural programs are programs found in most if not all agricultural colleges. Core agricultural programs include animal science, plant science, soil science, and agri-business. The court finds it significant that, among black undergraduates nationally, there is currently little demand for core agricultural programs. Nationwide, only 4% of persons pursuing academic programs in agriculture at all land grant institutions are black. Programs and projects undertaken in the field of agriculture are driven by the needs of the state's agricultural industry and the number of persons engaged and interested in agriculture in the state. From before 1987 until approximately 1990, both Mississippi as well as the country at large experienced a decline in interest in agricultural education and thus, declining enrollment in agricultural instruction. From 1990 until the present, both nationally and in Mississippi, enrollment has again picked up in the field.[222]

## 1. RESIDENT INSTRUCTION

Agricultural research conducted on the campus directly affects the quality of the resident instruction. Scientists employed in research and interacting with students improve the quality of the students' education and strengthens undergraduate programs in general. In 1960, MSU received $328,000 in state appropriations for resident instruction. Alcorn on the other hand received only $64,-

**217.** (1987) Seals 717–19; Seals 2329; Foil 6924.

**218.** (1987) Seals 717; Foil 6925.

**219.** (1987) Seals 718.

**220.** Foil 6925; (1987) Seals 718; Seals 2331; Anderson 4950–51.

**221.** Alternatively, the Brewton Report went on to conclude, "[i]f the State chooses to operate two land grant institutions, this function should be transferred from Alcorn to Itta Bena (including staff and equipment) creating thereby an entirely new institution. The present Alcorn plant would then be transformed into a community college, operated similar to the one proposed for Itta Bena." (1987) PX 200.

**222.** Foil 6856; 6910–20; Acker 6959–60; Seals 2342–2352; BDX 306.

000. Alcorn did not approach MSU's 1960 state appropriation for resident instruction until 1980.[223]

## 2. RESEARCH

When the State of Mississippi accepted the Hatch Act funds in 1888 there were two land grant colleges in existence. Mississippi A & M, the predecessor of MSU, was designated to receive those funds in that year. The Mississippi Agricultural and Forestry Experiment Station or "MAFES" is the legal entity designated by the state legislature as the recipient of the federal research money available through the Hatch Act. MAFES conducts the state's forestry and agricultural research, and is an "integral part," or a "corporate part" of MSU.[224]

Alcorn was exempted from having an experiment station in 1878. That exemption was based on race. In 1955, the Mississippi Forestry Experiment Station at MSU received state appropriations of $611,000. By 1965, this appropriation had grown to $1.3 million. By comparison, ASU first received state funds for research in 1973. By 1981, ASU was receiving state research funds of $178,000, substantially less than MSU's 1955 state appropriation. This pattern persists. In 1993, MSU received $17 million in state-appropriated funds earmarked for research functions. For the same year, ASU received $254,000 in state funds for this purpose.[225]

The beneficiaries of agricultural research include the consumers of improved agricultural products, farmers employing improved agricultural processes made possible through agricultural research, agricultural students in the state through access to research installations, experiment stations' lands and facilities and exposure to the research funds made available to support graduate students. Since 1967, ASU has received federal money for agricultural research matched by the State since 1993. Within the past thirty years, agricultural research has become more sophisticated, more complex and more costly. Today, in many agricultural disciplines, a mass of scientists is usually required to make progress in agricultural research.[226]

With little or no exception, federal Hatch Act dollars are administered in every state by a single institution. In this time of fewer and fewer persons entering the field of agriculture, but the system nevertheless effectively feeding more and more people, it would be inefficient and, thus, educationally unsound to administer two separate agricultural research programs in the state. To diffuse the program would create two separate administrative entities, difficulties in communication among the participating scientists, and inefficient duplication.[227]

## 3. EXTENSION

When MSU was designated to receive the Smith–Lever extension dollars in 1916, ASU was exempted from receiving those funds on the basis of race. The legal entity established to administer the land grant cooperative extension function under MSU is the Mississippi Cooperative Extension Service, or "MCES." In 1955, ASU received no state funding for extension work. By comparison, MSU was receiving approximately $75,000, a figure that had grown to $10.5 million by 1981. ASU first received state-appropriated extension funds in 1981 in the amount of $108,000. For fiscal year 1993, MSU received $14 million in state appropriations earmarked for extension. By comparison, ASU received $118,000 in state extension monies. The MCES contacts as reported to the USDA indicate that the MCES serves Mississippi's black population in statistical parity with its representation in the state.[228]

The general rule of practice is that Smith–Lever funds are administered by only one university in each state. The evidence shows it would be inefficient and, thus, unsound for the State to administer Smith–Lever dollars

**223.** (1987) Seals 725–26; 737; Seals 2355; Foil 6872.

**224.** Foil 6864–65; (1987) Foil 3065–66.

**225.** (1987) Seals 729; Seals 2339–40; 2348.

**226.** Foil 6872–76; Acker 6957–58.

**227.** Acker 6955–57; Foil 6877–78.

**228.** Foil 6880–81; 6899–6903; Seals 2341; (1987) Seals 733; BDX 308–09.

through two independent cooperative extension programs. To duplicate administrative processes and procedures as it relates to the delivery of extension programming is unsound because the short duration of extension educational programs makes program coordination difficult from year to year. As an educationally sound alternative to the present system of agricultural research and extension in Mississippi, effective and efficient use of federal funds would be furthered by the establishment of a single state administrative structure for research and extension.[229]

## CONCLUSION: LAND GRANT

The size and breadth of MSU's land grant activities as compared with those of ASU are traceable to the *de jure* past and to decisions of the State to allocate state resources on the basis of race.[230] Moreover, there appears to be a connection between the quality of education in agricultural sciences offered by MSU because of its broad research mission when compared with that offered at ASU with its limited research mission.

The court agrees with the plaintiffs that the natural development of ASU has clearly been retarded because of the past discrimination practiced by the defendants. However, the court finds that within the context of two land grant institutions, there is no current state policy or practice which prevents or discourages black students from enrolling in the agricultural offerings of MSU or white students from enrolling in those programs at ASU. The court further finds that, even though the number of black students choosing to pursue a career in agriculture is very small, the academic and research facilities at both MSU and ASU are available to them, as well as to persons of both races engaged in agricultural occupations. To attempt to break up those facilities and allocate them equally between educational institutions for that reason alone argues for institutional rights and loses sight of the rights protected and enforceable under the Equal Protection Clause. The current allocation of agricultural education programs is educationally sound and there exists no practical alternative to the current method of providing research and extension services.[231]

## CLIMATE [232]

### A. CONTENTIONS

Somewhat like an aggregation of individual complaints of racial discrimination, perhaps the best articulation of this claim is found in the United States' list of "Practicable Alternatives to Remnants that State Contends Are Justified" as "[t]he failure of the several universities to have comprehensive programs to address problems of other-race faculty and students [which] appears to reinforce the lack of substantial other-race presence at all of the universities."

### B. OVERVIEW

The court has heard extensive testimony in the nature of both expert and lay opinion relating to the issue of whether or not certain, any, or all Mississippi HWIs have what has come to be known in this area of the law as a racially hostile campus climate. In 1987, this court found that "the evidence ... shows that other-race students who choose to attend any of the eight Mississippi institutions enjoy desegregated campus environments." *Ayers,* 674 F.Supp. at 1558. The plaintiffs have called upon the court to reexamine the evidence that supported that previous finding in light of the *Fordice* analysis, and to consider the additional evidence developed since this case was tried in 1987. The findings on this issue are set out below and include findings relating to minority recruitment and retention programs at the HWIs.

### C. RACIAL CLIMATE IN GENERAL

A racial climate at Mississippi HWIs that is hostile to black students is alleged to exist today. However, even the plaintiffs' witnesses testified that this racial polarization,

---

**229.** Acker 6962–63; Foil 6889–90.

**230.** Notwithstanding defendants' distinction that centrality of the administration of land grant funds is not traceable.

**231.** Foil 6877; 6888–89; Acker 6955–63.

**232.** Appendix B11–B12; C22; US29.

apparently at the will of both white and black students, can be said to exist at almost any campus selected at random across the United States. The courts have found the phenomenon of voluntary racially polarized voting to exist throughout America today and have drawn up congressional and other political voting districts in response to it. The phenomenon of varying degrees of racial polarization is also found to exist on most college campuses. The court heard extensive testimony about this situation and the remedial efforts of the HWI administrations. The racial climate of a campus consists of the prevalent racial attitudes on the campus and the extent to which diversity is represented at various levels of university life. To the extent that an institution has a racially hostile climate, a barrier to student access is present.[233]

Both faculty and student peers set the tone of the campus climate prevailing at a university. A more racially diverse faculty will be associated with a more positive racial climate. Black student choice continues to be affected by the public perception of the black community toward the HWIs. That perception—that attendance at certain institutions is not a logical choice—is caused and/or shaped by the relative underrepresentation of minorities at the HWIs in terms of students as well as faculty, higher admission standards at the HWIs, and the perceived racial climate of the university.[234] Some of the programs and practices of the HWIs directed toward increasing diversity of their respective student bodies, both at the graduate and undergraduate level, include the following.

## 1. THE UNIVERSITY OF MISSISSIPPI

For the 1991–92 school year, black students made up approximately 8% of the total enrollment at UM.[235] In 1983, UM formally disassociated itself from the use of the Confederate flag as a pep symbol at athletic events. Although the band still plays "Dixie" at university functions, public opposition to the practice has caused the university to reduce its playing of this composition, associated by some with racism but by others with merely a pep song. As an accommodation to those who oppose the song, the university now combines "Dixie" with "The Battle Hymn of the Republic" at athletic events and other public functions.[236] In 1988, the first black fraternity house burned on the eve of its opening. While the cause of the fire remains unknown, donations from white fraternities and others replaced the house.[237]

In 1989, the Chancellor of UM set up a task force to determine the extent of minority participation in campus life. The task force eventually made approximately 51 recommendations to the chancellor regarding improvement of the racial climate on campus. Dissatisfied with the university's responses, in 1993 the Black Faculty and Staff Organization ("BFSO") made a report to the chancellor, recommending among other things (1) implementation of the 1989 report recommendations; (2) the development of a racial harassment policy; and (3) the establishment of race relations/multi-cultural training workshops and seminars with mandatory attendance required for all top-level administrators, deans, department heads and supervisors. After contending that the university had a "hostile, intimidating environment," the report concluded with the suggestion that if the recommendations therein were not acted upon, the BFSO would be forced to "take [their] grievances to a national, public forum" or "file a class action suit on behalf of the African–Americans and other minorities on this campus." [238] In the event the university did not act upon its recommendations, the BFSO also proposed to "encourage African–American students not to enroll at the University." Thus, out of concern about what they allege is a lack of nurturing at UM, some black faculty have taken the ironic

---

**233.** Allen 4368–70; 4382; 4612–13.

**234.** Allen 4378–82; 4418–21.

**235.** Allen 4388; USX 372.

**236.** Turner 6416.

**237.** Turner 6414–16; Williams 2015; 2103–04.

**238.** PX 444; Hanshaw 1773.

stance of discouraging potential black students from attending the university.[239]

As noted earlier, in an effort to increase diversity, UM gives priority to black faculty for university housing. The university also has a freshman/sophomore mentoring program designed as an aid in easing racial tensions on campus and as a way of creating a sense of belonging among black students. A minority graduate outreach program has also been established for the purpose of increasing the number of minority graduate students. The program offers full tuition for qualified African–Americans as well as a stipend. In 1991 and again in 1992, the program has won the "National Peterson Award" for enhancing diversity in higher education. As a result of this program, minority enrollment in graduate school rose from below 16 students in 1987 to approximately 282 by 1990. A program known as "Smile" has also been established wherein upper division black students advise lower division black students.[240]

· Also available at the university is a six-week summer program which brings minority students to the campus to learn about graduate study and to participate in a number of programs including career aptitude tests. There exists a black graduate/professional student organization that meets regularly. The university also participates in national, regional and state fellowship programs/consortia designed to increase minority participation. Additionally, "Multicultural Retreats" are sponsored by the Division of Student Affairs and involve participation throughout the university.[241]

## 2. MISSISSIPPI STATE UNIVERSITY

For the 1991–92 school year, African–Americans made up 13% of the total enrollment at MSU.[242] MSU actively recruits minority students and hosts a "Minority Student Achievement Program" (MSAP) that attracts approximately 200 minority students each year. MSU's black student council awards a $1,000 "Martin Luther King Scholarship" to an incoming freshman student each year. MSU has a Cultural Diversity Center designed to aid minority students academically as well as socially. The Center serves as a liaison between minority students and the university's administration. Recruitment assistance grants are provided to individual departments by the Graduate School to assist departments in minority recruitment. Monies allocated for this purpose are applied to travel funds and/or the development of minority recruiting literature. The Patricia Roberts Harris Program was established in 1992 at MSU. The program, which is presently funded by a $768,000 grant, is designed to aid African–American students and women in pursuing doctorates in disciplines where black and females are underrepresented. Fellowship assistance through the program spans three years. Another program established at the university in 1989 is targeted at African–American and female undergraduates and designed to encourage minority participation in graduate school. Presently funded at approximately $95,000, the program offers participants the chance to study on the campus for a summer in certain disciplines where as a group the participants are underrepresented.[243]

MSU presently sets aside approximately $80,000 per year to fund its Plan of Compliance. Within the Graduate School, the Plan of Compliance monies are used to provide assistantships for students until the completion of their degree. MSU is the permanent host of the National Black Graduate Student Conference which draws participants from across the country.[244]

## 3. THE UNIVERSITY OF SOUTHERN MISSISSIPPI

For the 1991–92 school year, black students made up 12% of the total enrollment at

**239.** Williams 2016–22; 2115–17; Hanshaw 1766–74; 1780; Turner 6502; PX 444.

**240.** Williams 2101–05; Turner 6382–91; Dingerson 7847–48.

**241.** Dingerson 7849–55; BDX 51; BDX 466.

**242.** Allen 4388; USX 372.

**243.** BDX 30; Person 9320–22.

**244.** Person 9323; Zacharias 8435–37; BDX 366.

USM.[215] Like MSU, the Graduate School at USM provides monies to departments in the university for travel and for the publication of minority recruitment brochures/literature. In 1993, the university had set aside approximately $500,000 for an assistantship budget to attract black teaching assistants through stipends and tuition waivers. Further assistance to graduate students in the disciplines of chemistry and polymer science is provided in the form of four-year fellowships financed through federal and university monies. The Patricia Roberts Harris Fellowships available at MSU are also provided by USM and include eleven stipends with tuition assistance.[246]

The National Physical Sciences Consortium between business and industry and the university provides stipends for black students and is of recent origin at USM. Other stipends (six in number) for black doctoral students through cooperation with the Board and the SREB are likewise of recent origin. Of the eight national black sororities and fraternities in existence, six are active at USM and one other inactive at the present time.[247]

### 4. DELTA STATE UNIVERSITY

Twenty-three percent of DSU's student body is African–American, the largest percentage of any HWI. Since the 1987 trial of this case, DSU has had an approximate 52% increase in black student enrollment. For the same time period DSU's white enrollment has increased only approximately 19%.[248] African–Americans make up approximately 6% of the university's faculty. As noted previously, DSU offers its black faculty a chance to further their education and thus improve their credentials by pursuing terminal degrees elsewhere as a "grow your own" strategy for improving the percentage of black faculty at DSU.[249]

African–Americans are present at all levels of student life at DSU, and have held leadership roles including President and Vice–President of the student body as well as Homecoming Queen. DSU has had a black admissions counselor in its recruiting office since 1977. DSU participates in the Mississippi Alliance for Minority Participation and the Delta Mathematics Project, a joint venture of the Board, DSU, MVSU and 27 school districts in the Mississippi Delta designed to improve math instruction in the region.[250]

### 5. MISSISSIPPI UNIVERSITY FOR WOMEN

MUW's black enrollment has increased 51% since the original trial of this case in 1987. Efforts to increase diversity include sensitivity training for MUW recruiters and the use of minority recruiters, recruiting publications and surveys. MUW provides Heritage Scholarships to blacks entering the university with ACT scores of 18, 19 and 20. MUW also provides its admissions staff with sensitivity training, and has set up an office of multi-cultural affairs which serves as a liaison for the institution and its minority students.[251] Finally, like all of Mississippi's HWIs, MUW has an active Black Student Union organization.

### D. CONTINUING RACIAL IDENTIFIABILITY

For the period 1991–92 there continues to be a sizable underrepresentation of black students at most of the HWIs in the state as well as a sizable underrepresentation of white students at all of the HBIs in Mississippi, although the number of black students choosing to attend HWIs is steadily increasing. The HBIs as a group had approximately two-thirds of the total black student enrollment in the system at the undergraduate level for the year 1991–92. In 1986, of the total black undergraduate students in the

**245.** Allen 4388; USX 372.

**246.** Vanaller 9383–84.

**247.** Vanaller 9384–85; Wesley 9396.

**248.** Wyatt 10705.

**249.** Cruthers 7431; Wyatt 10705–713.

**250.** Wyatt 10704–07; BDX 14.

**251.** Rent 10537–41; BDX 37.

system, 69% attended the HBIs. By 1991, that figure had decreased slightly to 67%.[252]

In 1986, 61% of all black graduate students in the Mississippi system of higher education were enrolled at the HBIs but, by 1991, more than half the black graduate students attended a HWI—approximately 59%.

It is obvious to the court that black students in Mississippi are moving to the HWIs, but little change has been seen in the racial percentages of the HBIs. As will be discussed hereinafter, one of the main problems in desegregation throughout the United States in the field of higher education, has been not in more and more blacks deciding to take advantage of the greater opportunities offered at public comprehensive universities, most of which are historically white, but in the paucity of whites who choose to go to the HBIs.

## E. RETENTION

System-wide, white student retention rates continue to be higher than black student retention rates. For the period 1985–86 to 1991, approximately 47.7% of the white students entering college in 1985–86 had earned degrees by 1991 compared with approximately 29.4% of the entering black student cohort.[253]

Contrary to the nurturing and support theory often urged as the reason to maintain predominantly black colleges, without exception, Mississippi's HWIs have consistently better retention/graduation rates for black students than do the HBIs for black students.

## F. STUDENT CHOICE AND THE HWIs

The reputation and historic racial identity of state campuses play a role in influencing black and white students in their decisions of where to apply.[254] Student choice in Mississippi, as reflected by stated preferences on the ACT questionnaires for public universities in the state, was analyzed by the defendants' statistician in 1987 and again in 1994. That analysis revealed that black students who were qualified by ACT scores to attend the HWIs in 1985–86 chose to attend DSU, MSU, MUW and USM in statistical parity with their representation in the qualified pool. With respect to UM in 1985–86, the number of black students in the qualified pool eligible to attend this university was not in statistical parity with the number actually enrolled.[255] Dr. Siskin's analysis reveals that black students qualified to attend the HWIs in 1992–93 were represented (enrolled) at DSU, MSU, MUW and USM in statistical parity with their representation in the qualified pool. With respect to UM, in 1992–93, the number of black students in the qualified pool to attend this university was not in statistical parity with the number in actual attendance.[256]

## G. STUDENT CHOICE AND THE HBIs

Five factors generally are thought to influence white attendance at HBIs of higher learning. As described by the private plaintiffs' expert, they are as follows: (1) location and the commuting convenience incident thereto; (2) lower expenses than those incurred at comparable institutions; (3) broad accessibility, i.e., that students can gain entrance; (4) academic program offering at the desired quality; and (5) racial idealism.[257] Analysis of the data provided by ACT ques-

**252.** Allen 4388–89; 4398–99; USX 372. Enrollment figures for 1990 by institution reveal the following: ASU 94% black; JSU 92% black; MVSU 99.5% black. By comparison, for 1990 the HWIs' white enrollments were as follows: DSU 78%; MSU 82%; MUW 81%; UM 85%; USM 84%. Allen 4511; USX 22(a).

**253.** Broken out by university for the entering 1985–86 cohort, the following percentages represent the retention rate by race over the five-year period: ASU 27.2% black/62.5% white; JSU 27.3% black/11.1% white; MVSU 24.1% black; MSU 37.3% black/52.4% white; UM 42.1% black/48.8% white; USM 39.7% black/40.3% white; DSU 34.7% black/47.3% white; MUW 40% black/41.5% white. Allen 4375–77; 4444–45; USX 014.

**254.** Allen 4424–25.

**255.** See Ayers, 674 F.Supp. at 1558.

**256.** (1987) Siskin 4219; (1987) BDX 192–3; Siskin 8693–97; BDX 133.

**257.** Loewen 10199–200.

tionnaires for the years 1990–1993 indicates that white college-bound high school students continue to express little or no preference to attend historically black public universities in Mississippi.[258] Evidence also indicates that this is a national phenomenon.

Because white students who attend HBIs as a group tend to be older students rather than those directly out of high school, the very low numbers consistently found through analysis of ACT data do not with complete accuracy depict the actual numbers of white Mississippians attending the public HBIs.[259] As a group, the predominant characteristic of the students indicating some preference to attend a historically black school was their academic qualifications. These students were the least qualified academically to attend any four-year university in terms of high school grades, ACT scores and lack of college preparatory courses. Factors identified in the ACT questionnaire such as location, program offering, tuition or cost, and the special needs of the student were statistically insignificant relative to the academic preparation factor and thus, possess little predictive power in determining why white Mississippians choose public historically black universities in the state even to the limited extent that they do. Of the white students who did choose to attend public black universities in Mississippi, cost was the most significant factor after that relating to academic preparation.[260]

## CONCLUSION: CLIMATE

■ Some of Mississippi's HWIs continue to have an image problem, whether deserved or not, in the black community. That image problem stems from both the universities' historical roots and past participation in discrimination near the close of the *de jure* period, as well as its continued links to the past in terms of the symbols with which some universities and/or their alumni choose to identify. However, African–Americans are becoming more and more comfortable in applying to and enrolling in the HWIs as shown by the dramatic increase in the percentage of black students enrolled in the HWIs in Mississippi over the past ten years.

The myriad of reasons why whites attend the State's historically black universities or, conversely, why blacks choose to attend historically white universities, while interesting, is not central to the issues involved in this lawsuit. Rather, the issues in this cause focus on determining where unlawful barriers, if any, continue to persist which deter further desegregation of the system. Stated differently, in this context, the court must identify traceable practices and policies from the *de jure* period that discourage or prevent blacks from attending the HWIs or, conversely, whites from attending the HBIs.[261] Thus, being better informed of why students do or do not choose a particular institution of higher learning is helpful in determining whether a particular vestige of the past shapes or impacts student choice and determines the result. Directing or impacting student choice in and of itself, however, is not an end to be shaped by this court.

Ghosts of the past, which potentially have segregative effects by stimulating a climate nonconducive to diversity on the historically white campuses, include the lack of minority faculty as well as their absence in significant numbers in the top positions within Mississippi's academia. As noted earlier, the acute shortage of qualified faculty is to some extent—but by no means exclusively—a product of the *de jure* segregation practiced throughout the South. This shortage is a national, not a regional one and there is a degree of irony in the fact that the very

**258.** By way of illustration, only .1% of the white ACT test takers that indicated a Mississippi public institution of higher learning as a first preference for attendance indicated a predominantly black senior college in the state (15 out of 15,663 respondents). As to the total white test takers indicating any preference (other than first choice) for a predominately black senior college, only .43% so indicated a preference (69 out of 15,663). That percentage raises slightly when adding those whites which indicated some pref-

erence for any predominately black school, senior or junior college (204 out of 15,663). Siskin 8700–01; BDX 120.

**259.** Loewen 10205–206.

**260.** Siskin 8702–11; BDX 120–32.

**261.** *See Knight v. Alabama,* 14 F.3d 1534, 1541 (11th Cir.1994).

institutions which prevented the enrollment and participation of African–Americans in higher education, now must pay a premium for their presence in order to assure their students adequate preparation for the cultural diversity they will face upon graduation.

The court finds that each university in the state has made and continues to make significant progress in its battle to increase diversity and to provide a welcoming climate on its campuses. The court has considered evidence of a subjective nature in determining whether these actions have been and are currently effective. The court has likewise considered objective evidence of the success or failure of the HWIs to further provide a welcoming climate for all groups in society. The testimony of dissatisfied students and disgruntled professors has been considered together with evidence of retention and participation rates.

The court has heard numerous witnesses testify as to their individual experiences on most of the HWI campuses. Juxtaposed to that evidence are the objective measures typically utilized to gauge campus climate such as institutional retention rates. The plaintiffs' experts testified that the reason that the HWIs have higher retention rates for black students than the HBIs is because of the clientele served by the two groups; however, nothing in the retention rates of the HWIs indicates a pervasive hostile climate at any, much less all, of the HWIs. The evidence showing that, nationally, traditionally black universities as a group have higher retention rates for black students than their traditionally white counterparts, but that the defendant HWIs have higher black retention rates than the HBIs, is evidence that the defendant HWIs in this cause are doing something right.[262] Moreover, by accepting the proposition that the academic preparation of the universities' clientele affects the overall retention rate, where a racially hostile climate is pervasive at an institution, the retention rates between black and white students at that university, evidencing the same or approximate level of preparation,[263] should vary and, to a small degree, they do; however, that degree of variance is too small to indicate pervasive racially hostile conditions.[264]

## GOVERNANCE/BOARD OF TRUSTEES [265]

### A. CONTENTIONS

■ "Whether vestiges of the State operated racially dual system of public higher education remain in the State of Mississippi, particularly with respect to ... [the] composition of [the] Board of Trustees ... and administrative staff." [266]

### B. BACKGROUND

Prior to 1910, the governance of the system of higher education was through separate governing boards for each institution. In 1910 the State went to a single board system which then governed the four extant colleges, Alcorn, Mississippi Woman's College, University of Mississippi and Mississippi State University. No blacks were appointed to this board during its existence.[267]

In 1932, the State created and entrusted the Board of Trustees of State Institutions of

---

**262.** Dr. Ray Hoops, former Vice–Chancellor for Academic Affairs at UM and now the President of Southern Indiana University, testified that as a former administrator of the university which had the largest absolute number of minority students of any institution of higher learning in the United States (Wayne State), he had the opportunity to observe the racial relationships and the racial climate of that university as compared with the racial climate of UM. Dr. Hoops, who, as the record shows, has a personal and professional record which enhances his credibility in this area, testified that he saw a better interracial climate on the UM campus than he observed at Wayne State. Hoops 6736.

**263.** Ignoring the percentage of the cohort enrolled under exceptions to the regular admission requirements.

**264.** Compare ASU retention rates for blacks and whites. To conclude that the variance by race is consistent with a racially exclusionary environment would infer JSU has a racially hostile environment for whites; yet, no evidence exists to support that proposition.

**265.** Appendix A1–A5; US17–US22.

**266.** United States Contested Issues of Fact No. 2(c).

**267.** Anderson 4768.

Higher Learning with the responsibility for all institutions of higher learning including the state normal schools.[268] No black person served on the Board of Trustees until 1972. *Ayers,* 674 F.Supp. at 1550. In 1974, the first black persons were appointed to serve in the capacity of professional staff members. *Id.*

## C. TODAY

Presently, the Board is composed of twelve persons representative of various professions appointed by the governor with the advice and consent of the Mississippi Senate. All university presidents and the Commissioner of Higher Education report simultaneously to the Board. Currently, there are three black members on the Board, two of whom testified in support of the Board's proposals in this action. The court finds it persuasive in the area of governance and in deciding the issue of whether black board members better represent the interests of African–Americans than do whites, that in presenting to the court the views on merging HBIs and HWIs and on admissions standards, black board members testified contrary to the positions taken by the plaintiffs herein; and the only board member who testified in support of any of the plaintiffs' positions was white.

The immediate past president of the Board is African–American, and black board members are equally active in all aspects of board business. Evidence indicates that the Board continues to be responsive to the concerns raised in this lawsuit. The immediate past president of the Board, Mr. Sidney Rushing, appointed a task force charged with reviewing factors in the State that impinged on diversity system-wide. Of the Board's 108 employees, 26 are black. Black board staff members hold professional positions of responsibility such as Assistant Commissioner for Academic Affairs and Associate Commissioner of Academic Affairs.[269]

268. Anderson 4769.

269. Luvene 7906; Crawford 7579–80; Rushing 7739–40; PX 125.

270. Appendix A5; US22.

271. Appendix US15–US16.

## CONCLUSION: GOVERNANCE

The court finds no evidence of a current practice "of denying or diluting the representation of black citizens on the governing board," or of "arbitrarily limiting the activities of the administrators of HBIs in a way that impedes their ability to protect the right of their students."[270] The fact that blacks have actively participated on the Board for more than twenty years indicates that no current exclusionary policy exists. As to the contract issue, it has been made clear that the State, through the Board, failed to award contracts or consultantships to black citizens during *de jure* segregation. The plaintiff parties' allegation that this practice continues to exist remains unsubstantiated in the absence of evidence that any blacks have applied for or have been denied available consultantships.

### FAILURE TO PLAN/ASSESS[271]

## A. CONTENTIONS

■■■ It is the United States' position that the defendants' liability in part flows from their failure to formulate a plan for desegregation. Stated succinctly, "it is the independent duty of the State to search for and eradicate all remnants of the dual system and demonstrate to the Court 'that it has dismantled the dual system.'"[272]

## B. OVERVIEW

The United States Department of Health, Education and Welfare (HEW) rejected the IHL Board's 1974 Plan of Compliance. *Ayers,* 674 F.Supp. at 1530. The governing board commissioned five studies between 1927 and 1966.[273] These reports helped shape higher education for the State including the development of institutions. The State has made different assessments of higher education needs during various time periods. Some assessments ignored black

272. Pretrial Order at p. 25.

273. Those studies are as follows: the O'Shea study (1927); the Campbell study (1933); the Mississippi Study of Higher Education (1945); the Brewton study (1954); and the 1965/66 Role and Scope study.

higher education; some opposed higher education for blacks; and still others made recommendations for expansion and programmatic development in relation to higher education for blacks.[274] As noted earlier, Mississippi's system of higher education is marked by a very high degree of institutional autonomy. While the Board recommends what policies to follow with regard to addressing diversity issues, in the words of one board member, "[w]e leave it to the institutions to diversify themselves." [275]

## CONCLUSION: FAILURE TO PLAN/ASSESS

The court must reject the United States' position that the obligation of the State in desegregation of the higher education system must be codified in a formal plan.[276] Likewise, the court rejects the notion that the Constitution requires an assessment of public institutions on the basis of their student bodies' predominant racial characteristics.[277] As previously observed by this court and other courts who have considered desegregation cases in higher education, the eradication of the vestiges of the de jure systems will not necessarily eradicate the racial identifiability of public institutions. The defendants' past failure to plan and assess the deficiencies in their higher education system that have fostered segregation and to eliminate the vestiges of their prior de jure segregated system will be addressed in the remedial decree and any further orders of the court.

## ACCESS: COMMUNITY COLLEGES [278]

### A. OVERVIEW

■ The State's community college system is the subject of a separate lawsuit, severed from this suit on an earlier occasion. (Community colleges described herein are public two-year colleges, also referred to as junior colleges.) Nonetheless, to the extent that the access issue has turned upon evidence regarding the community college system, specifically black transfer and participation rates, the same were explored in this action.

### B. BACKGROUND

There is an association between black enrollment and vocational programs offered at predominantly black junior colleges; namely, that where there is a higher percentage of black enrollment, there is a high percentage of students enrolled in vocational courses.[279]

An ACT score is now required for entrance into some academic and technical programs offered at junior colleges across the state.[280] In some instances, the ACT score required for admission is actually higher than that required at any of the public four-year institutions. This appears to be a significant change from 1987 when this action was first tried.[281] At many junior colleges, an ACT minimum score is also employed in making decisions about financial aid, namely, scholarships.[282] For students beginning their postsecondary education in a four-year institution, evidence exists to suggest that there is a higher probability that those students will complete a bachelor's degree than those beginning in a two-year institution. This is a national phenomenon. There is some evidence to suggest that blacks do not transfer to four-year universities in Mississippi and nationally at the same rate as do whites.[283]

274. For example, the Brewton study and the 1965–66 study served to project enrollments and make recommendations related to program expansion and institutional development. The Brewton report suggested closure of ASU or merger with JSU. USX 108–9; Anderson 4772; 5094; (1987) PX 200.

275. Rushing 7767.

276. See Appendix US15.

277. See Appendix US16.

278. Appendix US31.

279. Paul 9996–98; USX 703.

280. Paul 9999–10000; USX 704–05.

281. See Ayers, 674 F.Supp. at 1536 ("Students may attend a public junior college, all of which have open admission policies"). When this action was first tried in 1987, evidence was presented that for admission to certain programs at various junior colleges, an ACT score was used for informational purposes only. (1987) Thrash 1134.

282. USX 706; Paul 10004–006.

283. Paul 10028; 10032.

In the public four-year university system as a whole, only 8% of the total black enrollment are transfer students originating from the community college system as compared with 19% of the white students so enrolled.[284] The overwhelming majority of students who start at the junior college level do not transfer to a four-year university but of those who do, their retention/graduation rates are lower than those of students who began at a four-year institution.[285] The reasons for the disparity in transfer rates to four-year institutions between the races has not been fully explained. Clearly, the fact that black students are more populous in vocational programs which do not require more than two years to complete plays some role in explaining the disparity.

Students do not transfer in equal numbers to each of the four-year campuses. USM had the highest proportion of transfer students in its student body (45.64%) while MVSU had the lowest percentage (4.70%) for the Fall of 1993. USM has a higher percentage of transfer students than the other Mississippi universities largely because of its recruiting efforts and its articulation agreements with several community colleges on the Gulf Coast and surrounding regions.[286] Because the two-year community colleges are implementing ACT cutoff scores in some courses, it appears that the two-year system is not serving as a full alternative route to the bachelor's degree particularly for black students who on average have lower ACT scores than their white counterparts.[287]

## CONCLUSION: COMMUNITY COLLEGES

To some Board members, the public community college system serves as an efficient vehicle for the remediation of students not prepared for four-year institutions.[288] While it is perhaps logical to assume, as some board members do, that it is more economical to remediate students at the community college level, it is obvious that the community college system in Mississippi is not, in fact, performing that task to any great degree, particularly in light of its newly imposed program specific ACT cutoffs. There is no allegation that the community college system is operated in this manner with discriminatory purpose or any showing that any policy and/or practice identified with the community college system is traceable to *de jure* segregation.[289] Evidence indicates that the community college system can have an impact on the admissions policies of the universities and their ability to further diversify institutions of higher learning. This court still has the community college case within its jurisdiction, and the State, it appears, is losing a valuable resource in not coordinating the admissions requirements and remedial programs between the community colleges and the universities. Such coordination has not been proposed to the court, but the court will direct the Board to study this area and re-

---

**284.** DSU has the highest percentage of black transfers at 25% of its student body. For the same time period, DSU's white transfer rate was lower (23%). USM has the second highest percentage of black transfers at 19% of its student body.

**285.** Allen 4472–74; USX 18.

**286.** In the late 1980s, the Board standardized curricula across universities so that every baccalaureate program that exists at an IHL has the same curriculum. Thus, any student attending a public junior college in the system can transfer to any senior college in the system without loss of college credit hours.

**287.** Paul 10032–33; 10041–42; 10066–67; USX 713; USX 716; Pickett 5954–5956.

**288.** Miller 5624–25; Luvene 7923.

**289.** That is to say that the State may benefit from the observations made by the plaintiff parties' witnesses in this area, namely, Dr. Paul, but is not compelled to accept her recommendations in the context of this lawsuit. Educationally sound recommendations which the court finds has support in the record include: (1) elimination of ACT test scores as cutoffs for academic/technical program entry at all community colleges (Paul 10083); and (2) improvement of the facilitation of transfers to the public four-year universities. Some of the ways to do this include: (a) a three-way contract between the student, the community college he or she attends and the transferee college; (b) automatic dual admission to the transferee institution upon entrance to the community college. Dual admission would address issues such as financial aid, the possibility of reserved seating, the issuance of an identification card to the student by the four-year university and, finally, the clarification of maturation standards. Paul 10085.

port to the Monitoring Committee on its results.

### ATHLETIC CONFERENCES [290]

█ The continued practice of having the HBIs compete in racially identifiable athletic conferences is traceable to Mississippi's as well as the rest of the South's *de jure* past.[291]

Although the defendants have denied that participation in racially identifiable athletic conferences fosters segregation at the state universities, no evidence has been presented which confirms or negates the allegation that this vestige of the past impedes further desegregation of the HBIs. This court has placed the burden on the defendants to negate the inference that a traceable practice currently fosters segregation, which in this context, means that the practice challenged does not impede further desegregation of the HBIs/HWIs.

Although not required to come forth with an educationally sound practicable alternative, the United States contends that the withdrawal from "athletic participation in conferences which fail to gain membership from historically 'other-race' schools" is such an alternative. The court is unaware from this record of any HBI that has sought to join or has any desire to join the SEC or any of the other Division I athletic conferences. The court sees no practicality in such a move and has heard no testimony endorsing the practicality of such a joinder. Most universities in Division I conferences throughout America, including UM, MSU and USM, have athletic scholarships that are predominantly bestowed on black athletes. The court finds the fact that no HBI in the state is a member of an athletic conference with a HWI in this state is not evidence of discrimination against black students. To the contrary, from observations at athletic events, the court can take judicial notice that black students far outnumber white students in the statistical pool of college athletics in the HWIs, and at the HBIs black athletes are generally the exclusive participants. To argue that making HBIs members of Division I athletic conferences will somehow aid desegregation is unsupported by any evidence in this record.

The fact that one may identify the predominant racial composition of schools through their participation in an athletic conference, in itself, says nothing of its impact on desegregation of the institution under scrutiny. No witness, expert or lay, has testified that participation in racially identifiable athletic conferences impedes desegregation of Mississippi HBIs/HWIs. While one witness proffered the opinion that such participation might influence a student's decision of where to attend,[292] the court finds that testimony unpersuasive. If there is one aspect of university life that most evidences institutional diversity, it is athletic competition. No witness aligned with any party has indicated either the feasibility or desirability of modifying this practice. Accordingly, the court cannot conclude that institutional participation in racially identifiable athletic conferences fosters either the racial identifiability of Mississippi IHLs or that the elimination of such participation would be consistent with sound educational practices.

### GRADUATE COUNCILS [293]

No evidence was presented to support the allegation, raised for the first time on remand, that "black persons" are "excluded . . . from graduate school councils, faculty councils and other councils." While it is obvious that blacks were excluded from such organizations as they existed at the HWIs during *de jure* segregation, no testimony was presented to show such exclusion since *de jure* segregation. Graduate councils at both the HWIs and HBIs, as well as faculty senates, continue to be racially identifiable.[294] Beyond that, the court has heard no evidence serving to identify a practice traceable to *de jure* segregation that continues to segregate the universities.

290. Appendix US61.

291. Anderson 5015–17; Loewen 5104–09.

292. Conrad 5385–86.

293. Appendix A6.

294. Anderson 5014; PX 196; PX 192.

## CONCLUSION: INTERACTION OF POLICIES AND PRACTICES FOSTERING SEPARATION OF THE RACES; THE SCOPE OF THE VIOLATION

After consideration of the evidence, the court finds the following:

(1) Undergraduate admissions policies and practices are vestiges of *de jure* segregation that continue to have segregative effects.

(2) Graduate admissions policies and practices are not vestiges of *de jure* segregation.

(3) Policies and practices governing the missions of the institutions of higher learning are traceable to *de jure* segregation and continue to foster separation of the races.

(4) Funding policies and practices follow the mission assignments and, to that degree only, are traceable to prior *de jure* segregation.

(5) Policies and practices governing the allocation of facility funding in terms of capital improvements/repair and renovation funding do not follow the mission assignments and are not traceable to *de jure* segregation.

(6) Policies and practices governing equipment availability and library allocations follow the mission assignments and, to that degree, are traceable to *de jure* segregation.

(7) Current employment policies and practices are not traceable to *de jure* segregation.

(8) There are no current policies and practices traceable to *de jure* segregation that foster a racially inhospitable climate at the HWIs.

(9) Current policies and practices governing appointment to or employment by the Board are not traceable to *de jure* segregation.

(10) The practice of maintaining participation in racially identifiable athletic conferences is traceable to *de jure* segregation, but does not have segregative effects.

(11) Policies and practices governing appointment to graduate councils are not traceable to *de jure* segregation.

(12) Policies and practices relating to the provision of duplicative offerings between proximate institutions which are racially identifiable are traceable to *de jure* segregation and continue to have segregative effects.

(13) Operation and maintenance of two racially identifiable land grant programs are traceable to *de jure* segregation and have segregative effects.

(14) Continued operation of eight universities, all of which are to some degree racially identifiable at the undergraduate level, is traceable to *de jure* segregation and continues to have segregative effects.

### DEFENDANTS' PROPOSED REMEDIES

In response to the United States Supreme Court decision in this action, the defendants proposed a limited reorganization of the State's system of higher education. Certain elements of the proposal are discussed below.

### ADMISSIONS

#### A. OVERVIEW

Conceding only that the Supreme Court "criticized" the previous existing admissions standards, the defendants nonetheless seek to alter the current standards and to put in place a system-wide admissions standard for the 1995–96 school year.

#### B. PROPOSAL

##### 1. OVERVIEW

Set to begin in the Summer of 1995, the Board has instituted a state-wide admissions policy to govern all universities. Under the proposed admissions standards, "regular admission" to any university will be granted for high school students with a minimum 3.20 high school grade point average ("GPA") in a specified College Preparatory Curriculum or "core."[295] Those students under a 3.20 GPA but (1) equal to or greater than a 2.50 GPA in the core, *or* a class rank in the top 50% in

---

**295.** The "College Preparatory Curriculum" is a series of courses now consisting of four units of English, three units of science, three units of social studies, one-half unit of computer applica-
tions and, finally, two electives to include any two of the following: foreign language, world geography, a fourth-year lab-based science or fourth-year mathematics. BDX 202.

their high school graduating class *and* (2) a minimum score of 16 on the ACT may also be regularly admitted. Finally, all high school students completing the core with a minimum GPA of 2.00 and a score of 18 on the ACT may likewise be regularly admitted.[296]

## 2. SPRING PLACEMENT PROCESS

Students desiring to enter a four-year institution in the state, yet failing to qualify under the proposed "regular" admissions standards, may nonetheless be "conditionally admitted." Such students must successfully complete an "Academic Screening Program" designed by the Board to determine whether a student will benefit from remediation and/or what remediation the student will need in order to become prepared for college.[297]

Described as a process that begins in the spring of a student's senior year in high school, data is collected on the student through a variety of instruments including the "accuplacer," a study skills instrument, ACT subtest scores and counselor interviews.[298] Interviewing, testing and counseling will be held on each university's campus prior to the beginning of the summer session. For students required to be screened, they must complete the Mississippi College Placement Examination or "MCPE", a standardized placement examination.[299] After the data gathered during the spring placement process is analyzed, a placement decision is made. The decision will address whether the student should be enrolled in summer reme-

dial instruction or regular freshman curriculum with or without academic support.

## 3. SUMMER PROGRAM

For those students who after screening indicate a need for remediation, a Summer Program of approximately ten to eleven weeks is available. The program is described by its developers as "an intensive program that concentrates on those high school subject areas (writing, reading, mathematics) that are applicable to success in first-year college courses." Students who complete the Summer Program with success are admitted to the university of their choice "with mandatory participation in the Year-Long Academic Support Program" during their freshman year.[300]

As proposed, those students who participate in the Summer Program will experience remedial courses taught in the traditional classroom with computer-assisted individualized components. Additionally, students will become climatized to college campus life though a variety of cultural, recreational and social activities offered through the program. About halfway through the program (approximately the fifth week mark), an assessment will occur to allow those students, who have demonstrated the ability to negotiate college-level course work, the chance to exit early at this point.[301]

At the end of the summer, the students are again tested with the accuplacer to determine the progress the student has made between

---

**296.** BDX 202.

**297.** Upon review by the United States Department of Education, the Board has substituted the term "full admission" for that of "regular" admission; Students falling into the category of "conditional" admittees will now have "full admission" status, and those students formerly falling under "provisional admission" will be granted the status of "full admission with academic deficiencies." BDX 713 (Supp.). These changes were necessary to insure students admitted under the previous designations would be eligible for federal financial aid. Defendants' Proposed Findings of Fact and Conclusions of Law. pp. 22–23.

**298.** Boylan 6302. The accuplacer is a cognitive assessment instrument that measures intellective areas and student characteristics. Conversely, the study behavior inventory is an affective in-

strument that looks at the student's study skills and attitudes. An affective assessment instrument measures personal characteristics, attitudes, and values. Boylan 6303. Primarily now used by four-year institutions in America with open-door admission policies, the accuplacer is designed to identify deficiencies students possess in certain college curriculum areas. It is not designed as a screening instrument or as a component of an admission process per se but rather as a placement device. Doyle 6148; 6173; 6197.

**299.** BDX 202.

**300.** BDX 713 (Supp.) (full admission with academic deficiencies).

**301.** Boylan 6305.

entry and exit and to what extent the student has mastered the required material. Input from the students' teachers and/or counselors in what has been described as a type of case study conference will also be considered. Finally, what has been termed the Learning Assistance and Student Skills Inventory (LASSI) may be employed to determine the students' readiness to engage in successful college study as well as to assess behavioral strategies.[302]

Following the Summer Program, the students enter college in the Fall with a moderate amount of academic support services or with a lighter course load along with a greater amount of support services. Otherwise, the students are counseled to explore other educational alternatives.[303] The Summer Program's reliance on a series of assessment instruments is a recognition of the generally recognized principle in the field of developmental education that students learn in a variety of ways at varying rates and through the employment of different intervention strategies.[304] The Summer Program features early intervention on a comprehensive scale. It is contemplated that the Summer Program will employ state-of-the-art computer-based assessment, instruction, software and management. Computer-based instruction is combined with traditional classroom instruction and individualized instruction.

As contemplated, the yearlong academic support program is a continuation of the individualized instruction received in the summer and includes computer-based instruction, freshman seminar programs, learning centers and laboratories, tutoring, and counseling.

## C. IMPACT PROJECTED FOR NEW ADMISSIONS STANDARDS

The predicted impact of the new 1995 standards depends on the frame of reference,

e.g., whether the 1995 proposed standards are compared with admissions standards prevailing at the time of the 1987 trial or, alternatively, those prevailing today. As previously noted, when the ACT changed its format in 1989, and the HBIs retained the same ACT score entrance requirements, the HBIs in effect reduced their admissions requirements. As compared with the standards in existence and litigated in the 1987 trial, the predicted impact is as follows: (a) the pool of black students eligible for regular admission to a public HWI will increase from approximately 32.4% to 52.5%; (b) the pool of black students eligible for regular admission at the HBIs in 1995 will be increased from approximately 45.3% to 52.5%; (c) the pool of black students eligible for admission to the system as a whole will also increase under the proposed 1995 standards as compared with the 1987 standards.[305]

As compared with the standards which prevail today (Enhanced ACT of 15 at the HBIs), 68.2% of the black high school graduates who took the ACT are currently eligible for regular admission to some university in the system versus 52.5%[306] or 50.7%[307] which would be eligible in 1995 under the proposed system. Thus, there would be an overall percentage decline of black students eligible for regular admission to the system;[308] however, the Summer Program would, it is anticipated, give those students another opportunity to gain admission into the university of their choice.

## D. PROPOSED REMEDIES/ADMISSIONS

### 1. PRIVATE PLAINTIFFS

It is the private plaintiffs' position that the regional universities (ASU, MUW, MVSU and DSU) should essentially have what they

302. Boylan 6306.

303. Boylan 6305–07.

304. Boylan 6307–10.

305. Anzalone 5782–5790; BDX 249–254.

306. BDX 252.

307. PX 387.

308. Anzalone 5780–83; Miller 5572–73; BDX 252. Of those now eligible at the HBIs (Enhanced ACT composite score of 15), students scoring a 14 on the English section of the ACT and those scoring a 16 on the math section are enrolled in a developmental program. PX 25; PX 15.

term "open admissions" (i.e., an ACT score of 10 and a high school diploma). The three white comprehensive universities would use the previously described admissions standards the Board now proposes for all the universities; JSU would have open admissions for eight years with the option thereafter of gradually raising its admissions standards to the level prevailing at the comprehensive universities.

Furthermore, it is these plaintiffs' position that no university may employ an ACT score or any other test score as a cutoff score or as the sole selection criterion in the decision to award scholarship monies or other financial aid. The plaintiffs also propose that all test cutoff scores now governing entrance to any graduate or professional program be suspended pending examination of the standards by the plaintiffs.

### 2. UNITED STATES

Several of the United States' witnesses endorsed the admissions standards as outlined in a September, 1992 Board proposal that was never adopted. In pertinent part, that proposal recommends the following admissions standards: attainment of a 2.0 GPA in the core with a minimum ACT score of 16 for "priority admission"; 2.50 GPA (core) with a ranking in the upper fifty percentile (50%) of the graduating class and a minimum ACT composite score of 13 for "regular admission."[309] The United States' witnesses appear to acknowledge as educationally sound, use of the ACT assessment as part of the admissions standards.[310] The United States also appears to endorse state-wide admissions requirements and has also suggested adoption of a 2.5 overall GPA for admission to all universities.[311]

### E. CRITIQUE: ADMISSIONS

The Board's proposed admissions requirements have as a component the taking of a certain core curriculum as described heretofore. While no one disagrees as to the benefits accruing to students by exposure to the core,[312] the private plaintiffs have raised issues as to whether or not the core is provided in all school districts and the quality of the core provided in the poorest school districts of the state. In 1987, this court concluded that the "prescribed pre-college curriculum is an appropriate measure of academic progress and achievement in high school." *Ayers,* 674 F.Supp. at 1532–33. No evidence has been adduced to disturb this court's finding that "the completion of the high school course requirements has resulted in a higher level of academic preparation for those students wishing to experience the rigors of academic life at the university level." *Id.,* 674 F.Supp. at 1535. The same holds true today.[313]

Evidence has been adduced that blacks participate in the core curriculum in fewer numbers than do white high school students.[314] Rather than seeking a remedy for the low participation rate, the plaintiffs ask the court to prohibit the Board from requiring participation in the core. The plaintiffs have not called into question the abundance of testimony validating the core curriculum requirement as a desirable educationally sound component of the admissions standards. Evidence exists that the core is provided in every school in the state.[315] The court does not find it persuasive that many school districts which have less money to spend on their programs than others are

309. Paul 10090; Conrad 10361–62; PX 385.

310. Dr. Allen's recommendations, in general, approximate what the Board has proposed, e.g., GPA used with test scores, probationary admission, class rank, and letters of recommendation. Allen 4454. Prior to trial, the United States urged use of the HBIs' admissions standards of a 15 ACT score and high school graduation by all universities. "Practicable Alternatives to Remnants that State Contends Are Justified Submitted by the United States" p. 11.

311. "Practicable Alternatives" p. 11. Statewide admissions criteria and standards "that increase

educational opportunity for blacks" are also a part of the Conrad proposal. Conrad 10297–10302.

312. *See* Allen 4464; Pickett 5950; Anzalone 5769–71; BDX 255.

313. BDX 255.

314. Pickett 6016–17.

315. Pickett 6016–17; BDX 222.

often predominantly black and less able to adequately fund the core subjects. The record shows that many of the school districts which rank near the bottom in budget expenditures turn out students who as a group rank near the top on the standardized college admission tests relative to other school districts.[316] The court finds that the core curriculum component is educationally sound.

Clearly, the new admissions standards through their uniformity will eliminate the prior segregative effects of the previous differential admissions standards between the HBIs and HWIs, noted by the Supreme Court in *Fordice*, ── U.S. at ──, 112 S.Ct. at 2739. Use of the ACT in combination with a prescribed high school GPA will provide substantial flexibility in the regular admissions process and is an educationally sound method of corroborating academic readiness not otherwise available by reliance on high school GPAs alone.

While the new admissions standards may reduce the number of black students eligible to be admitted to the system without remedial courses required, it is not evident that the new standards will actually reduce the number of black students ultimately admitted to the system as either regular or remediated admittees.

The plaintiffs have questioned whether high school graduates having multiple academic deficiencies, and not eligible for formal admission until completion of the Summer Program, will attend the Summer Program or perhaps forego a college education altogether. The court does not view the Board's obligations to the state's graduating high school students as encompassing students ineligible for regular admission under its proposal, who do not choose to participate in a screening process for academic placement analysis. It does not appear to the court, as argued by the plaintiffs, that the Board has disclaimed responsibility for the students currently exiting the state's primary/secondary school system. It has made commendable efforts toward increasing the quality of the educational experiences of those students through "Project 95" and other such programs.

While components of the program have been tested elsewhere in the United States, the Summer Program has not been implemented as a complete and comprehensive system. The accuplacer has been pilot-tested at some high schools in the state, but as of the time of trial, an analysis and evaluation of that testing had yet to be undertaken.[317] The witnesses for the plaintiffs took issue with the opinions proffered by the defendants' witnesses on the anticipated benefits of the Summer Program but, primarily, the basis for that difference of opinion is confined to concerns over the expected length of the program.[318] The creator of the program has nationally recognized expertise in the remediation/developmental education arena [319] and the court finds the proposed program to be credible and educationally advanced. In its proposed form, it is considered by its developers as an educationally sound developmental system.[320]

## CONCLUSION: UNDERGRADUATE ADMISSIONS

 After considering the evidence of the general admissions policies throughout the

---

316. BDX 224. For example, Hinds A.H.S. School District is ranked second in the state in terms of its average per pupil expenditures, yet is ranked 148 (out of 153) in terms of ACT mean composite scores, as compared with other school districts. Claiborne County School District is ranked third in terms of average per pupil expenditures, but is ranked 140 in terms of ACT mean composite scores. Conversely, Ocean Springs School District is ranked 127 (out of 153) in terms of average per pupil expenditures, but is ranked first in the state in terms of ACT mean composite scores. Itawamba A.H.S. School District ranks at the bottom of the list (153) in terms of average per pupil expenditures, but is ranked near the top in terms of ACT mean composite scores (27).

317. Pickett 5984.

318. Young 9639; George 3423; Carter 2854–56. *See also* Allen 4544–47; Whisenton 3315–16.

319. Dr. Boylan, currently the Director of the National Center for Developmental Education and professor of higher education at Appalachia State University, has extensive experience with developmental education programs, particularly those programs currently in existence at HBIs. Boylan 6268–73.

320. Boylan 6313.

United States, the court must reject as an admissions standard, open admissions for any university. As a diagnostic tool, even the plaintiffs' witnesses acknowledge that the ACT continues to be a valid indicator of academic preparation to do college-level work and areas of educational deficiencies.[321] While there is evidence to suggest that blacks as a group score lower on the ACT than whites, that evidence does not compel abandonment of the ACT as a placement aid. The primary disagreement between the parties is the use of the ACT as a component of the admissions decision, as proposed by the defendants, rather than solely as a placement aid as proposed by the plaintiffs.

The plaintiffs contend that use of the ACT in admissions decisions is not justified by the small improvement in correlation between college GPAs and high school GPAs when ACT scores are also used as a predictor.[322] Average ACT scores do vary considerably among school districts in Mississippi.[323] As previously noted, however, the court cannot conclude from the evidence that the size of a school district's budget is directly proportional to the ACT scores of that district's students. The converse is true in many cases. Nevertheless, the court still finds the ACT a sound component of the admissions decision for the reason that the ACT, in combination with high school grades, remains a better predictor of academic performance than either criterion alone.[324]

Some expert witnesses, including some of the defendants' witnesses, have concluded that differential or tiered admissions standards based on university missions are both sound and the usual practice in higher education where the institutional landscape is not homogeneous.[325] However, the proposal of the Board in this area is also educationally sound, especially in a system which has a large contingent of two-year community colleges, most of which have open admissions in most fields. The Board's admissions proposal will therefore be ordered into effect.

These admissions requirements even for full regular admission are quite moderate. As one witness testified, with such moderate admissions requirements, it might well develop that in the future in some states such as California, where approximately only one out of ten applicants is admitted to the state university system because of the competitive admissions requirements, students will hear about a state with moderate admissions requirements, a clean environment, relatively low crime rates, and college campuses where as many as 90% of the students are attending on federal Pell Grants, and there will be a mass migration to that state. These moderate standards then no longer would be feasible because the state universities could not accommodate the large number of persons seeking admittance, and admissions requirements would have to be raised to accommodate only those who are best prepared to take advantage of the educational opportunities offered.

The court does not find persuasive the concern voiced by the plaintiffs that these moderate standards, as proposed by the Board, will exclude from college many who are unprepared as a result of their minority racial status. To the contrary, the evidence is that overall there will be an increase in the number of eligible minorities when compared with the standards in existence before the HBIs lowered their admissions requirements in 1989. The number of eligible African–American applicants to the HWIs would actually increase, a strong move toward desegregation. The court does not find persuasive or educationally sound the adoption of open admissions or continually lowering admissions standards, as was done at the HBIs after the 1987 trial. The universities across the nation generally are moving toward higher admissions requirements, not lower ones. According to the testimony, students in working toward goals will usually do that which is expected of them. If they believe they need not prepare themselves for college by taking the core curriculum in high school,

**321.** Loewen 5156; 5206–07; Hillard 9882.

**322.** Loewen 5162–5169.

**323.** BDX 224.

**324.** Anzalone 5791–94; Loewen 5162–65.

**325.** Hoops 6826–28; Anzalone 5839; Blake 4130; Wyatt 10736.

they will not do so. Such unpreparedness may bring them to college campuses unable to execute the rigors of college work and result in low retention rates, college debt accumulations and years expended with no degrees. Conversely, if those students interested in college understand that a certain minimum standard of performance in the secondary schools is required in order to be eligible to attend a higher education institution, those students will more likely meet those requirements and be ready for college work. It has also been shown that institutions of higher learning which open their doors to unprepared students via open admissions not only do a disservice to many of the admittees, but can lower the quality and, concurrently, the prestige of the institutions generally. The Board's admissions standards include the Summer Program for remediation purposes for those who need it and also a highly efficient community college system with quality instruction, a significant number of which have open admissions.

## MISSIONS

### A. OVERVIEW

The Board chose not to alter the mission designations of the various institutions slated to persist under the proposed reorganization of the system of higher education. The three historically white "comprehensive" universities remain "comprehensive" in name and in fact; JSU continues under the previously defined "urban" status with an added "enhanced" designation, and the remaining institutions retain their "regional" designations. However, the defendants have proposed to enhance the funding and programmatic offerings at JSU and ASU. In particular, the changes in programmatic scope of the institutions include the following:

### B. PROPOSAL

#### 1. JACKSON STATE UNIVERSITY

JSU will be encouraged and aided to become a multi-campus institution to serve the Jackson urban area.... Selected programs in the field of allied health, which are non-duplicative of those at UMMC or which may be offered on a cooperative basis with UMMC, shall be provided by JSU either at the main campus or at another suitable location in the Jackson area. Programs in social work (Ph.D) and urban planning (Masters/Ph.D.) shall be provided by JSU at its Graduate Center (formerly the Universities Center). A doctoral program in business (DBA) shall also be provided by JSU at its Graduate Center when JSU's existing business programs are accredited. If a clear need is shown for an urban area law school providing both day and night opportunities, such a school will be provided by JSU at its Graduate Center.[326]

#### 2. ALCORN STATE UNIVERSITY

The State shall provide the Small Farm Development Center at ASU with annual research and extension funds to match dollar-for-dollar similar federal funds appropriated to ASU, up to an aggregate of $4 million each year. An MBA program shall be provided by ASU at its Natchez Center.[327]

### C. PROPOSED REMEDIES: MISSIONS

#### 1. JSU: Private Plaintiffs

As a point of common ground, the plaintiff parties agree to the defendants' proposed programmatic changes and financial enhancement of the institution. No evidence indicates that these modifications are not educationally sound. Rather, it is the plaintiff parties' contention that these changes are not enough and that the plan for JSU reflects a lack of long-range commitment to the betterment of JSU, a commitment that must be made if JSU is to become desegregated.

As a remedy to the inequitable treatment of JSU in the past and ostensibly as a means of increasing other-race presence at JSU, private plaintiffs want the institution to achieve control over the Universities Center located in Jackson and the University of

---

**326.** BDX 638.

**327.** BDX 638.

Mississippi Medical Center (UMMC) also located in Jackson.

### 2. JSU: United States

The United States takes the position that institutional and programmatic enhancement of JSU will increase diversity at the campus. According to the United States' expert witness, a successful desegregation plan should have at least nine essential elements. Relevant to the mission area are the following recommendations: (1) reclassification of institutions into a single state-wide system with sharpened institutional missions and genuine areas of institutional program exclusivity; (2) enhancement and sharpening of the missions of the HBIs; (3) elimination of selected non-essential (non-core) high demand programs at the HWIs; (4) transfer of selected non-essential high demand programs from the HWIs to the HBIs; and (5) the creation of new high demand programs at the HBIs.[328]

### D. CRITIQUE: MISSIONS

#### 1. JSU

Situated in the largest population center in the state, JSU has the primary mission to serve the needs of the Jackson area. Without a doubt, JSU's arrested development is traceable to the policies and practices of *de jure* segregation. Although the relatively fewer programmatic offerings and the complete absence of professional programs at JSU more likely than not affect its position and reputation vis-a-vis the white comprehensive universities, the court now must focus on whether any enhancement will produce a significant white presence at JSU, and

if so, the extent and more importantly, the form that enhancement must take to be effective in desegregating the institution.

### 2. ASU

The court is likewise convinced that ASU's limited role in the land grant arena is directly traceable to prior state-mandated segregation. The court finds that the operation of two racially identifiable land grant institutions might continue to have some segregative effects that would be minuscule because of the small number of students now majoring in agriculture.

The evidence preponderates toward the conclusion that dividing the roles within the extension arena between two universities rather than as it is currently conducted is not an educationally sound alternative to remedying this state of affairs.

### CONCLUSION: MISSIONS

#### A. JSU

■ The court finds Dr. Conrad's effort commendable but cannot order program transfer and/or elimination based on the record before the court which, as the witness agreed, provides inadequate evidence on which to base such action.[329] The court agrees in part with the plaintiffs' contentions as they concern JSU's lack of professional programs, typically, the types of programs that promise the greatest degree of desegregation, e.g., pharmacy, law, engineering.

The court also finds, however, that the feasibility[330] and educational soundness of program transfer to the degree urged by Dr. Conrad, as well as the requested medical school affiliation with JSU, are not apparent

**328.** Conrad 10297–10302. Other components not considered here include: (a) state-wide admissions criteria and standards that increase educational opportunity for blacks; (b) the creation and fostering of institutional initiatives to improve recruitment, retention and academic success of other-race students at both the HBIs and the HWIs (illustrative of such initiatives are measures to enhance campus climate, strengthen other-race recruitment and broaden other-race financial aid such as other-race scholarships at both the HBIs and HWIs); (c) improving the facilities at the HBIs directed toward improving the attractiveness of these institutions and altering the public perceptions of these institutions (included under this rubric are measures direct-

ed toward enriching existing programs, strengthening faculty and securing accreditation where necessary); (d) measures designed to desegregate faculty and staff; (e) adequate resources set aside to fund the desegregation plan with these components; and, finally, (f) provisions for monitoring and evaluating the planned remedy.

**329.** Conrad 10396–98.

**330.** Although the plaintiffs' attorneys want the medical school transferred to JSU, the president of JSU advised the court that he does not want control of the medical school.

on the record. While programmatic enhancement through transfer could possibly solve the prestige problems faced by JSU, the same cannot be ordered as an educationally sound step toward increasing that prestige. The court agrees that the endowment for JSU proposed in the amount of $5 million and the funds proposed to be set aside to purchase adjoining land are sound steps toward correcting JSU's image and will so order those steps implemented. In order to increase other-race presence at JSU, the court will require the Board to take steps toward developing strong articulation agreements between JSU and surrounding community colleges within its service area. These steps should insure some alteration in the percentage of students enrolled in upper division courses, thereby creating the potential of increasing its funding under the formula.

In terms of the dearth of professional programs at JSU, the court finds that, to some degree, the lack of such programs does obstruct potential other-race enrollment at the main campus. The Board's position that no qualified blacks are excluded from any professional program in the state today misses the point entirely inasmuch as the issue is the dearth of professional programs potentially attractive to academically prepared whites at the HBIs rather than the existence of race-neutral admissions standards. The court finds persuasive the defendants' position that other-race participation in the medical profession is more a matter of the admissions requirements in place at the medical school rather than its affiliation with a particular university. The evidence fails to establish how institutional affiliation with UMMC will increase diversity at JSU or within the medical profession as a whole. Especially persuasive on this point is Dr. Lyons' testi-

mony that JSU does not see the need for that affiliation.[331]

The court has heard some evidence pertaining to UM's Law School and the problems experienced by the school in recruiting and/or retaining black students. Law, like medicine, is a high demand profession and currently, there is no public law school in the Jackson area, the center of state government and where approximately 50% of the state's attorneys practice or reside. As part of its proposal to enhance JSU, the Board proposed to the court that JSU should have a law school "if the need exists," and that "a study will be made." The court is not advised by this record if the Board's proposal for a law school to be located at JSU is contingent on a "need" for two state law schools or a need for the one state law school to be located in Jackson as part of JSU in order to help carry out the Board's planned enhancement.

The Board shall make a study addressing both possibilities and present its results to the Monitoring Committee. All the preceding considerations pertaining to law schools are also applicable to the professional five-year program of pharmacy, and perhaps more so, since all pharmacy students must spend at least a school year, or a substantial part thereof, in Jackson at the UM medical school. The same study and report made on the law school should be made as to the pharmacy school.

JSU remains deficient in terms of the breadth of its doctoral offerings. In part, because of the program review process, it is apparent to the court that, without intervention, JSU will remain an "urban institution" in name only.[332] The Commissioner of Higher Education identified several programs under consideration for implementation at JSU. The Board proposes: (1) selected programs in allied health; (2) a doctorate in business

---

**331.** While the plaintiffs' witnesses indicate that admissions requirements need not be the same as those currently in place, provided exit requirements remain rigid, Sullivan 9705, in either case, the court fails to see how participation in the medical profession would be increased beyond what exists now by affiliation with JSU.

**332.** When drafting a proposal for a new program, it is necessary for the institution to identify

possible duplication with other programs in the system, and yet, the other three comprehensive institutions already offer most programs. The Board defines "unnecessary duplication," in part, as the existence of two or more identical or very similar programs at two or more institutions at the same time. *Cf.* testimony of Meredith in 1987 (4515–4530) with testimony of Cleere in 1994 (8221–8297).

(DBA); (3) a doctorate in social work; and (4) a doctorate in urban planning.[333] According to the commissioner, these programs promise to add some degree of uniqueness to JSU. The court will require an institutional study to be conducted by the Board to determine where the programs slated for addition at JSU will be provided to ensure a reasonable degree of desegregation at both its main campus as well as throughout the university. The study will also address the need for any additional programs at JSU to enhance the potential for diversity.

## B. ASU

 The court has already addressed ASU's mission in the land grant area. As to the proposed funding for the small farm development center and the proposed endowment, the court finds that these steps promise realistically to solve ASU's other-race presence problems and is otherwise educationally sound. ASU's provision of the MBA is likewise an educationally sound step to increasing other-race presence at ASU.

## PROGRAM DUPLICATION

The court finds that program duplication between the racially identifiable universities in the Delta, MVSU and DSU, is traceable to the *de jure* era and continues to have segregative effects. As previously found, students choose to attend a particular university for a variety of reasons, including location, costs of attendance, the admissions requirements and the programs offered. Because of the proximity of these institutions (approximately 35 miles apart) and the similar scope of their missions, (liberal arts undergraduate institutions) location, costs and program offerings would not appear to have a significant impact on student choice. Rather, lower admissions standards at MVSU appear more likely to attract black students of the Delta region, since as a class black students score lower on the standardized tests used for admission to universities. In light of differing admissions standards, it is clear that program duplication between these two universities does foster segregation. The Board's consolidation proposal eliminates this duplication.

In considering the issue of program duplication between non-proximate institutions—institutions more than fifty miles apart—the court finds that it has not been established that program duplication between non-proximate racially identifiable universities significantly fosters segregation. Generally, white place-bound students are more likely to choose a HBI than white students who are not place-bound. Thus, location appears to be a significant consideration if costs of attendance are similar. While academic reputation and prestige of a university likewise play a role in student choice, neither of these factors is a function of the similarity between program offerings. As previously noted, admissions standards play a role in the public's perception of the relative quality of institutions. The consistently lower admissions standards in effect at the HBIs have perpetuated the perception that these institutions are inferior. Accordingly, the likelihood of significant desegregation of HBIs is small and confined to those students who are academically underprepared.

The court finds that students, of either race, most likely to be influenced by programmatic duplication are those with the most choices of what universities to attend. Blacks are now attending the HWIs as a group in statistical parity with their representation in the qualified pool. The court concludes that "unnecessary" duplication as defined by Dr. Conrad has little to do with student choice, absent a difference in the prestige or public image of the HWIs vis-a-vis the HBIs. Any such differences are to a large part a result of the differential admissions standards.

The court finds that the Board's program review process is an educationally sound way of managing duplication in the system. System-wide admissions standards, coupled with the financial and programmatic enhancements of JSU and ASU, realistically promise to obviate or lessen whatever segregative effects are potentially harbored by the duplication between racially identifiable non-proximate institutions.

---

**333.** Cleere 8221–56; BDX 638.

## NUMBER OF INSTITUTIONS

### A. OVERVIEW

In the area of program duplication, the Board essentially contends that while duplicative offerings may be found throughout the system, the most significant degree of duplication that exists is between proximate institutions in the Delta and the northeastern area of the state, namely, the programmatic duplicative offerings between the historically white DSU and the historically black MVSU, and the duplicative offerings between MSU and MUW, both historically white institutions. That duplication, the defendants maintain, has been effectively eliminated through the defendants' merger proposal described below.

### B. PROPOSAL: MERGER OF DSU AND MVSU

The Board proposal is as follows: "Six Universities, along with all other administrative units under the Board of Trustees, shall comprise a system of higher education." With regard to the number of institutions in the Mississippi Delta, what this means in detail is the following:

> DSU and MVSU can be practicably consolidated, and should be, to create Delta Valley University. Students admitted to and enrolled in DSU or MVSU will be entitled to be enrolled in DVU. To the extent educationally sound and practicable, and recognizing their assignments may change based upon needs, individuals at DSU or MVSU who hold academic tenure may transfer to DVU; in any event tenured faculty of DSU and MVSU will be offered positions within the statewide system. The academic programs of the two predecessor institutions will continue at DVU where appropriate. All administrative positions at DVU will be filled on a competitive basis. The president will be appointed for three years in order to implement a

plan of consolidation and set the stage for a permanent president to be selected during the third year.[334]

### 1. THE DECISION TO MERGE

The duplication between these geographically proximate institutions would be resolved by adopting the six-university proposal. Certain board members testified that the proposed consolidation of the two universities is based on consideration of many options. The Board considered the merger the best solution to the "Delta situation" in addressing the Supreme Court's decision and this court's order on remand. The decision to locate the new institution, DVU, at the existing site of DSU in Cleveland is the result of an analysis of the projected cost relating to the buildings necessary to be constructed.[335]

### 2. CRITIQUE

#### (a) Historical Precedent

During the *de jure* period, consultants questioned whether the State should cease operating the HBIs as independent institutions of higher learning.[336] One recommendation of the Brewton Report of 1954 was the possible consolidation of all three black universities "into the educational systems of the University of Mississippi and Mississippi State College rather than ... operating them as three independent institutions."[337]

#### (b) Fiscal Responsibility

There is no planned use for the MVSU campus at Itta Bena. The State of Mississippi has a large investment in MVSU and continues to invest in the university. In terms of the amount of money spent for repair and renovation for the period 1981–1994, measured by the amount of dollars per square foot, MVSU has received the most funds of all universities in the system.[338] Moreover, the air-conditioning of residence halls at MVSU was relatively recently ap-

---

**334.** BDX 638.

**335.** Crawford 7598; Luvene 7912–14; Garrett 9561; Cruthers 7445.

**336.** Hudson 584–86; Blake 3977–78; Anderson 4972–73.

**337.** (1987) PX 200.

**338.** MVSU ranks second in the system in terms of the amount of repair and renovation appropriations per FTE student.

proved by the Board and is presently underway for completion in the Fall. The sum of $3 million is currently available to MVSU for deferred maintenance and/or repairs and renovations.[339]

The amount of savings, if any, to be gained by merger is debatable. According to the defendants, approximately $1.3 million out of the total operating budget of the two universities should be saved by merger. Repair, renovation and capital improvements needs at MVSU are currently estimated at $18,-682,800, but repair and renovation needs alone may exceed that figure substantially.[340]

#### (c) Size and Character of the Merged Institutions

While sharing substantially the same service areas geographically, MVSU and DSU serve vastly different student populations. DSU is currently 77% white and 23% black as opposed to MVSU which is approximately 99.6% black. The average ACT score for entering freshmen at DSU is 19.79 as opposed to 16.52 at MVSU. While 82.4% of DSU students are on financial aid, all of the students at MVSU receive some form of financial aid.[341] Finally, whereas only 8.2% of the freshmen enrolled at DSU are enrolled in some form of developmental studies, 58% of the entering MVSU freshmen are enrolled in developmental studies.[342]

Smaller campuses in general have better retention rates for black students and for students in general. This has been attributed to the closer relationships between faculty and students, as well as closer and more efficient student monitoring; however, MVSU's retention rates remain consistently lower than the retention rates of its peer institutions.[343] It is likely that this disparity is attributable to the academic unpreparedness of the students MVSU accepts, as indicated by their ACT scores.[344] The Board argues that, academically speaking, the merger of MVSU and DSU should provide a much stronger institution of higher learning in the Delta, and that gain can be realized with only a minimal impact on the geographic access for the citizens of the Delta.[345]

### C. PROPOSAL: MERGER OF MUW AND MSU

What further desegregation of the Mississippi system of higher education means to the Board in the northeastern portion of the state is the following:

MSU and MUW can be practicably merged, and should be, with MSU as the surviving institution. With appropriate faculty input, MUW's program offerings can readily be provided by MSU. Students admitted to and enrolled at MUW will be entitled to be enrolled in MSU. To the extent educationally sound and practicable, and recognizing their assignments may change based upon needs, individuals at MUW who hold academic tenure may transfer to MSU; in any event tenured faculty of MUW will be offered positions within the statewide system.[346]

### 1. THE DECISION TO MERGE

The concept of "shared pain" guided the Board when considering and proposing the merger of MUW with MSU.[347] Certain board members testified that the MUW/MSU merger was proposed in response to the Supreme Court's observation relating to the impact the number of institutions the State chose to fund had on student choice.[348]

---

**339.** Cleere 8096; Curry 6675–76; Bowman 6628–29; BDX 175; BDX 175A.

**340.** Lott 7147; Kaiser 1020–21.

**341.** However, the percentage of black students on financial aid enrolled at DSU approximates the percentage at MVSU.

**342.** BDX 672.

**343.** USX 14.

**344.** *See* Allen 4442–46.

**345.** *See* Cruthers 7443–44.

**346.** BDX 638.

**347.** Crawford 7601; Luvene 7915–16; Garrett 9560–61.

**348.** Crawford 7598–99; Cleere 8098–99.

## 2. CRITIQUE

### (a) Background

The closure of MUW was first discussed and a plan developed in 1985.[349] As recently reaffirmed by the Board, MUW's articulated mission is simply the provision of quality education with a special emphasis on the education of women.[350]

It is anticipated by the Board that approximately $5.5 million may be saved out of the total annual operating budget by the proposed merger.[351] Other witnesses, including one of the Board's witnesses, testified that there would be very little, if any, savings ultimately realized by the merger.[352] All but a few programs offered at MUW are duplicated at MSU.[353]

### (b) Impact on Desegregation

Several statistics brought out at the trial indicate that MUW's current role in the desegregation process is significant. MUW has the second highest percentage of black students of the five HWIs in the state (Fall, 1993). For the entering freshman cohort of 1986, MUW had the highest graduation/retention rate for blacks among the state's public universities, including the HBIs. Evidence presented by both parties, however, does tend to support the Board's proposal to merge. In terms of full professors, MUW has the dubious distinction of being 100% white. African–Americans, however, are present in the lower professorial ranks. Assuming the black students enrolled at MUW attend MSU after closure of MUW, a greater number of black students enrolled at MSU might serve to further diversify MSU by attracting more black students. The merger of the faculties of MSU and MUW would not, however, produce a critical mass in terms of faculty desegregation of MSU,[354] and the merger would actually decrease the percentage of African–Americans students at MSU.

## CONCLUSION: NUMBER OF UNIVERSITIES

■ According to the defendants, the number of institutions the State continues to operate is the only vestige of the *de jure* past that has continued to have segregative effects to the present time.[355] The defendants contend that the proposed mergers of MUW/MSU and MVSU/DSU will result in a new system where no HWI duplicates the mission of ASU or the new DVU. ASU would alone be the only "less than 5,000 student population university with a primary undergraduate mission." DVU remarkably would have no racial identity. Accordingly, segregative duplication would be eliminated.[356] The court agrees with the defendants' position that the racially identifiable institutions in the Delta continue to foster segregative choice; and, more likely than not, this situation serves to perpetuate the racial identifiability of MVSU.

349. Anderson 4977.

350. Rent 10563.

351. Lott 7147–49.

352. The dispute over the actual savings to be realized through consolidation of MSU and MUW centers around the costs to the State of maintaining MUW as a free-standing institution versus its absorption by MSU. Generally, the dispute revolves around what the Board includes as "overhead" or support functions expenditures versus instructional costs. What expenditures are considered to be overhead, to a large degree, dictates how expensive to the State MUW appears to be and, concomitantly, how much savings through merger (via elimination of overhead) might ultimately be realized. *See* BDX 668.

353. Cleere 8098–99. Using the Board's definition, however, that duplication would not appear to fall under the rubric of "unnecessary" inasmuch as, beyond the core liberal arts curriculum, MUW offers few programs that are not high demand and/or supported by state needs. *See* WX 18 (MUW offers nursing, business administration and elementary education); Pickett 6002–6004.

354. Rent 10545–552; Clauge 4172–74; Cruthers 7444–45; Zacharias 8478; WX3; WX5; BDX 269(a); USX 78.

355. According to the defendants, since the "maintenance of eight universities ... is indeed the only present policy or practice traceable to *de jure* segregation which continues to have segregative effects ... [a]ll of the plaintiffs' claims of disparate treatment of certain universities in reality simply address aspects of the continued operation of such eight universities." Pretrial Order at 7(c).

356. Crawford 7599–7600.

The question now presented is whether that segregation-fostering duplication may nonetheless be retained as educationally justifiable and without a practicable alternative. To put this question and the MUW/MSU consolidation issue into context, some observations about the Mississippi educational system as a whole need be noted initially.

Mississippi has approximately 915,858 black citizens or 3.12% of the nation's total black population.[357] Nationally, 53% of the students enrolled in the public higher education system are full-time students, but in Mississippi, 77% of the students enrolled in the public system are full-time students.[358] For fiscal year 1992–93, the total amount of financial aid provided to Mississippi students through Pell Grants was $37 million. In that year, 9,076 white students in the system received Pell Grants as compared with 11,872 black students.[359] Clearly, participation in financial aid programs is higher for blacks as a group than for whites.

In terms of FTE students as a percentage of the population, Mississippi is supporting more than the normal higher education load, where the "load on the system" is expressed as the number of FTE students per 1000 population.[360] For every million persons in the state, there are 3.44 public four-year institutions. This amount is higher than the average number of institutions per million persons in either this region of the country or nationally.[361]

As a general matter, participation rates for African–Americans lag behind those for whites in Mississippi's system of higher education. This is also a national phenomenon. Black participation rates in higher education alone, however, are no indicia of whether a system of six as opposed to eight universities is educationally sound in the absence of evidence that any university in the system is turning qualified students away because of lack of space.

The court finds that the most segregative aspect of the State system of higher education is the maintenance of eight universities with differential admissions standards between the HWIs and HBIs, thereby maintaining the racial identifiability of the universities. The court finds little or no desegregative impact on the system at large to be gained by the proposed merging of MUW with MSU. The Board's theory of "sharing the pain" while commendable as evidence of sensitivity on the Board's part, is an inadequate justification for so drastic a measure with practically nothing to be gained relative to the ends of desegregation. Although there would likely be some savings realized by the State by the proposed merger, the issues involved in this cause concern desegregation and equal access to the higher education system regardless of race, and the court is not going to attempt to reorganize the State's system of higher education based on economic considerations not pertaining to constitutional issues. That is better left to the political and policy-making institutions of the state—the IHL Board and the legislature.[362] Because the elimination of MUW would not serve any useful purpose in desegregating the higher education system, as testified to by the plaintiff parties' witnesses and some of the defendants' witnesses, the court rejects this remedial proposal in its entirety. By this finding, the court does not enjoin the State from merging MUW if it so determines that for fiscal or other reasons it should be done. That is a decision to be made by the policy-making part of state government.[363] The court is merely holding

**357.** BDX 308; Foil 6895.

**358.** Wharton 8929–30.

**359.** Lott 7135–36. By institution, the percentage of enrolled students that received Pell Grants for fiscal year 1992/93 is as follows: ASU 79.31%; JSU 69.57%; MVSU 95.20%; DSU 47.55%; MSU 30.48%; MUW 36.73; UM 25.37%, and USM 44.30%. BDX 293.

**360.** Wharton 8928; BDX 296.

**361.** Cruthers 7391. Mississippi has more four-year institutions per million persons (3.44) than the average number of institutions per million persons in the states of the Southeastern region (3.14) or in the nation (2.35). BDX 666.

**362.** This court has made this point before. *Ayers*, 674 F.Supp. at 1564.

**363.** Miss. Const. Art. 8, § 213–A (Supp.1994).

hereby that the merger of MUW and MSU is not constitutionally mandated.

■■ The court, however, agrees that the existence of the proximate racially identifiable universities in the Delta, each of which has similar programmatic scope but dissimilar admissions standards, tends to shape student choice by race and thereby perpetuates segregation. On the record, however, the court cannot find that institutional enhancement of MVSU will eliminate the vestiges of segregation that have contributed to MVSU's status as essentially a one-race institution. Evidence does not persuade the court that merely adding programs and increasing budgets will desegregate a HBI. That is not to say, however, that changes made over time at the university consistent with its mission as a baccalaureate institution cannot promote diversity at the campus. The court cannot find that institutional or programmatic enhancement of MVSU is justified as educationally sound for desegregation purposes based on this record.

Nor is it clear to the court that the maintenance of eight universities by the State of Mississippi is educationally unjustified. While the Board opted not to consider altering the programmatic makeup of the two institutions, and there is evidence to suggest that transferring programs to MVSU may not be educationally sound, there is likewise evidence that measures can be taken which, over time, offer a potential of desegregating MVSU. As one of the State's own witnesses testified, evidence suggests that HBIs in other formally *de jure* segregated states have been successful in integrating their student bodies through a variety of approaches and measures.[364] Evaluation of the success or failure of such measures takes time.[365]

Evidence also suggests that as an institution with a baccalaureate mission and enrollment below 2500 students, MVSU is not an "inefficient" institution where efficiency is measured in terms of achieving higher education for educationally under-served blacks at the lowest possible cost. MVSU consistently has a high percentage of its entering class enrolled in developmental education.[366] Because of the institution's location in one of the poorest regions in the country, MVSU has a high density of academically underprepared blacks within its service area. Because of this historic fact, MVSU has developed a strong commitment to serving students from socioeconomic backgrounds which, in the main, are vastly different from those of the clientele of the other public institutions of higher learning in the state, including its neighbor DSU.[367]

One probable result of MVSU's commitment to serving its present constituency is its poor retention rate relative to the other universities. As noted earlier, of the first-time entering freshman class of 1985–86, DSU's graduation/retention rate for black and white students combined is 45%. The comparable MVSU retention rate is only 24%.[368] Because of the multiple educational deficiencies of its traditional clientele, it is difficult to conclude from this data, however, that the institution is ineffective in performing its mission as an institution of higher learning. Over a seven-year period (1986–1993) MVSU has produced more black baccalaureates than DSU, MUW and UM combined.[369] While certainly a function of its predominant racial composition, the number of blacks completing higher education at MVSU is significant in and of itself as to whether the university's continuance is educationally sound. The position of many educators the court has heard from, including some of the State's witnesses, is that consolidation of the two universities in the Delta would be a mistake for a variety of

364. *See* Hoops 10856–10931; Conrad 10317–10329.

365. Even with access to the traditional tools employed at the primary/secondary level, altering the racial composition of institutions takes time. Meaningful desegregation of institutions of higher education is a complex endeavor that has not been achieved during a period of over thirty years of race-neutral admissions requirements.

366. PX 232.

367. PX 25; PX 29; Wyatt 10750–52.

368. USX 014.

369. PX 205; BDX 400a.

reasons.[370] Juxtaposed to that testimony is the testimony of those educators who believe consolidation would be successful in achieving desegregation without eroding access to quality education in this region of the state.

The court finds that the Board's proposal for merger of DSU and MVSU is predicated to a large degree on optimistic speculation that a new university, fully integrated and without any racial identity, will "likely result." The court further finds that the Board's proposal is unsupported at this time by sufficient research to determine whether it is practical to merge these institutions.[371] The court heard testimony that while the State allocates only approximately $7 million per year to MVSU's budget, the institution has an annual overall budget of more than $25 million. This institution is able to serve approximately 2,000 students on only $7 million of state-appropriated funds while generating from outside sources—grants from foundations, etc.—more than two-and-one-half times its state allocation. No other state institution can make that statement. There is a lack of empirical evidence to suggest the educational and/or fiscal soundness of several factors involved in the proposed merger. Abandonment of the physical plant at Itta Bena is a major consideration. MVSU has the largest percentage of its students residing in dormitories of any of the eight institutions. As this opinion is being written, there is a multi-million dollar building program underway on the Itta Bena campus, approved by the Board, including air-conditioning and building expansion, at a cost of more than $6 million. Simultaneous with these expenditures being made by the State, the Board seeks court approval of its proposal to close down the campus. New academic programs have been instituted at MVSU, even after the trial of this cause and during the pendency of this court's ruling.

Determination of whether the enhancements and additions to the physical plant at the Cleveland campus, proposed by the Board, will suffice to absorb the projected enrollments is a serious question. DSU's dorms are currently near capacity. The two new dorms at DSU, with construction costs estimated in the amount of $6 million each, proposed to accommodate MVSU's students appear inadequate for the number of students currently in MVSU's dorms. Whether less drastic measures are warranted, such as subsidizing other-race scholarships at Itta Bena, a tool which has been employed by the HWIs for many years with some measure of success, should be considered. Perhaps most significantly, a determination of whether the Board's proposed new admissions standards would lessen or negate the segregative effects of the two proximate racially identifiable universities should also be studied. Also significant is that the proposal likewise closes DSU, one of the most integrated institutions in the system. The loss that may result from an administrative and programmatic shakeup in the event of consolidation is difficult to predict. The cumulative institutional knowledge that has made DSU a relative success story in terms of educating both races and has made MVSU a significant nurturer of underprepared blacks is susceptible to being lost under the proposal.

Although the Board is to be commended for its good faith proposal in responding to the Supreme Court's opinion in this cause, the court must reject this part of the Board's proposal at this time and will direct the Board to explore these areas more thoroughly to determine what measures have had success in other systems of higher education, if any, which also have a reasonable chance of success in desegregating MVSU. If in good faith the Board reaches the same conclusion that consolidation is the only educationally feasible solution, it shall substantiate that conclusion to the Monitoring Committee with data necessary for the court to make an informed decision as to its educational soundness. The study outlined above shall be presented to the Monitoring Committee within the time specified in the remedial decree.

---

**370.** Even prior to the Board's merger proposal to the court, the presidents of all universities registered their opposition to the closure or merger of any university. Rent 10580–81.

**371.** Cruthers 7444.

## CONCLUSIONS OF LAW

The court has jurisdiction over this action pursuant to 42 U.S.C. § 2000d–1 and 28 U.S.C. § 1345. Private plaintiffs' claims are based on the Thirteenth and Fourteenth Amendments, 42 U.S.C. §§ 1981, 1983, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d. The claims of the United States are based on the Fourteenth Amendment and Sections 601 and 602 of Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d and 2000d–1. "As recipients of federal financial assistance, the State of Mississippi and its agents exercising management and control of public colleges and universities are prohibited from discrimination against any individual on the basis of race, color or national origin." Section 601 of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d. *Ayers v. Allain,* 674 F.Supp. at 1551 n. 6. Title VI prohibits discrimination which is violative of the Equal Protection Clause of the Fourteenth Amendment. *Regents of the University of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978).

"The defendants do not dispute that Mississippi law forbade interracial education at the University of Mississippi up to the time of the decision in *Meredith v. Fair,* 305 F.2d 343 (5th Cir.1962). Defendants' racially segregative policies at that time encompassed the areas of: (1) student enrollment, (2) maintenance of branch centers by the historically white universities in close proximity to the historically black universities, (3) employment of faculty and staff, (4) provision and condition of facilities, (5) allocation of financial resources, (6) academic program offerings, and (7) racial composition of the governing board and its staff." *Ayers,* 674 F.Supp. at 1551.

The legal standards germane to this cause on remand, unlike the 1987 litigation, are not in dispute. Conclusions of law applicable to the factual findings of the court are set forth throughout this opinion and will not all be restated herein. The legal principles embodied in *United States v. Fordice,* —— U.S. ——, 112 S.Ct. 2727, 120 L.Ed.2d 575 (1992), govern this cause on remand as summarized below.

"If the State perpetuates policies and practices traceable to its prior system that continue to have segregative effects—whether by influencing student enrollment decisions or by fostering segregation in other facets of the university system—and such policies are without sound educational justification and can be practicably eliminated, the State has not satisfied its burden of proving that it has dismantled its prior system. Such policies run afoul of the Equal Protection Clause, even though the State has abolished the legal requirement that whites and blacks be educated separately and even though it has established racially neutral policies not animated by a discriminatory purpose." *United States v. Fordice,* —— U.S. at ——, 112 S.Ct. at 2737. *Fordice* requires that each challenged policy or practice of the State must be evaluated to determine "whether it is traceable to the prior *de jure* system, whether it continues to foster segregation, whether it lacks sound educational justification, and whether its elimination is practicable. [It] is the State's burden to show that it has dismantled its prior dual system at the liability stage...." *United States v. Louisiana,* 9 F.3d 1159, 1164 (5th Cir.1993).

Where the State proves that a challenged policy, shown by plaintiffs to be traceable to segregation, has no segregative effects, it is relieved of its duty to eliminate or modify the challenged policy. *Knight v. State of Alabama,* 14 F.3d 1534, 1541 (11th Cir.1994). The State likewise has no obligation to modify or eliminate policies and practices traceable to *de jure* segregation that continue to manifest segregative effects where it is not possible to do so "consistent with sound educational practices." *Knight,* 14 F.3d at 1541. Because policies and practices traceable to the *de jure* era are the court's focus, "[t]hat an institution is predominately white or black does not in itself make out a constitutional violation." *Fordice,* —— U.S. at ——, 112 S.Ct. at 2743.

The present admissions standards are not only traceable to the *de jure* system and were originally adopted for a discriminatory purpose but also have present discriminatory effects. *Fordice,* —— U.S. at ——, 112 S.Ct. at 2739. Undergraduate admissions require-

ments must be modified to eliminate the differential admissions standards between the HBIs and HWIs. The Board's proposal in the admissions area is an educationally sound means of accomplishing that task and is consistent with the mandate issued in this cause.

Program duplication continues to be pervasive in the system, but, as noted previously, not all program duplication is segregative in effect. In terms of program duplication between JSU and other institutions in the system, the court finds that an institutional study encompassing this issue is warranted and will order that such a study be conducted within the time specified in the remedial decree. The court finds that the Board must study program duplication between DSU and MVSU to determine whether any segregative duplication may be eliminated consistent with sound educational practices.

The court finds that the Board's proposed programmatic and financial enhancements of JSU realistically promise to further desegregate that institution and is a step toward increasing its prestige consistent with sound educational practices.

The court is unable at this time to determine whether merger of DSU and MVSU is educationally sound, as noted previously. Accordingly, the Board is directed to further study this issue and, in the event that it determines that the proposed consolidation is the most feasible and sound means of accomplishing desegregation in the Delta, consistent with sound educational practices and practical alternatives, the Board must substantiate that determination to the Monitoring Committee.

### REMEDIAL DECREE

It is hereby ORDERED, ADJUDGED AND DECREED, that each of the defendants, their agents, servants, employees, and their successors in office, and all persons in active concert or participation with them, be and they are hereby permanently **ENJOINED AND RESTRAINED** from maintaining remnants and vestiges of the prior *de jure* system in the public higher education system in the State of Mississippi and in each public institution of higher education identi-

fied as a party defendant herein and their successors. The defendants are also enjoined from engaging in any practice which has the effect of impeding the desegregation of the State's institutions of higher education. To implement this injunction the appropriate parties identified shall take the following action:

1. A Monitoring Committee shall be established to monitor the implementation of the terms and obligations imposed by this decree. The Monitoring Committee shall consist of three disinterested persons with experience in the field of higher education agreed on by the parties and appointed by the court. The parties shall submit to the court by May 1, 1995 the names of the members of the Monitoring Committee as agreed on. If the parties are unable to agree on the composition of the committee, the court will name the members of the committee. The committee shall be responsible for reviewing and analyzing submissions by the defendants and making recommendations to the court. The committee members shall be compensated for reasonable fees and expenses incurred for its work on a per diem basis.

### ADMISSIONS

2. The 1995 admissions standards as proposed by the Board for first-time freshmen, effective for the academic year 1995–96, shall be implemented at all universities.

### MISSIONS

3. Effective the 1996–1997 academic year, as proposed by the Board, selected programs in the field of allied health, which are non-duplicative of those offered at UMMC or which may be offered on a cooperative basis with UMMC, shall be implemented at JSU. Programs in social work (Ph.D) and urban planning (Masters/Ph.D) shall be implemented at JSU. A doctoral program in business (DBA) shall also be implemented at JSU as proposed by the Board when existing business programs are accredited.

4. The Board shall undertake an on-site institutional study of JSU to determine the relative strengths and weaknesses of its existing programs as soon as is practicable.

This study will be undertaken with the express purpose of determining the nature and direction of those programs slated to be implemented, as well as further programmatic expansion at JSU, to best achieve the urban emphasis of its mission. Included in this study will be an evaluation of the feasibility and educational soundness of establishing an engineering school, a public law school, and a five-year pharmacy program under the direction and control of JSU. The nature and extent of duplication with other institutions in the system will be addressed in this study in the context of determining whether meaningful programmatic uniqueness may be gained which would bring about significant white enrollment through elimination and/or transfer of existing programs at other institutions and the feasibility/educational soundness of such elimination and/or transfer. The results of that study will be presented to the Monitoring Committee by July 1, 1996 for its review and submission of its recommendations to the court.

5. By July 1, 1996, an articulation agreement between JSU and surrounding community colleges will be developed to develop practices promoting racial diversity on the JSU campus; and the Board will take whatever remaining steps are necessary, if any, to vest complete institutional control in JSU over the facility formerly known as the Universities Center in JSU.

6. Beginning as of July 1, 1996, as proposed by the Board and extending over a period of no more than five fiscal years, special funds proposed by the Board for the benefit of JSU's main campus up to an aggregate of $15 million shall be provided by the State earmarked to fund property acquisition, campus entrances, campus security and grounds enhancement.

7. Effective no later than July 1, 1996, the State shall provide special funds of $5 million to be placed in an endowment trust for the benefit of JSU, with the income therefrom to be used to provide funds for continuing educational enhancement and racial diversity, including recruitment of white students and scholarships for white applicants in a number and an amount determined by the court upon recommendation from the Monitoring Committee.

8. Beginning no later than July 1, 1996, the State shall provide special funds for the Small Farm Development Center at ASU to provide annual research and extension funds to match dollar-for-dollar federal funds appropriated to ASU up to an aggregate of $4 million each year.

9. Effective no later than July 1, 1996, the State shall provide special funds of $5 million to be placed in an endowment trust for the benefit of ASU, with the income therefrom to be used to provide funds for continuing educational enhancement and racial diversity, including recruitment of white students and scholarships for white applicants in a number and an amount determined by the court upon recommendation from the Monitoring Committee.

10. Effective no later than the 1996–97 academic year, a MBA program shall be offered at ASU's Natchez Center. The State shall provide special funding for this program addition at ASU including related capital improvement when the Board determines the need thereof.

11. The State shall submit within one year of this remedial decree a report to the Monitoring Committee addressing the practicability of assuming control over the facility maintenance monies now controlled by each of the eight institutions.

12. If, after further study of any available educationally sound alternatives, the Board determines that desegregation in the Mississippi Delta can be attained only through its DSU/MVSU consolidation proposal and that abandoning the financial investment presently in place at the Itta Bena campus and constructing replacement facilities at the Cleveland campus present a practical course of action, it shall substantiate that conclusion no later than July 1, 1996 to the Monitoring Committee. The Monitoring Committee shall review the Board's report and submit its findings and recommendations to the court.

13. The Board shall submit for the Monitoring Committee's review graduate catalogs of all Mississippi IHLs that outline the cur-

rent graduate school admissions requirements no later than June 1, 1996.

14. The Board is hereby directed to study the feasibility of establishing system-wide coordination of the community colleges in the State in the areas of admissions standards and articulation procedures, and report to the Monitoring Committee by July 1, 1996.

15. The Board shall have control over and responsibility and accountability for the use and expenditure of all funds provided to comply with the remedial measures outlined herein. The State shall provide the funding for all such measures ordered by this decree.

16. The court retains jurisdiction over this action for the purpose of overseeing the implementation of the terms and objectives of this decree.

## APPENDIX

## PRIVATE PLAINTIFFS

Private plaintiffs believe the following aspects, features, policies, and practices of the defendants are remnants of the *de jure* system, and are examples of racial discrimination carried out by the defendants:

A1. The practice, manifested in a variety of ways in the selection process of denying or diluting the representation of black citizens on the governing board.

A2. The practice of denying black citizens nondiscriminatory participation in the governance of the system through the hiring practices for the governing board staff.

A3. The governing board's policy and practice of approving proposed lists of hires submitted to it by the individual universities under which:

(a) there are few, if any, black administrators at the highest levels of the HWIs; and

(b) there are few black administrators at HWIs in general, including their off-campus location.

A4. The governing board's practice of giving few contracts to African–Americans and using few African–Americans as consultants.

A5. The practice of arbitrarily limiting the activities of the administrators of HBIs in a way that impedes their ability to protect the right of their students to receive nondiscriminatory educational opportunities.

A6. The practice of excluding black persons from graduate school councils, faculty councils, and other councils.

B1. The continuing unlawful admission standards operate in connection with other factors (e.g., few black administrators at HWIs, particularly at highest levels; problems with racial climate and curriculum content at HWIs) to direct black students to HBIs. At those schools, defendants' policies and practices concerning program placement, funding, facilities, equipment, and mission, as well as cumulative deficits, continue, in combination, to provide black persons programs of a lesser breadth than are available to white persons (e.g., 83% of white undergraduates in the system attended MSU, UM or USM in 1992–93 with the most expansive programs due to discrimination; the corresponding figure for black undergraduates was 29.3%).

B2. The State has continued its practice of denying black students equal access to the institutions of higher learning because of the entrance requirements established by the Board of Trustees, including the use of ACT test scores in a manner that disproportionately excludes black students from enrollment at historically white universities and relegates those students to the historically black schools.

B3. The policy and practice of minimizing black persons' access to the university system by a variety of actions including, but not limited to, the manner in which ACT scores have been (and are) utilized and funding policies (Amended formulation).

B4. The policy of using ACT cutoff scores in selecting persons to receive particular scholarships at the undergraduate level at each HWI, as well as utilizing alumni connection as a criterion in granting scholarships.

B5. The practice of using material at HWIs which do not inform potential applicants of the test score admission exceptions, or do so in a manner that is not clear.

B6. The policy of defining the admission exceptions more narrowly at HWIs than HBIs.

B7. The practice of ailing to use the admission exceptions to a substantial degree at HWIs.

B8. The practice of using regular admission requirements which:

(a) the majority of black high school graduates cannot satisfy due to inadequate course offerings, equipment, and personnel in their local school districts; and/or

(b) the majority of black high school graduates cannot satisfy due to educational disadvantage based on a lack of access to college preparatory work of sufficient quality in their local districts.

B9. The policy of using test score cut-offs in admitting persons to certain undergraduate programs on a regular admission basis.

B10. The policy/practice of using test score cut-offs in admitting persons to graduate programs on a regular admission basis.

B11. The practice of failing to provide programs to help students and staff cope effectively with racial diversity.

B12. The practice of not providing a welcoming climate for black students at HWIs.

B13. The practice of operating universities without academic and other programming appropriate for a university anticipating the attraction of a diverse student population.

B14. The minimal enrollment of African–American persons in professional programs is, at a minimum, a concomitant of the other policies/practices set forth in this subpart, as well as the policies/practices described in subpart C.

C1. The policy and practice of continuing to use the 1981 mission statement.

C2. The policy and practice of providing greater funding per student to historically white universities than to the historically black universities that effectively eliminates the black universities as viable choices for attendance by white students, and adversely affects the educations of the students at the HBIs.

C3. The policy and practice of using a funding formula under which level of funding turns upon factors shaped by racial discrimination.

C4. The policy and practice of using a funding formula which does not provide additional funds to either any university admitting large numbers of students from lower income families who need financial assistance or any university admitting concentrations of students needing programs of academic/social support.

C5. The policy and practice of providing special line item funding disproportionately to the HWIs with the result that the HBIs are further disadvantaged in their ability to compete for white students, and the educations of their students are adversely affected.

C6. The policy and practice of maintaining a total funding structure (including athletic and other sources of revenue) which perpetuates segregation and the denial of equal educational opportunity.

C7. The practice of failing to take the necessary steps (including the provisions of required facilities) to secure the accreditation of programs at the HBIs.

C8. The policy and practice of maintaining an allocation of baccalaureate degree programs which is unfavorable to the HBIs and their students.

C9. The policy and practice of maintaining an allocation of masters degree programs which is unfavorable to the HBIs and their students.

C10. The policy and practice of maintaining an allocation of doctoral degree programs which is unfavorable to the HBIs and their students.

C11. The policy and practice of maintaining a distribution of professional programs (and their governance) which is unfavorable with regard to both access of black citizens to these programs, and the status of resources of the HBIs—factors affecting their abilities to attract diverse populations and to afford

educational opportunities untainted by discrimination to their students.

C12. The policy and practice of ailing to establish unique attractive program offerings at historically black universities.

C13. The policy and practice of maintaining an allocation of land grant programs between ASU and MSU, which is unfavorable to ASU and its students (includes number and level of programs, number and level of staff, buildings and land available; federal and state funding; research and extension functions; and experimental stations).

C14. The policy and practice of unnecessarily duplicating HBIs' programs and course offerings at HWIs.

C15. The policy and practice of maintaining facilities at the HBIs that are of lesser quality, in an overall sense, than those at the HWIs.

C16. The policy and practice of maintaining a pattern of equipment availability which is unfavorable to HBIs and their students.

C17. The policy and practice of maintaining a pattern of equipment availability which is unfavorable to HBIs and their students.

C18. The policy and practice of maintaining JSU without adequate land.

C19. The policy and practice of maintaining JSU without a football stadium controlled by JSU (adversely affecting JSU's ability to self-generate funds and its overall status as a university).

C20. The policy and practice of operating "off-campus" offerings at HWIs, in close proximity to HBIs, competing with HBIs for students, as well as utilizing facilities and other resources, including the Universities Center at Jackson competing with JSU.

C21. The policy and practice of operating historically white junior colleges, in part with funding approved by the defendant governor, which compete with HBIs for students, including the operation of Hinds Community College at several locations in Jackson competing with JSU, as well as, at a minimum, Mississippi Delta Community College, Holmes Community College, and Copiah–Lincoln Community College.

C22. Fostering in every way the concept that HBIs are not for white students.

D1. The policy and practice of the governing board, of ratifying employment recommendations of individual universities which perpetuate the racial identifiability of those universities as well as the recommendations themselves.

D2. The HWIs' practices of granting full professorship and tenure status to few African–American persons.

D3. The policy and practice of paying lower salaries to the faculty at the HBIs than to the faculty at the HWIs.

D4. The small numbers of black faculty at HWIs, a feature or aspect of the system, is traceable in part to the *de jure* system, namely, defendants' offering only a few graduate programs at HBIs in the period through the present. This reduced the pool of black persons who could gain the credentials needed for teaching positions, a consequence still haunting the system.

\* \* \* \* \* \*

## UNITED STATES

1. Whether the defendants have at any time since October, 1962 maintained a racially dual system of public higher education in the State of Mississippi.

2. Whether vestiges of the State operated racially dual system of public higher education remain in the State of Mississippi, particularly with respect to:

(a) student enrollment (at all levels);

(b) faculty and administrative staff employment and employment related issues;

(c) composition of Board of Trustees governing board and administrative staffs;

(d) development and implementation of institutional missions and scopes;

(e) development and implementation of academic programs;

(f) allocation of land grant functions;

(g) construction and maintenance of physical facilities;

(h) allocation of state appropriations.

3. Whether the post-*Brown* admissions policy has failed to eliminate the effects of segregation among public institutions of higher education in Mississippi.

4. Whether the defendants' policies and practices regarding the use of the ACT Assessment in determining undergraduate admission were for the purposes of limiting black student access to the historically white institutions.

5. Whether implementation of the defendants' policies and practices regarding the ACT Assessment in determining undergraduate admission have had the effect of limiting black student access to historically white institutions of higher learning.

6. Whether the defendants have failed to utilize other readily available, equally valid, and less racially exclusionary alternatives in the undergraduate admissions/selection decision-making process, and whether they would have done so but for racial reasons: alternatives such as those recommended by the American College Testing Program and most of the professional associations that have considered the use of standardized tests in the admission/selection decision-making process.

7. Whether defendants' employment and employment related policies and practices perpetuate segregation by resulting in racially identifiable faculty and administrators at Mississippi public institutions, and in race-based differences in faculty rank, tenure, and salary.

8. Whether Alcorn State University has been limited in its role in the State of Mississippi's land grant program, due to its racial heritage and the racial identity of its enrollment and administration, in the allocation of programmatic offerings, physical facilities and funding resources (federal, state and local) in a manner that decreases its attractiveness to other race students.

9. Whether the State of Mississippi has allocated resources to the traditionally black institutions of a kind and degree sufficient to give them a realistic opportunity to attract white students.

10. Whether the defendants have since 1954 engaged in any actions which have had the intent and effect of impeding the process of disestablishing the State operated racially dual system of public higher education and its effects in Mississippi, including, *inter alia,* the establishment and implementation of racially discriminatory admissions criteria at public universities.

11. Whether the defendants have since 1954 engaged in any actions which have had the effect of increasing or perpetuating racial separation among Mississippi public institutions of higher education, including, *inter alia,* the maintenance and operation of traditionally white institutions, or branches thereof, in close proximity to traditionally black institutions.

12. Whether the defendants have perpetuated segregation in Mississippi's public institutions of higher education by deterring other-race enrollment in traditionally black public universities through the assignment of institutional missions and scopes, the placement of academic programs, the construction and maintenance of physical facilities, and the allocation of state appropriations.

13. Whether the document entitled "Modifications to the Plan of Compliance to Title VI of the Civil Rights Act of 1964," dated May 28, 1974, as supplemented by letter dated June 14, 1974, as implemented, has removed state-imposed barriers to desegregation in higher education in Mississippi.

14. Whether the defendants are required to develop, submit to this court, and implement a plan of desegregation which promises realistically and promptly to eliminate remnants of the state-operated racially dual system of public higher education and its effects in Mississippi.

A. *Failure to Address the Remediation of the Dual System*

15. The policy and practice of failing to adopt a constitutionally acceptable plan which eliminates all aspects of the racially dual system of higher education once mandated by State law.

16. The policy and practice of Mississippi officials never having done a real assessment

of the needs and deficiencies of the separate and unequal historically black institutions and addressing the results of such an assessment.

### B. *Policies and/or Practices Concerning the Governance of the System*

17. The State has continued its policy and practice of excluding black persons from equitable representation on the Board of Trustees, from employment as board administrators and staff, and from enjoying full participation in the activities of the Board. Specially included in this are the following:

18. The practice, manifested in a variety of ways, of denying or diluting the representation of black citizens on the governing board.

19. The practice of denying black citizens non-discriminatory participation in the governance of the system through the hiring pattern for the governing board staff.

20. The governing board's policy and practice of approving proposed lists of hires submitted to it by the individual universities under which:

 (a) there are few, if any, black administrators at the highest levels of the HWIs;

 (b) there are few black administrators at HWIs in general, including at their off-campus locations.

21. The governing board's practice of giving few contracts to African–Americans and using few African–Americans as consultants.

22. The practice of arbitrarily limiting the activities of the administrators of HBIs in a way that impedes their ability to protect the right of their students to receive nondiscriminatory educational opportunities.

### C. *Policies and/or Practices Concerning Admissions and Student Access*

23. The policy and practice, manifested through the years in a variety of ways, of minimizing the participation of black persons in the system of higher education (at all levels), with the consequence that there are 30–40 thousand fewer black Mississippians in higher education than there would be absent discrimination.

24. The State has continued its practice of denying black students equal access to the institutions of higher learning because of the entrance requirements established by the Board of Trustees, including the use of the ACT test scores, in a manner that disproportionately excludes black students from enrollment at historically white universities and relegates those students to the historically black schools.

25. The practice of using the ACT in selecting persons to receive scholarships at the undergraduate level.

26. The practice of using materials which do not inform potential applicants of the test score admission exceptions, or do so in a manner that is not clear.

27. The practice of using admission requirements that disproportionate numbers of black persons cannot satisfy due to inadequate course offerings, equipment and personnel in their local school districts.

28. The practice of using test score cutoffs in admitting persons to graduate and professional programs, on a regular admission basis, with the result that blacks are disproportionately excluded from these programs.

29. The practice of ailing to provide training programs to help staff and students cope effectively with racial diversity.

30. The practice of operating universities without academic and other programming appropriate for a university anticipating the attraction of a diverse student population.

31. The policy and practice of failing to administer the Junior Community College system (including coordination between the Junior Community College system and the four-year IHL system) to improve, and remove barriers to, black student access to baccalaureate education.

### D. *Policies and Practices Bearing Upon the Ability of the Historically Black Institutions to Attract Diverse Student Populations*

*Mission Statement*

32. The policy and practice of continuing to use the 1981 mission statement.

33. The policy and practice of operating only historically white institutions as major comprehensive institutions and historically black institutions as undeveloped institutions.

*Funding*

34. The policy and practice of operating the historically black institutions as inferior entities with less financial and other resources.

35. The policy and practice of providing greater funding per student to historically white universities than to the historically black universities which effectively eliminates the black universities as viable choices for attendance by white students.

36. The policy and practice of using a funding formula under which the level of funding turns upon factors shaped by racial discrimination (e.g., the mission statements and limited curricular offerings).

37. The policy and practice of using a funding formula which does not provide additional funds to either any university admitting large numbers of students from lower income families who need financial assistance, or any university admitting concentrations of students needing programs of academic/social support.

38. The policy and practice of providing special line item funding disproportionately to the HWIs with the result that the HBIs are further disadvantaged in their ability to compete for white students.

39. The policy and practice of maintaining a funding formula and a total funding structure (including athletic and other sources of revenue) which perpetuate the inequalities of the statutory dual system.

*Academic Programs*

40. The practice of failing to take the necessary steps (including the provision of required facilities) to secure the accreditation of programs at the HBIs.

41. The policy and practice of maintaining an allocation of baccalaureate degree programs which is unfavorable to the HBIs.

42. The policy and practice of maintaining an allocation of masters degree programs which is unfavorable to the HBIs.

43. The policy and practice of maintaining an allocation of doctoral degree programs which is unfavorable to the HBIs. These program allocation policies at the three levels of educational achievement have had the predictable result of artificially reducing the available pool of "qualified" black potential professorial candidates.

44. The policy and practice of maintaining a distribution of professional programs (and their governance) which is unfavorable to the HBIs.

45. The policy and practice of failing to establish unique attractive program offerings at historically black universities.

*Academic Programs—Land Grant*

46. The policy and practice of maintaining an allocation of land grant programs between ASU and MSU, which is unfavorable to ASU (this includes number and level of programs; number and level of staff, buildings and land available; federal and state funding; research and extension functions; and experimental stations). Subsumed under this are the following discrete elements:

(a) The policy and practice of having created and continuing to maintain ASU as a severely limited participant in the State's land grant structure;

(b) The policy and practice of maintaining limited land grant curricula offerings (resident instruction) at ASU compared to that offered at MSU, continuing the practice of the historic dual system with ASU having an inferior mission, number and level of academic programs with limited funding and facilities;

(c) The continuing policy and practice of providing limited or no state funding to ASU for land grant research and facilities for research as a result of decisions made by the State under the statutory dual system;

(d) The policy and practice of the State continuing to fail to designate ASU as a recipient of a share of the Hatch Act funds;

(e) The policy and practice of continuing to consign ASU's land grant research functions to the ultimate administration of MAFES, an entity of MSU;

(f) The policy and practice of continuing to relegate ASU to a more limited role in the State's land grant extension program as a result of ASU's status under the statutory dual system;

(g) The continuing policy and practice of providing limited or no state funding to ASU for land grant extension functions and facilities for extension as a result of decisions made by the State under the statutory dual system;

(h) The policy and practice of the State continuing to fail to designate ASU as a recipient of a share of Smith–Lever funds;

(i) The policy and practice of continuing to consign ASU's land grant extension functions to the ultimate administration of MCES, an entity of MSU.

*Academic Programs—Unnecessary Duplication*

47. The policy and practice of unnecessarily duplicating HBIs' programs and course offerings at HWIs.

*Facilities*

48. The policy and practice of maintaining facilities at the HBIs that are of lesser quality, in an overall sense, than those at the HWIs.

49. The policy and practice of maintaining libraries at the HBIs that are inferior to the libraries at the HWIs.

50. The policy and practice of maintaining a pattern of equipment availability (especially including the super computer) which is unfavorable to HBIs.

51. The policy and practice of maintaining JSU without adequate land.

52. The policy and practice of maintaining JSU without a football stadium controlled by JSU (adversely affecting JSU's ability to self-generate funds and its overall status as a university).

*Higher Education in Close Geographic Proximity to the Black Universities*

53. The policy and practice of operating "off campus" offerings of HWIs, in close proximity to HBIs, competing with HBIs for students, as well as utilizing facilities and other resources, including the Universities Center at Jackson competing with JSU.

54. The policy and practice of operating historically white junior colleges which compete with HBIs for students, including the operation of Hinds Community College at several locations in Jackson competing with JSU.

*Employment*

55. The policy and practice of the governing board of (i) ratifying employment recommendations of individual universities which perpetuate the racial identifiability of those universities; and (ii) failing to direct measures to change the basic racial result of the hiring processes of the individual universities which is that, on the whole, whites are hired to teach at predominantly white schools and blacks are hired to teach at predominantly black schools.

56. The policies and practices that govern the hiring processes of the individual universities that, on the whole, result in whites being hired to teach at predominantly black schools.

57. The failure of the Board to adopt and implement steps to eliminate the basic racial identifiability of the individual universities based upon the racial composition of the faculty and administrators of the universities.

58. The HWIs' practices of granting full professorship and tenure status to few African–American persons.

59. The policy and practice of paying lower salaries to the faculty at the HBIs than to the faculty at the HWIs.

*Number of Institutions*

60. Plaintiffs recognize that the issue of the number of institutions of higher education (senior and community colleges) to be operated is before the court.

*Athletic Competition*

61. The policy and practice of maintaining athletic competition in conferences whereby it is possible to identify the historic

racial identity of the university by reference to the conferences alone. Thus, the historically black universities compete in a conference where all of the members are historically black schools and the historically white universities compete in conferences composed exclusively of historically white schools.